**EXHIBIT A**

In The United States District Court

For The Middle District Of Florida

Jacksonville Division

Dustin DuFault,

Plaintiff,

V. CASE NO. 3:25-cv-683-MMH-MCR

Sheriff Bill Leeper, In His Official Capacity
as Sheriff of Nassau County;
Director John Anstett, In His Individual Capacity;
Sergeant Kellam Paolillo, In His Individual Capacity; And
Detective Ivan Pinkston, In His Individual Capacity;

Defendants.

# First Amended Complaint For Violations Of 42 U.S.C. § 1983

Plaintiff Dustin DuFault, pro se, alleges as follows:

## INTRODUCTION

**EXHIBIT A**

1. Plaintiff brings this action under 42 U.S.C. § 1983 against Sheriff Bill Leeper in his official capacity and against certain officials, including supervisors and investigators, in their individual capacities. The action challenges Defendants' unconstitutional policy or custom of affirmatively interfering with and obstructing the enforcement of Florida statutes when certain favored individuals are implicated. This custom has deprived Plaintiff of his rights under the Fourteenth Amendment to the United States Constitution, including substantive due process through arbitrary and conscience-shocking actions, and equal protection through disparate treatment in the handling of his reports. Plaintiff seeks damages from the responsible officials and *Monell* relief against the Sheriff.
2. While each constitutional claim is pleaded in a separate count, they share a common feature: In each episode, Defendants took affirmative steps to exempt Ms. Erin Schreiber—and her associates—from ordinary enforcement of criminal laws.
3. Ms. Schreiber is a Nassau County School Board employee and the mother of Plaintiff's three minor children. However, these matters do not arise from custody disputes or family court proceedings; they challenge only state action by Nassau County Sheriff's Office (NCSO) officials. For instance, Defendants refused to issue trespass warnings against Ms. Schreiber when

requested by Plaintiff and rescinded a duly issued trespass warning requested by Plaintiff's apartment complex management. When Plaintiff reported evidence of falsified school records for his children, NCSO declined to investigate. Finally, NCSO closed a child-abuse investigation involving Ms. Schreiber and her paramour based on a threshold legal rationale that foreclosed culpability, despite contrary evidence. These actions resulted in disparate treatment favoring Ms. Schreiber over similarly situated complainants.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and § 1343(a)(3) (civil rights actions), as the claims arise under the Constitution of the United States and 42 U.S.C. § 1983.
5. Venue is proper under 28 U.S.C. § 1391(b)(2), as all events giving rise to the claims occurred in Nassau County, within the Middle District of Florida.

## PARTIES

6. **Plaintiff.** Dustin DuFault is an adult resident of Nassau County, Florida. He is the father of three minor children and brings this action pro se to vindicate his constitutional rights arising from Defendants' interference

**EXHIBIT A**

with criminal law enforcement in matters involving his family and property. His children are identified in this pleading by initials consistent with Fed. R. Civ. P. 5.2.

7. **Defendants:**

a. Defendant Sheriff Bill Leeper is the elected Sheriff of Nassau County, Florida, sued in his official capacity as head of the Nassau County Sheriff's Office (NCSO). This suit, actionable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), seeks compensatory damages, declaratory relief, and injunctive relief against the NCSO entity for its unconstitutional policies and customs. At all times relevant to this complaint, Sheriff Leeper was the final policymaker with respect to law enforcement policies, practices, and training.

b. Defendant John Anstett is Director of Law Enforcement Operations for the Nassau County Sheriff's Office. He is sued in his individual capacity for damages. At all times relevant to this complaint, he acted under color of state law and exercised supervisory authority over law enforcement operations.

c. Defendant Kellam Paolillo was a Sergeant with the Nassau County Sheriff's Office. He is sued in his individual capacity for damages. At all times relevant to this complaint, he acted under color of state law as a

supervising law enforcement officer.

d. Defendant Ivan Pinkston is a Detective with the Nassau County Sheriff's Office. He is sued in his individual capacity for damages. At all times relevant to this complaint, he acted under color of state law as an investigating officer.

## FACTUAL ALLEGATIONS

### A. Background and Family Framework

8. Plaintiff Dustin DuFault is an adult resident of Nassau County, Florida, along with his three minor children: L.C.D. (born 2012); S.C.D. (born 2014); and S.M.D. (born 2016), identified by initials per Fed. R. Civ. P. 5.2. Ms. Erin Schreiber, the children's mother and a Nassau County School Board employee, shares legal custody under a parenting plan from Nassau County Circuit Court. The plan sets specific timesharing and exchanges but grants no entry rights to either parent's residence outside designated periods (Exhibit A: Relevant Excerpts from Parenting Plan).

9. Ms. Schreiber is employed by the Nassau County School Board. As documented below, she has repeatedly received preferential treatment from NCSO when criminal laws would otherwise apply to her conduct.

**EXHIBIT A**

These incidents occurred between 2023 and 2024 and caused ongoing harm to Plaintiff and his children.

**B. The Trespass Enforcement Obstruction**

10. Throughout 2023 and continuing today, Plaintiff resided at Eastwood Oaks Apartments, a private apartment complex in Hilliard, Nassau County, Florida. Plaintiff repeatedly informed Ms. Schreiber that she was not welcome to come to his home unless explicitly invited or during swaps of the children as described in the adopted parenting plan.

11. Despite this, Ms. Schreiber repeatedly entered or attempted entry to Plaintiff's home during Plaintiff's timesharing periods. Her conduct involved screaming at Plaintiff and his children, banging on and opening the door to their home, and often required police intervention to restore order and stop Plaintiff's family from being confined in fear.
12. Each time Ms. Schreiber engaged in this conduct, Plaintiff contacted NCSO to restore peace and asked the responding officers to trespass Ms. Schreiber. Ms. Schreiber would tell the responding officers that she could not be trespassed because she had a parenting plan that allowed her to pick up the children from Plaintiff's home. Based on Ms. Schreiber's characterization of

**EXHIBIT A**

the parenting plan, and without reviewing its contents, the responding officers declined to issue trespass warnings.

13. On June 11, 2024, Ms. Schreiber picked up Plaintiff's children for a "dinner visit" that encompassed several hours in the evening. When returning the children to Plaintiff's home, Ms. Schreiber informed Plaintiff that she would return in the morning to pick up L.C.D. and take her to her therapy appointment, claiming that Plaintiff was unwilling to drive L.C.D. to her appointment. That was not true, and when Plaintiff attempted to explain that L.C.D.'s care providers had decided it was best for therapeutic reasons to do a telehealth session the following day, Ms. Schreiber became enraged and insisted she would return for an in-person appointment. This demand was unacceptable to Plaintiff and did not comport with the adopted parenting plan. Plaintiff made it clear to Ms. Schreiber that this was not acceptable and instructed her not to return to his home the following day.

14. Despite Plaintiff's admonishment, Ms. Schreiber returned on the morning of June 12, 2024, and began banging on Plaintiff's door and screaming. These actions caused fear and distress to Plaintiff and his children, who ran and hid, and caused L.C.D. to miss her therapy appointment. Plaintiff messaged Ms. Schreiber via Our Family Wizard (OFW) asking her to leave so that he would not need to involve the police again. This message is

**EXHIBIT A**

incorporated under Exhibit A. Ms. Schreiber did not leave, so Plaintiff contacted NCSO, and deputies responded.

15. When the deputies arrived, Plaintiff again asked them to trespass Ms. Schreiber. Ms. Schreiber again told the officers that she could not be trespassed due to the parenting plan. The responding officers adopted Ms. Schreiber's interpretation and representation of the parenting plan as barring Plaintiff from having trespass rights under the law. Instead, the officers asked Ms. Schreiber to leave the property at that time, which she did. The officers then left shortly afterward.

16. Within 5 minutes of the officers' departure, Ms. Schreiber returned to Plaintiff's home and began engaging in substantially similar conduct, prompting Plaintiff to contact NCSO again. The same officers returned to the apartment complex. Without speaking to or receiving direction from Plaintiff, the officers spoke with the management of Eastwood Oaks Apartments, who independently stated they had received many complaints about Ms. Schreiber's conduct on the property and wanted to trespass her. The officers accepted the trespass request from apartment complex management, but by this time Ms. Schreiber had departed. They then informed Plaintiff that Ms. Schreiber would be subject to criminal trespass if

**EXHIBIT A**

she returned to any portion of the Eastwood Oaks Apartments property, and they recorded it in their system.

17. Plaintiff informed Ms. Schreiber of these developments via OFW. As this would require a modification of the swap location in the parenting plan, Plaintiff suggested the Library as a closer alternative that the children enjoy. Plaintiff made it clear, based on the deputies' instructions, that returning to Eastwood Oaks Apartments was not an option, and that barring an alternate suggestion from Ms. Schreiber, Plaintiff would be at the Library for the next swap on June 17, 2024.

18. On the morning of June 17, 2024, Ms. Schreiber returned to Eastwood Oaks Apartments. A trespass warning was issued to Ms. Schreiber by NCSO, and Plaintiff was given a copy. Ms. Schreiber was given clear warning by NCSO Deputies Sellers and McClendon that she would be arrested if she returned to the property. A copy of the Trespass Warning is included as Exhibit B.

19. Later that morning, Ms. Schreiber contacted NCSO claiming, "She doesn't want to complain but just wants to understand what's going on." Deputy Sergeant Kellam Paolillo responded to Ms. Schreiber's call and "picked up and voided" Ms. Schreiber's copy of the trespass warning as documented in his call for service report.

**EXHIBIT A**

20. An unknown deputy then came to Plaintiff's home to notify him of this development. The deputy requested that Plaintiff surrender his copy of the trespass warning, and Plaintiff declined.

21. At 2:53 p.m., Plaintiff contacted NCSO to discuss the decision to void the trespass warning with higher-ranking officers and was referred to Deputy Sergeant Kellam Paolillo, who contacted Plaintiff via phone. Paolillo advised Plaintiff that the trespass warning would not be issued "due to the court order in place and after consulting with NCSO Legal Counsel," as memorialized in his Call For Service Detail Report. Plaintiff then asked Paolillo to have his supervising Lieutenant Griffith contact him to discuss the matter further. Both of Deputy Sergeant Kellam Paolillo's reports are incorporated as Composite Exhibit C.

22. At 5:12 p.m., Plaintiff emailed Sheriff Bill Leeper with his assessment of the legally precarious actions taken by his officers. Sheriff Leeper did not respond to this email, which is incorporated as Exhibit D.

23. At 5:42 p.m., Plaintiff had not been contacted by Lieutenant Griffith and called NCSO dispatch to inquire. Plaintiff was told another request was entered and that there appeared to be a problem with the prior request. Plaintiff does not recall receiving a call from Lieutenant Griffith, and a

**EXHIBIT A**

record of the call was not produced in Plaintiff's public records requests to NCSO.

24. On June 13, 2024, Plaintiff contacted NCSO General Counsel Bobby Lippelman in a good faith attempt to resolve this matter extrajudicially (Exhibit E: Emails). Plaintiff did not receive a response from Mr. Lippelman but received a phone call from NCSO Director of Law Enforcement Operations John Anstett on behalf of Mr. Lippelman on June 16, 2024. Mr. Anstett reiterated NCSO's policy of not enforcing trespass laws when a party has a parenting plan, regardless of its provisions or property rights. When Plaintiff asked Mr. Anstett to state this policy in writing via email, Mr. Anstett declined "unless something changes." This interaction demonstrates the chain-of-command's reliance on legal advice to support non-enforcement in such cases, contributing to the pattern favoring Ms. Schreiber and causing ongoing harms to Plaintiff's family security. Plaintiff memorialized the details of this conversation in his own email to Mr. Lippelman on June 16, 2024, and never received a response disputing the accuracy of that memorialization. Plaintiff's emails to Mr. Lippelman are incorporated as Exhibit E.

25. On information and belief, Eastwood Oaks management did not request rescission of the trespass warning and continues to authorize NCSO to enforce trespass against Ms. Schreiber on the property.

**C. The Falsified School Records Report and Inaction**

26. During the 2022-2023 school year, Ms. Schreiber was employed by the Nassau County School Board as a part-time teacher, and Plaintiff's children attended Nassau County schools. On multiple occasions during Plaintiff's timesharing, the children described being picked up from school by Ms. Schreiber shortly after Plaintiff dropped them off, taken to Ms. Schreiber's home to play board and/or card games, and returned to school shortly before Plaintiff arrived in the school pickup line. This was confusing, as Nassau County schools use an automated alert system for absences. Upon information and belief based on the children's reports and Plaintiff's personal knowledge, Ms. Schreiber was unresponsive to Plaintiff's attempts to communicate that this was unacceptable.

27. After exhausting attempts to reach a reasonable agreement with Ms. Schreiber, Plaintiff emailed the principal of Hilliard Elementary School (where the conduct occurred), the principal of Hilliard Middle-Senior High School (L.C.D.'s new school and Ms. Schreiber's employer), and the school superintendent on September 28, 2023, raising concerns about removals

without notifications. Plaintiff received a cursory response related to his records request but which did not address the children's claims. When Plaintiff collected the records from the school office, Principal Loudermilk of Hilliard Elementary School explained that after a certain time of day, children were counted as present for funding purposes, likely explaining the lack of notifications. On information and belief, as a school board employee, Ms. Schreiber knew of this record-keeping practice and may have exploited it to conceal her activities (details in Exhibit F: Composite Document).

28. Ms. Schreiber's conduct continued during the 2023-2024 school year. She removed L.C.D. from her classroom and the school campus on multiple occasions without generating attendance reports to Plaintiff. When questioned, Ms. Schreiber messaged Plaintiff via Our Family Wizard (OFW) claiming her actions were sanctioned by specific school officials. However, after reviewing the message with the principal, Plaintiff learned the purported conversations had not occurred. Ms. Schreiber also referred to herself as L.C.D.'s "Teacher of Record" as if it were a disinterested third party. On information and belief, the OFW message was intended to conceal interference with accurate attendance reporting of L.C.D. (Exhibit F: Including OFW details).

**EXHIBIT A**

29. Limited records and School Board oversight hindered redress, despite Florida Statutes requiring accurate attendance records (e.g., Fla. Stat. § 1003.23). This changed on May 7, 2025, when Ms. Schreiber filed a sworn, verified emergency motion in the family case (*PETITIONER/FORMER WIFE'S VERIFIED EMERGENCY MOTION TO SUSPEND TIMESHARING AND/OR OTHER RELIEF*, Docket #343; Case No. 2019-DR-974; Fourth Judicial Circuit Court of Florida in Nassau County), averring under penalty of perjury that on April 28, 2025, L.C.D. was "too distraught to attend her classes until 5th period" and suffered "an extreme panic attack." Without challenging state proceedings, this evidences reliance on misrepresented attendance to reduce Plaintiff's timesharing (Exhibit H: Redacted Motion Excerpts, if available).

30. Ms. Schreiber secured permission for L.C.D. (12 years old) to testify as a minor at the resulting emergency hearing. L.C.D. testified under oath that she did not attend classes on April 28, 2025, and the court found her credible (Exhibit H: Redacted Hearing Excerpts, if available). This reference illustrates harms from alleged federal violations, without relitigating state matters.

31. Despite these sworn averments, L.C.D.'s academic records reflect her as present in each class on April 28, 2025. On information and belief, this

required teachers to make false entries or a central actor to modify the records (Exhibit F: Re: Discrepancies).

32. On June 3, 2025, Plaintiff sent a public records request to Assistant Superintendent Mark Durham, describing Ms. Schreiber-linked discrepancies and unrecorded removals (Exhibit F: June 3 Email). Mr. Durham responded on June 19, 2025, that all student check-outs and check-ins should be recorded (Exhibit F).

33. Plaintiff then assembled all of the documentation he had collected regarding the discrepancies in his children's attendance records and brought them to NCSO headquarters in Yulee, Florida, circa June 23, 2025, requesting to speak with a detective to discuss investigating potential criminal conduct. A deputy was dispatched to review the materials Plaintiff brought in. After reviewing, the deputy stated that discrepancies appeared in the data provided but, instead of referring the matter to a detective, inquired what Plaintiff wanted done with the information. When Plaintiff reaffirmed his request for investigation—explaining he had dealt with these issues for years—the deputy pressed whether Plaintiff sincerely wanted to pursue criminality among potentially involved parties (teachers, principals, etc.). The deputy then recounted his upbringing in Hilliard, recalling children wandering campus during school and opining that accurate

**EXHIBIT A**

attendance records were not a reasonable standard under those circumstances. On information and belief based on Plaintiff's personal knowledge of the interaction, this view contradicted Florida Statutes and Assistant Superintendent Mark Durham's policy stating that check-ins and check-outs must be recorded. Plaintiff's records, however, indicated manipulation to conceal conduct not beneficial to the children. Nevertheless, the deputy declined to refer the materials for further investigation. The composite document Plaintiff submitted to NCSO is attached as Exhibit F.

34. On the evening of September 19, 2025, Plaintiff spoke with S.C.D. after receiving a school notification of S.C.D.'s last-period absence. S.C.D. explained that he left early with Ms. Schreiber for the homecoming parade and mid-first period (her Drama Class) to change clothes from the previous day; however, S.C.D.'s attendance record did not reflect the first-period absence.

35. On the evening of September 21, 2025, Plaintiff clarified the circumstances with S.C.D., who confirmed leaving mid-first period after school began.

36. These conversations with S.C.D. were video-recorded pursuant to a prior court order secured by Ms. Schreiber (full recordings available upon request).

**EXHIBIT A**

37. Florida Statute § 1003.23 requires accurate attendance records for all students via its invocation of rules set forth by the State Board of Education. Falsification of public records is a criminal offense under Florida Statute § 839.13. Despite clear evidence of systematic attendance record falsification affecting Plaintiff's children, NCSO refused to investigate, demonstrating selective enforcement that favors Ms. Schreiber.

38. NCSO's failure to investigate these claims, including the sentiments expressed to Plaintiff citing school connections as a reason not to proceed, exemplifies the custom of preferential non-enforcement (Para. 9) and deliberate indifference (Para. 24), contributing to the erosion of evidence regarding the wellbeing of Plaintiff's children in Ms. Schreiber's care.

**D. The Child Abuse Investigation Obstruction**

39. On April 11, 2024, Plaintiff picked his children up from school to begin his timesharing period. As is his custom, they returned to Plaintiff's apartment and began preparing to go swimming in the apartment pool. When preparing, it became evident that S.C.D. had extensive bruising across his back and arms, including handprint bruises on both arms. S.C.D. and his siblings described him getting into an altercation with Ms. Schreiber and her paramour, Richard "Noah"

Raulerson, who is also a teacher and employee of the Nassau County School Board.

40. To ensure S.C.D.'s safety and wellbeing, Plaintiff took him to a local hospital for evaluation, where he was medically coded for child abuse, and the attending staff made referrals to the Department of Children and Families (DCF) and Nassau County Sheriff's Office. NCSO officers Hagan and Millan responded to the hospital, took evidentiary photos, and conducted interviews with Plaintiff's children. On information and belief, the body-worn camera footage recorded during these interviews should have been retained as evidence under Florida's General Records Schedule GS2 for Criminal Justice Agencies and District Medical Examiners (7 years after age of majority or 4 years from discovery, whichever later). However, Plaintiff has been unable to obtain this footage through public records requests to NCSO, which stated the records were disposed of under generalized retention schedules.

41. Detective Ivan Pinkston was assigned to investigate the abuse claim. Detective Pinkston contacted Plaintiff and stated he would be unable to begin his investigatory process until DCF provided their report. Based on Detective Pinkston's account, the responsible person was out of town,

**EXHIBIT A**

causing the investigation to begin after the DCF "Safety Plan" had already run.

42. DCF determined that the primary culpable party was Ms. Schreiber's paramour, Richard "Noah" Raulerson, with culpability for Ms. Schreiber for failing to protect.

43. When Detective Pinkston received the DCF report, he contacted Plaintiff and stated he would interview Raulerson the following morning.

44. Pinkston erroneously applied *in loco parentis* immunity to Raulerson, misusing Florida jury instructions despite case law limiting it to qualifying relationships and noting that excessive bruising exceeds reasonable discipline (on information and belief; e.g., *Paddock v. Gierada*, 2018 WL 4511977 (M.D. Fla. 2018)). The investigation ignored witnesses, evidence, and severity, without prosecutor input. Anstett ratified the closure (on information and belief; Para. 7(b)). The sham disposition created false "no abuse" records, which Ms. Schreiber exploited for counter-claims portraying Plaintiff negatively, further eroding his timesharing and shocking the conscience by endangering S.C.D.

**E. Ratification, Custom Evidence, and Harms**

45. Plaintiff complained to Sheriff Bill Leeper (official capacity, Para. 7(a)) about

this pattern on dates including August 5 and September 1, 2024, via letters and Fla. Stat. Ch. 119 requests for records (Exhibit G: Complaints and PRR Denials). Leeper ratified by inaction, despite notice of the custom. Denials created evidentiary gaps, alleged here on information and belief from pre-suit diligence, unanswered queries, and circumstantial proof (e.g., dispatch recording of "stand down" directive for Schreiber matters, obtained via her PRR; Exhibit H: Transcript).

46. Collectively, these incidents demonstrate Defendants' policy or custom of obstructing enforcement for Ms. Schreiber and associates (Paras. 1-3), via Paolillo's voiding, Pinkston's mishandling, Anstett's supervision, and Leeper's deliberate indifference. This reflects *Monell* liability for deliberate indifference, causing disparate treatment, conscience-shocking dangers, emotional/familial harm, and parental deprivations via falsified reports—under NCSO scope, with individual liability potential under Fla. Stat. § 111.07. Relief is sought solely for federal violations, not state proceedings.

**CLAIMS FOR RELIEF**

**COUNT I: 42 U.S.C. § 1983 – Violation of Fourteenth Amendment Substantive Due Process (General Allegation)**

**EXHIBIT A**

47. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

48. Defendants Sergeant Paolillo, Detective Pinkston, and John Does #1-4, acting under color of state law, deprived Plaintiff of his substantive due process rights under the Fourteenth Amendment by engaging in arbitrary and conscience-shocking conduct. This includes voiding a valid third-party trespass warning without justification, directing a sham child abuse investigation that ignored mandatory protocols, and destroying evidence, all pursuant to a policy of selective non-enforcement.

49. These affirmative acts created and enhanced foreseeable dangers to Plaintiff and his minor children, interfering with his liberty interest in familial security and parental association. The conduct reflects deliberate indifference and shocks the conscience, as Defendants knew of the risks from reports and DCF findings but chose leniency favoring Ms. Schreiber.

50. Defendant Sheriff Leeper, in his official capacity, is liable for failing to supervise or train personnel, ratifying the policy through notice and inaction.

51. As a direct and proximate result, Plaintiff has suffered emotional distress, familial disruption, and other damages.

EXHIBIT A

**COUNT II: 42 U.S.C. § 1983 – Violation of Fourteenth Amendment Equal Protection**

52. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

53. Defendants, under color of state law, violated Plaintiff's right to equal protection under the Fourteenth Amendment by selectively treating reports implicating Ms. Schreiber with undue leniency, without any rational basis. For example, they voided a third-party trespass, closed an abuse case despite contrary evidence, and denied records that would have been produced for non-favored individuals.

54. On information and belief, based on denied public records and the pattern described, NCSO enforces similar trespass and abuse laws against non-affiliated persons but defers here due to Ms. Schreiber's status, creating a class-of-one discrimination (*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)).

55. Defendant Leeper, in his official capacity, is liable for maintaining this discriminatory custom.

56. This unequal treatment proximately caused harm to Plaintiff, including ongoing insecurity and distress.

EXHIBIT A

**COUNT III: 42 U.S.C. § 1983 – Monell Claim Against Municipality for Unconstitutional Policy or Custom**

57. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

58. NCSO and Defendant Leeper (official capacity) are liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), for maintaining a policy or custom of inadequate training and supervision on impartial law enforcement, including mischaracterizing criminal matters as "civil" and conducting superficial investigations for favored individuals.

59. This practice is widespread, as evidenced by multiple incidents (trespass rescission, abuse closure, record falsifications decline), Sheriff Leeper's notice, and denied public records concealing details. It reflects deliberate indifference to constitutional rights, causing the violations herein (*Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997)).

60. The policy directly and proximately caused Plaintiff's injuries, as a proper custom would have prevented the harms.

**COUNT IV: 42 U.S.C. § 1983 – Violation of Fourteenth Amendment Substantive Due Process (State-Created Danger in Child Abuse Investigation)**

**EXHIBIT A**

61. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

62. Defendants Detective Pinkston, John Does #1-4, and Sergeant Paolillo, under color of state law, violated Plaintiff's substantive due process rights by affirmatively creating or enhancing danger to his minor son S.C.D. through a sham child abuse investigation. With actual knowledge of risks (ER coding, DCF culpability, child statements), they delayed action, conducted a cursory interview, misapplied law, closed the case unfounded, and destroyed evidence—acts that emboldened perpetrators and perpetuated endangerment (*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989)—state-created danger exception).

63. This conduct shocks the conscience and constitutes deliberate indifference, as Defendants chose to shield Ms. Schreiber and her paramour despite mandatory duties (*County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). But for these actions, the risks would not have been enhanced, harming S.C.D.'s safety and Plaintiff's parental security.

64. Defendant Leeper, in his official capacity, is liable for the policy enabling this danger.

**EXHIBIT A**

65. Plaintiff has suffered direct harms, including familial insecurity and emotional distress from the prolonged exposure to identified risks.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and provide the following relief:

a. A declaratory judgment that Defendants' policy or custom of selective non-enforcement and inadequate investigations violates the Fourteenth Amendment;

b. A permanent injunction requiring Defendants to: (i) reinstate and enforce the trespass warning against Ms. Schreiber; (ii) re-open and conduct a full, unbiased re-investigation of the child abuse incident, including recovery or explanation of destroyed footage and review of comparable cases; (iii) produce all responsive public records under Fla. Stat. Ch. 119 with a sworn affidavit for any withholdings; (iv) implement training on impartial enforcement of Fla. Stat. §§ 810.09 and 39.205; and (v) preserve all related evidence;

c. Compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial (at least $250,000), for emotional distress, familial interference, lost timesharing, and evidence erosion (Paras 38, 46);

d. Punitive damages against the individual Defendants (Paolillo, Anstett, Pinkston) for reckless and deliberate indifference;

**EXHIBIT A**

e. Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

f. Expedited discovery under Fed. R. Civ. P. 26 on Defendants' policies, investigations, and comparable cases;

g. A trial by jury on all triable issues pursuant to Fed. R. Civ. P. 38; and

h. Such other and further relief as the Court deems just and proper.

## VERIFICATION

I, Dustin DuFault, declare under penalty of perjury under the laws of the United States of America (28 U.S.C. § 1746) that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: September 24, 2025

Dustin DuFault

Pro Se Plaintiff

815 Stanley Drive

Fernandina Beach, FL 32034

410.982.9607

dustin@halcyonharbor.com

**EXHIBIT A**

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable pursuant to Fed. R. Civ. P. 38.