FILED - USDC - FLMD - JAX
SEP 26 2025 PM4:00

In The United States District Court
For The Middle District Of Florida
Jacksonville Division

Dustin DuFault, 3:25-cv-683-MMH-MCR

Plaintiff,

V.

Sheriff Bill Leeper, In His Official Capacity
as Sheriff of Nassau County;
Director John Anstett, In His Individual Capacity;
Sergeant Kellam Paolillo, In His Individual Capacity; And
Detective Ivan Pinkston, In His Individual Capacity;

Defendants.

**First Amended Complaint For Violations Of 42 U.S.C. § 1983**

INTRODUCTION

1. Plaintiff brings this § 1983 action against Sheriff Bill Leeper in his official capacity and against certain officials including supervisors and investigators in their individual capacities. The action challenges Defendants' unconstitutional policy or custom of affirmatively interfering with and obstructing the enforcement of Florida Statutes, when certain favored individuals are implicated. This custom has deprived Plaintiff of his rights under the Fourteenth Amendment to the United States Constitution, including

substantive due process through arbitrary and conscience-shocking actions, and equal protection through disparate treatment in the handling of his reports. Plaintiff seeks damages from the responsible officials and *Monell* relief against the Sheriff.

2. While each constitutional claim is pleaded in a separate count, they share a common feature: in each episode, Defendants took affirmative steps to exempt Ms. Erin Schreiber—and her associates—from ordinary enforcement of criminal laws.

3. Ms. Schreiber is a Nassau County School Board employee and the mother of Plaintiff's three minor children. However, these matters do not arise from custody disputes or family court proceedings; they challenge only state action by NCSO officials. For instance, Defendants refused to issue trespass warnings against Ms. Schreiber when requested by Plaintiff and rescinded a duly issued trespass warning issued to Ms. Schreiber which was requested by Plaintiff's apartment complex management. When Plaintiff reported evidence of falsified school records for his children, NCSO declined to investigate. Finally, NCSO closed a child-abuse investigation involving Ms. Schreiber and her paramour based on a threshold legal rationale that foreclosed culpability, despite contrary evidence. These actions resulted in disparate treatment favoring Ms. Schreiber over similarly situated complainants.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and § 1343(a)(3) (civil rights actions), as the claims arise under the Constitution of the United States and 42 U.S.C. § 1983.

5. Venue is proper under 28 U.S.C. § 1391(b)(2), as all events giving rise to the claims occurred in Nassau County, within the Middle District of Florida.

## PARTIES

6. **Plaintiff.** Plaintiff Dustin DuFault is an adult resident of Nassau County, Florida. He is the father of three minor children and brings this action pro se to vindicate his constitutional rights arising from Defendants' interference with criminal law enforcement in matters involving his family and property. His children are identified in this pleading by initials consistent with Fed. R. Civ. P. 5.2.

7. **Defendants.**

   A. Defendant Sheriff Bill Leeper is the elected Sheriff of Nassau County, Florida, sued in his official capacity as head of the Nassau County Sheriff's Office (NCSO). This suit, actionable under *Monell v. Dep't of Soc. Servs.*, 436

*U.S. 658 (1978)*, seeks compensatory damages, declaratory relief, and injunctive relief against the NCSO entity for its unconstitutional policies and customs. At all times relevant to this complaint, Sheriff Leeper was the final policymaker with respect to law enforcement policies, practices, and training.

B. Defendant John Anstett is Director of Law Enforcement Operations for the Nassau County Sheriff's Office. He is sued in his individual capacity for damages. At all times relevant to this complaint, he acted under color of state law and exercised supervisory authority over law enforcement operations.

C. Defendant Kellam Paolillo was a Sergeant with the Nassau County Sheriff's Office. He is sued in his individual capacity for damages. At all times relevant to this complaint, he acted under color of state law as a supervising law enforcement officer.

D. Defendant Ivan Pinkston is a Detective with the Nassau County Sheriff's Office. He is sued in his individual capacity for damages. At all times relevant to this complaint, he acted under color of state law as an investigating officer.

FACTUAL ALLEGATIONS

**A. Background and Family Framework**

8. Plaintiff Dustin DuFault is an adult resident of Nassau County, Florida, along with his three minor children: L.C.D., born 2012; S.C.D., born 2014; and the youngest S.M.D., born 2016, identified by initials per Fed. R. Civ. P. 5.2. Ms. Erin Schreiber, the children's mother and a Nassau County School Board employee, shares legal custody under a parenting plan from Nassau County Circuit Court. The plan sets specific timesharing and exchanges but grants no entry rights to either parent's residence outside designated periods (Exhibit A: Relevant Excerpts from Parenting Plan).

9. Ms. Schreiber is employed by the Nassau County School Board. As documented below, she has repeatedly received preferential treatment from NCSO when criminal laws would otherwise apply to her conduct. These incidents occurred between 2023 and 2024 and caused ongoing harm to Plaintiff and his children.

**B. The Trespass Enforcement Obstruction**

10. Throughout 2023 and through today, Plaintiff resided at Eastwood Oaks Apartments, a private apartment complex in Hilliard, Nassau County, FL. Plaintiff repeatedly informed Ms. Schreiber that she was not welcome to come

to his home unless explicitly invited, or during their swapping of the children as described in the adopted parenting plan.

11. Despite this, Ms. Schreiber repeatedly entered or attempted entry to Plaintiff's home during Plaintiff's visitation periods. Her conduct involved screaming at Plaintiff and his children, banging on and opening the door to their home, and often required police intervention to restore order and stop Plaintiff's family from being "confined in fear" in their home.

12. Each time Ms. Schreiber engaged in this conduct, Plaintiff contacted NCSO to restore peace and order at his home. In each case, Plaintiff would ask the responding officers to trespass Ms. Schreiber. Ms. Schreiber would then tell the responding officers that she could not be trespassed because she had a parenting plan that states she picks the children up from Plaintiff's home. Based on Ms. Schreiber's characterization of the parenting plan, and without reviewing its contents, the responding officers declined to issue trespass warnings to Ms. Schreiber.

13. On June 11th, 2024 Ms. Schreiber picked up Plaintiff's children for a "dinner visit" which encompassed several hours in the evening. When returning the children to Plaintiff's home, Ms. Schreiber informed Plaintiff that she would return in the morning to pick up L.C.D and take her to her therapy appointment, claiming that Plaintiff was unwilling to drive L.C.D. to her

appointment. That was not true, and when Plaintiff attempted to explain to Ms. Schreiber that L.C.D.'s care providers had decided it was best for L.C.D. therapeutically to do a telehealth session the following day, Ms. Schreiber became enraged and insisted she would return in the morning to take L.C.D. to an in person appointment. This demand was unacceptable to Plaintiff and did not comport with the adopted parenting plan. As such, Plaintiff made it clear to Ms. Schreiber that this was not acceptable and not to return to his home the following day.

14. Despite Plaintiff's admonishment to Ms. Schreiber, she did return on the morning of June 12, 2024, and began banging on Plaintiff's door and screaming. These actions caused fear and distress to Plaintiff and his children, who ran and hid, and caused L.C.D. to miss her Therapy appointment. Plaintiff messaged Ms. Schreiber in *Our Family Wizard* once again asking her to leave so that Plaintiff would not need to again involve the police. This message is incorporated under Exhibit A. Ms. Schreiber did not leave and so Plaintiff contacted NCSO and deputies responded.

15. When the deputies arrived, Plaintiff once again asked them to trespass Ms. Schreiber. Ms. Schreiber again told the responding officers that she couldn't be trespassed due to the parenting plan. The responding officers again adopted Ms. Schreiber's interpretation and representation of the parenting plan as

barring Plaintiff from having trespass rights under the law. Instead – the responding officers asked Ms. Schreiber to leave the property at that point in time, which she did. Shortly afterwards, the officers also left.

16. Within 5 minutes of the officers' departure, Ms. Schreiber again returned to Plaintiff's home and began engaging in substantially similar conduct, prompting Plaintiff to again contact NCSO. The same officers returned back to Plaintiff's apartment complex. Without speaking to or with direction from the Plaintiff, the officers spoke with the management of Eastwood Oaks Apartments, who independently said they'd had many complaints about Ms. Schreiber's conduct on the property and that *they* wanted to trespass her. The officers accepted the trespass request from apartment complex management, but by this time Ms. Schreiber had departed. They then came back to my apartment and informed me of these events, and let me know that they were unable to cite Ms. Schreiber at that time because she'd already left, but to inform her that they had now received a valid trespass request, had recorded it in their system, and that she would be subject to criminal trespass if she returned to any portion of Eastwood Oaks Apartments property.

17. Plaintiff did inform Ms. Schreiber of these developments via *Our Family Wizard*. As this would require a modification of the swap location in the parties parenting plan, and Plaintiff suggested the Library as it is closer to Ms.

Schreiber's home and a location the children enjoy going to anyway, and offered for Ms. Schreiber to propose other locations. Plaintiff made it clear, based on the deputies instructions, that returning to Eastwood Oaks Apartments was not an option, and that barring a response with an alternate suggestion, that Plaintiff would be at the Library at the next swap date of June 17th, 2024.

18. On the morning of June 17, 2024 Ms. Schreiber returned to Eastwood Oaks Apartments. A trespass warning was issued to Ms. Schreiber with clear by NCSO, and Plaintiff was given a copy. Ms. Schreiber was given clear warning by NCSO deputies Sellers and McClendon that she would be arrested if she returned to the Eastwood Oaks Apartments property. A copy of the Trespass Warning is included as **Exhibit B.**

19. Later that morning, Ms. Schreiber contacted NCSO claiming, "She doesn't want to complain but just wants to understand what's going on." Deputy Sergeant Kellam Paolillo responded to Ms. Schreiber's call and "picked up and voided" Ms. Schreiber's copy of the trespass warning she was issued on behalf of Eastwood Oaks Apartments as documented in a call for service report he wrote.

20. An unknown deputy then came to Plaintiff's home to notify him of this development. The deputy requested that Plaintiff surrender his copy of the trespass warning and Plaintiff declined.

21. At 2:53pm Plaintiff contacted the NCSO to discuss the decision to void the trespass warning with higher ranking officers in the chain of command and was referred to Deputy Sergeant Kellam Paolillo, who contacted Plaintiff via phone. Paolillo advised Plaintiff that the trespass warning would not be issued "due to the court order in place and after consulting with NCSO Legal Counsel." As memorialized in his Call For Service Detail Report. I then asked officer Paolillo to have his supervising Lieutenant Griffith contact me to discuss the matter further. Both of Deputy Sergeant Kellam Paolillo's reports are incorporated as **Composite Exhibit C.**

22. At 5:12pm, Plaintiff emailed Sheriff Bill Leeper with his assessment of the legally precarious actions being taken by his officers. Mr. Leeper did not respond to Plaintiff's email, which is incorporated as **Exhibit D.**

23. At 5:42pm Plaintiff had not been contacted by Lieutenant Griffith and therefore called in to dispatch to inquire if he would be contacting me. Plaintiff was told another request was entered and that it appeared there was some kind of problem with the prior request. Plaintiff does not recall getting a call from

Lieutenant Griffith and a record of the call was not produced in Plaintiff's public records requests to NCSO.

24. On June 13, 2025, Plaintiff contacted NCSO General Counsel Bobby Lippelman in a good faith attempt to resolve this matter extrajudicially **(Exhibit E: Emails)**. Plaintiff did not receive a response from Mr. Lippelman, but did receive a phone call from NCSO Director of Law Enforcement Operations John Anstett on behalf of Mr. Lippelman on June 16, 2025. Mr. Anstett reiterated NCSO's policy of not enforcing trespass laws when a party has a parenting plan, regardless of its provisions or property rights (Para. 7B). When Plaintiff asked Mr. Anstett to state this policy in writing via email, Mr. Anstett declined to do so "unless something changes." This interaction demonstrates the chain-of-command's reliance on legal advice to support non-enforcement in such cases, contributing to the pattern favoring Ms. Schreiber and causing ongoing harms to Plaintiff's family security. Plaintiff memorialized the details of this conversation in his own email to Mr. Lippelman on June 16, 2025, and never received a response disputing the accuracy of that memorialization. Plaintiff's emails to Mr. Lippelman are incorporated as **Exhibit E**.

25. On information and belief, Eastwood Oaks management did not request rescission of the trespass warning and continues to authorize NCSO to enforce trespass against Ms. Schreiber on the property.

**C. The Falsified School Records Report and Inaction**

26. During the 2022-2023 school year, Ms. Schreiber was employed by the Nassau County School Board as a part-time teacher, and Plaintiff's children attended Nassau County schools. On multiple occasions during Plaintiff's timesharing, the children described being picked up from school by Ms. Schreiber shortly after Plaintiff dropped them off, taken to Ms. Schreiber's home to play board and/or card games, and returned to school shortly before Plaintiff arrived in the school pickup line. This was confusing, as Nassau County schools use an automated alert system for absences. Upon information and belief based on the children's reports and Plaintiff's personal knowledge, Ms. Schreiber was unresponsive to Plaintiff's attempts to communicate that this was unacceptable.

27. After exhausting his attempts to come to a reasonable agreement with Ms. Schreiber, Plaintiff sent an email to the principal of the school where this conduct had taken place (Hilliard Elementary School), to the principal of L.C.D.'s new school and Ms. Schreiber's employer (Hilliard Middle-Senior High School), and to the school superintendent, in an effort to raise this concern with them and inquire how it was possible that the children would be removed from school without a notification being generated. That email was sent on September 28, 2023. Plaintiff received a cursory response related to his

records request, but which did not address the claims being made by the children. However, when Plaintiff went to collect the records from the school office, he was told by Principal Loudermilk, of Hilliard Elementary School, that after a certain time of day, the children counted as being present for funding purposes, and that that was the standard they used for marking children absent, which was the likely reason he was not being notified. On information and belief, as a school board employee, Ms. Schreiber knew about this flaw in the record keeping process and may have exploited it to conceal her activities.

28. Ms. Schreiber's conduct continued during the 2023-24 school year. She removed L.C.D. both from her classroom and from the school campus on multiple occasions without generating attendance reporting to Plaintiff. When questioned about her conduct, Ms. Schreiber messaged Plaintiff in *Our Family Wizard* containing an explanation that her actions were in accordance with multiple specific school officials and sanctioned as proper by those individuals. However, when Plaintiff reviewed this message with the school principal, the principal conferred with the named parties and confirmed to Plaintiff the purported conversations had not taken place. Ms. Schreiber also referred to a title that she herself held in referring to L.C.D.'s "Teacher of Record" as if that was a disinterested third party when, in fact, that was referring to herself. On

information and belief, the message sent by Ms. Schreiber was intended to conceal her interference with accurate attendance reporting of L.C.D.

29. Limited records and School Board oversight hindered redress, despite Florida Statutes requiring accurate attendance records (e.g., Fla. Stat. § 1003.23). This changed on May 7, 2025, when Ms. Schreiber filed a sworn, verified emergency motion in the family case (PETITIONER/FORMER WIFE'S VERIFIED EMERGENCY MOTION TO SUSPEND TIMESHARING AND/OR OTHER RELIEF, Docket #343; Case No. 2019-DR-974; Fourth Judicial Circuit Court of Florida in Nassau County), averring under penalty of perjury that on April 28, 2025, L.C.D. was "too distraught to attend her classes until 5th period" and suffered "an extreme panic attack" .

30. Ms. Schreiber also secured permission for L.C.D. (12 years old) to testify as a minor at the emergency hearing which resulted from Ms. Schreiber's emergency motion. L.C.D. testified under oath that she did not attend her classes on April 28, 2025 and the court stated that they found her to be a credible witness.

31. Instead of reflecting that L.C.D. did not attend classes on April 28, 2025, her academic record reflects that she was present in each of her classes for that day. On information and belief, that would have required all of L.C.D.'s teachers to

either make false entries as to L.C.D.'s presence, or modification of the record after the fact.

32. On June 3, 2025 Plaintiff sent a public records request to the Nassau County School Board's point of contact for those requests – their assistant superintendent Mark Durham. In Plaintiff's email, he described the situations he had experienced with apparent discrepancies in his children's attendance records that appeared to involve Ms. Schreiber. Plaintiff's email specifically probed about how it would be possible for his children to be removed from school without generating attendance record documentation. On June 19, 2025, Mr. Durham responded to Plaintiff's inquiry by stating that all students check-outs and check-ins from school should be recorded.

33. Plaintiff then assembled all of the documentation he had collected regarding the discrepancies in his children's attendance records and brought them to NCSO headquarters in Yulee, Florida, circa June 23, 2025, requesting to speak with a detective to discuss investigating potential criminal conduct. A deputy was dispatched to review the materials Plaintiff brought in. After reviewing, the deputy stated that discrepancies appeared in the data provided but, instead of referring the matter to a detective, inquired what Plaintiff wanted done with the information. When Plaintiff reaffirmed his request for investigation—explaining he had dealt with these issues for years—the deputy

pressed whether Plaintiff sincerely wanted to pursue criminality among potentially involved parties (teachers, principals, etc.). The deputy then recounted his upbringing in Hilliard, recalling children wandering campus during school and opining that accurate attendance records were not a reasonable standard under those circumstances. On information and belief based on Plaintiff's personal knowledge of the interaction, this view contradicted Florida Statutes and Assistant Superintendent Mark Durham's policy stating that check-ins and check-outs must be recorded. Additionally, Plaintiff's reported discrepancies indicate manipulation to conceal conduct not incidental to regular schooling or otherwise beneficial to the children. Nevertheless, the deputy declined to refer the materials for further investigation. The composite document Plaintiff submitted to NCSO is attached as **Exhibit F.**

34. On the evening of September 19, 2025, Plaintiff had a conversation with his son S.C.D. Earlier in the day, Plaintiff had received notification that S.C.D. was absent from school during his last period. When Plaintiff inquired with S.C.D. about why he was absent, he stated that he'd left school early with Ms. Schreiber to attend the homecoming parade. He also stated that during first period – when he is in Ms. Schreiber's Drama Class – he noticed that he had not changed his clothing from the previous school day, and so he left campus

to go change and was also absent then. S.C.D.'s attendance record did *not* reflect that absence.

35. On the evening of September 21, 2025, Plaintiff again had a conversation with S.C.D. and Plaintiff wanted to clarify the circumstances of S.C.D.'s prior disclosed departure from campus. Plaintiff asked his son if he'd left school before classes began, or in the middle of 1st period, and S.C.D. stated he left in the middle of class, after school had begun.

36. These conversations with S.C.D. are video recorded and in Plaintiff's possession because of a prior court order secured by Ms. Schreiber compelling the recording of Plaintiff's conversations with his children.

37. Florida Statute § 1003.23 requires accurate attendance records for all students via its invocation of the rules set forth by the State Board of Education. Falsification of public records is a criminal offense under Florida Statute §839.13. Despite clear evidence of systematic attendance record falsification affecting Plaintiff's children, NCSO refused to investigate, demonstrating selective enforcement that favors Ms. Schreiber.

38. The failure to investigate these claims on the part of NCSO and the sentiment stated to Plaintiff about why Deputy Crews would not investigate due to the connection to school personnel is emblematic of the disregard for law

enforcement displayed throughout this action, and exemplifies the custom contributing to erosion of evidence of the wellbeing of Plaintiff's children when in Ms. Schreiber's care.

## D. The Child Abuse Report and NCSO Investigation

39. On April 11, 2024, Plaintiff picked his children up from school to begin his timesharing period. As is his custom with his children, they returned to Plaintiff's apartment and began preparing to go swimming in Plaintiff's apartment swimming pool. When preparing to go swimming, it became evident that S.C.D. had extensive bruising across his back and arms, including handprint bruises on both of his arms. S.C.D. and his siblings described him getting into an altercation with Ms. Schreiber and her paramour Richard "Noah" Raulerson, who is also a Nassau County School Board employee.

40. To ensure S.C.D.'s safety and wellbeing, Plaintiff took him to a local hospital for evaluation, where he was medically coded for child abuse, and the attending staff made referrals to the Department of Children and Families and Nassau County Sheriff's Office.

41. NCSO officers Hagan and Millan responded to the hospital, took evidentiary photos, and conducted interviews with Plaintiff, L.C.D. and an unspecified additional child as memorialized in officer Hagan's Case Supplement Report.

The evidentiary photos taken by officer Hagan were placed into evidence in S.C.D.'s abuse investigation with NCSO on April 12, 2024 at 1:00 a.m. as documented in the Property Detail Report attached as **Exhibit G**.

42. Officers Hagan and Millan informed Plaintiff that they would be contacted tomorrow at Plaintiff's home to interview with Detective Ivan Pinkston.

43. The following morning, Plaintiff and his children remained in Plaintiff's apartment as they had been told to expect contact from both DCF investigators and NCSO Detective Pinkston.

44. At approximately 11:47am on April 12, 2024 Plaintiff answered a knock on the door at his apartment to discover an NCSO officer now known as Deputy Roberto Silva and DCF investigators CPI Jordan Cox and CPI Peters (first name unknown), and welcomed them inside. After introductions, CPI Cox and CPI Peters began their interview process, while Deputy Silva remained in Plaintiff's entryway. When questioned, it became apparent that while Plaintiff presumed that Deputy Silva was the assigned detective, that instead he had been dispatched as an escort as requested by the DCF investigators. However, he stated he would record the interviews being conducted on his body worn camera, and Plaintiff observed him doing so. Deputy Silva also recorded the video recording Plaintiff had made the following day of S.C.D.'s explanation

for the bruises on his body as he played that video on his cell phone. Deputy Silva agreed to forward his body worn camera footage to Detective Pinkston.

45. Detective Pinkston never did come to Plaintiff's residence and on information and belief, never interviewed Plaintiff's children, and on personal knowledge did not interview Plaintiff.

46. On the afternoon of April 12, 2024 Plaintiff was contacted again by DCF CPI Cox who requested Plaintiff and his children attend another interview conducted by Luis Ramirez with the First Coast Child Protection Team in Jacksonville, FL. Plaintiff and S.C.D. participated in that additional interview. In the narrative obtained by Plaintiff from DCF, the CPT team noted:

> *"The child S.C.D. and father Dustin Dufault attended CPT in Jacksonville, FL. They were interviewed by Luis Ramirez but CPI was unable to attend. The child confirmed the mother's paramour grabbed him and slammed him to the wall for fighting with his sister. Initial medical impressions are physical abuse against S.C.D. and failure to protect against the mother. Please see CPT summary for details."*

> I have modified this quote to redact S.C.D's identity. The DCF Chronological Notes Report is attached as **Exhibit H** with appropriate redactions.

47. Both child abuse and failure to protect a child from abuse are criminal acts as covered under Florida Statutes Chapter 827.

48. When Plaintiff was able to reach Detective Pinkston, he was told that he needed to wait to receive the report from DCF before he would be able to

conduct his investigation and expressed difficulty getting the report due to a staff shortage at DCF.

49. According to Detective Pinkston's Investigation Summary, he received the DCF report on April 26, 2024. This is the day the DCF imposed "Safety Plan" expired and Plaintiff's children were permitted by DCF, barring law enforcement intervention, to be in contact with Richard "Noah" Raulerson.

50. Detective Pinkston memorialized in his Investigation Summary that on April 29, 2024 he conducted an interview with Mr. Raulerson at Hilliard Middle-Senior High School. Plaintiff obtained a copy of that recorded interview via Public records Request via audio recording which is 9 minutes and 11 seconds long. In the interview, Mr. Raulerson's account of the events leading to S.C.D.'s bruising can be plainly heard. Mr. Raulerson's statements as captured in the recording do not comport with the statements given by Plaintiff's children in their recorded statements taken by Plaintiff when he first discovered bruising on S.C.D., the interviews with other NCSO officers as witnessed by Plaintiff, nor in their interviews with DCF as memorialized in the DCF Chronological Notes Report (**Exhibit H**).

51. On July 10, 2025 Plaintiff made the following public records request of NCSO:

> *"All of the investigation materials and entire case file related to case 2024-40149. These should be un-redacted, as I am the victims father and legal custodian. Please be sure to*

> *include body camera footage of all involved officers, and all reports gathered from other agencies."*

52. Initial response to Plaintiff's request was deficient in several respects, causing Plaintiff to send a deficiency notice to NCSO. The original request and deficiency notice are attached as **Exhibit I**.

53. Plaintiff specifically requested audit logs for the body worn camera footage in the case of disposal, but despite multiple inquiries has not received audit logs showing the handling of the body worn camera footage taken by Officers Millan, Hagan, Silva, or Pinkston. According to NCSO BWC policy and procedure, all of their interactions involved in this case were to be recorded by policy (**See Exhibit J**), and Plaintiff has personal knowledge that recordings were made during his presence and interaction with officers Millan, Hagan, and Silva. Plaintiff has no way of knowing if the body worn camera footage was ever properly classified and associated with the Abuse case and investigation or not, and under what protocol they were, apparently disposed, despite his attempts to clarify with NCSO through their public records process.

54. Responsive documents instead included an attachment entitled: *gs2-june-2023 - BWC retention.pdf* (attached as **Exhibit K.**) The file is a page pulled from the State of Florida *General Records Schedule GS2 for Criminal Justice Agencies and District Medical Examiners* (GS2) and the two generalized retention schedules for body worn Camera footage is highlighted under items #224 & #192.

Omitted in the provided document is the rest of the retention schedules on other pages.

55. The full GS2 document has a particularized retention schedule as it pertains to Child Abuse Investigations under item #200. I have highlighted that section and it is attached as **Exhibit L.** On information and belief, all of the body worn camera interviews conducted of Plaintiff and his children should have been retained under this category and according to this retention schedule and entered as evidence in the child abuse investigation. That retention schedule extends for 7 years past the age of majority. S.C.D. was 10 years old.

56. On information and belief, no recorded interview with Plaintiff or his children was retained by NCSO or placed into evidence in this investigation, and Detective Pinkston made no independent effort to interview S.C.D. or the other children. Nor does it appear he attempted to resolve the substantial differences of Raulerson's account of events as compared to the multiple statements given to investigators by the DuFault children to both other NCSO officers and as documented in the DCF file that he did have access to.

57. Detective Pinkston's Investigative Summary concludes, based on his interview with Mr. Raulerson:

> *"Based on these circumstances, I do not believe Richard Raulerson knowingly or willfully abused the reported victim. Furthermore, an excerpt from The Florida Standard Jury Instructions for Criminal Cases reads as follows: It is not a crime for [a parent] [a person who is acting in the place of a parent] of a child to impose reasonable physical discipline on a child for misbehavior under the circumstances even though physical injury resulted from the discipline. The circumstances (striking multiple people) warranted a physical response from Raulerson."*

Detective Pinkston's Investigative Report is attached as **Exhibit M.**

Detective Pinkston's stated rationale for his disposition of this investigation hinged in part on invoking the possibility of Mr. Raulerson asserting an affirmative defense of *in loco parentis*. The full text of the relevant *Standard Florida Jury Instructions* is attached as **Exhibit N.** As stated in the full instructions, this is a highly nuanced matter. As stated in Detective Pinkston's Investigative Summary, Raulerson does not live with Plaintiff's children. On information and belief, he doesn't provide financially toward their care. The DuFault children informed Plaintiff after these events that Mr. Raulerson and Ms. Schreiber engaged in an argument about Mr. Raulerson no longer engaging in discipline with Plaintiff's children. These factors weigh heavily against Mr. Raulerson's ability to stand up an affirmative defense based on *in loco parentis*.

58. Furthermore, Detective Pinkston's statement that "I do not believe Richard Raulerson knowingly or willfully abused the reported victim" appears

prematurely conclusive (Exhibit N). The Florida Standard Jury Instructions define "willfully" as "intentionally and purposely." According to S.C.D.'s account in the DCF/CPT interview (Exhibit H), Mr. Raulerson grabbed and slammed S.C.D. against a wall, as described, causing the documented extensive bruising. Under the jury instructions, "child abuse" includes "the intentional infliction of physical injury upon a child." Whether such conduct exceeded reasonable discipline—particularly given the extensive bruising, handprint marks, medical coding for abuse, and DCF's findings of physical abuse and failure to protect (Exhibit H)—are questions of fact for a jury, especially in light of Mr. Raulerson's conflicting version of events (audio recording). Detective Pinkston's role was to gather evidence and, where probable cause exists, refer the matter for prosecutorial review—not to unilaterally determine affirmative defenses would succeed at trial.

59. On information and belief, based on pre-suit inquiries into other instances of child abuse, Detective Pinkston's assertions do not represent the standards applied by NCSO in similarly situated circumstances not involving Ms. Schreiber, perpetuating the practice of not investigating evidence of criminality when she is implicated. This is evidenced by the cursory 9-minute interview of Mr. Raulerson; the failure to properly enter, maintain, and retain evidence from multiple interviews provided to NCSO (e.g., body-worn camera footage

under GS2 #200); the failure to secure independent interviews with S.C.D. and other witnesses; the failure to resolve the vastly different account Mr. Raulerson gave compared to the children's statements and the DCF report available to him (Exhibit H); the failure to integrate the professional opinions of DCF and hospital workers; and the misapplication of an affirmative defense—all amounting to a complete systemic failure to investigate this matter and contributing to harms to Plaintiff's family, including reduced physical and emotional security and erosion of evidence regarding the children's wellbeing in Ms. Schreiber's care.

60. As a direct result of Detective Pinkston's premature case closure, Mr. Raulerson faced no consequences, the children received no protection, and Ms. Schreiber used the "unfounded" determination to undermine Plaintiff's credibility in family court proceedings, further eroding his parental rights. Without seeking to relitigate or challenge those state proceedings, Defendants' actions caused independent constitutional harms to Plaintiff, including interference with his fundamental liberty interest in the care, custody, and association with his children (*Troxel v. Granville, 530 U.S. 57, 65 (2000)*), emotional distress, and ongoing familial disruption.

61. This action does not seek to relitigate custody matters or family court determinations but rather challenges only NCSO's unconstitutional conduct in

handling criminal investigations, which had the collateral effect of undermining Plaintiff's parental rights.

########################

## E. Ratification, Custom Evidence, and Harms

62. The incidents described in Sections B, C, and D allege a pattern and practice of NCSO affirmatively obstructing enforcement of Florida criminal laws when Ms. Schreiber or her associates are involved. This pattern, on information and belief, evidences an unconstitutional custom that implicates both equal protection (through disparate treatment) and substantive due process (through arbitrary interference).

63. **Ratification by Final Policymakers.** Sheriff Leeper, as the final policymaker for NCSO, was directly notified of the unconstitutional trespass rescission on June 17, 2024 (Exhibit D) but took no corrective action. Director Anstett, acting with final policymaking authority or as Sheriff Leeper's authorized representative, explicitly confirmed NCSO's policy of non-enforcement of trespass laws in cases involving parenting plans on June 16, 2025, regardless of the plan's actual provisions or property rights involved. This high-level ratification ratified subordinates' actions and endorsed the non-enforcement approach as official policy.

64. **Pattern of Disparate Treatment.** On information and belief, NCSO's handling of matters involving Ms. Schreiber departed from standard law enforcement practices in similarly situated cases not implicating her or school affiliates:

a. In trespass matters, NCSO typically enforces property owners' rights upon request (as seen with Eastwood Oaks management, B16), but voided a valid trespass warning issued at management's request when Ms. Schreiber was the subject (B19);

b. In school records investigations, NCSO typically investigates credible allegations of public records falsification (per Fla. Stat. § 839.13), but refused to examine documented evidence when school board employees were implicated (C33);

c. In child abuse investigations, NCSO typically conducts thorough investigations including victim interviews and evidence preservation, but here conducted only a 9-minute interview with the alleged perpetrator at his workplace, failed to preserve mandatory body-worn camera footage, and closed the case despite medical coding for abuse and DCF findings (D50/53-59).

65. **Deliberate Indifference Through Obvious Inadequacy.** On information and belief, the investigation practices employed in these matters were so deficient

compared to standard protocols that they demonstrate deliberate indifference to Plaintiff's constitutional rights:

a. Accepting Ms. Schreiber's misrepresentation of the parenting plan without review, despite policy directives to disambiguate between civil and criminal matters (B12);

b. Refusing to investigate repeated misrepresentations in school records based solely on the deputy's personal opinions about Hilliard school practices (C33);

c. Closing a child abuse investigation without interviewing the victim or reconciling conflicting accounts between the perpetrator and multiple child witnesses (D45/56).

66. **Evidence of Preexisting Custom.** On information and belief, NCSO's preferential treatment of Nassau County School Board employees represents a preexisting custom or practice, as evidenced by:

a. Multiple officers' immediate deference to Ms. Schreiber's assertions without verification (B12/15);

b. The deputy's reflexive protection of school personnel when presented with evidence of criminal conduct (C33);

c. Detective Pinkston's disposition of the abuse investigation at Mr. Raulerson's school workplace (D50);

d. The coordinated nature of the trespass rescission, involving multiple command levels within hours (B19-21; C24).

67. **Moving Force Behind Constitutional Violations.** On information and belief, NCSO's customs and policies were the moving force behind Plaintiff's constitutional injuries, as the non-enforcement approach directly enabled the obstructions in trespass (B), records falsification (C), and abuse closure (D). But for this custom favoring Ms. Schreiber and her associates, Plaintiff would have received equal protection under the law, his property rights would have been enforced, criminal investigations would have proceeded according to standard protocols, and evidence of his children's welfare would have been preserved.

68. **Continuing and Cumulative Harms.** As a direct and proximate result of Defendants' unconstitutional customs, policies, and actions, Plaintiff has suffered and continues to suffer:

a. Deprivation of equal protection through disparate treatment in law enforcement services;

b. Violation of substantive due process through arbitrary and conscience-shocking interference with criminal law enforcement;

c. Interference with his fundamental liberty interest in the care, custody, and management of his children (Troxel v. Granville, 530 U.S. 57, 65 (2000));

d. Ongoing security concerns from the inability to enforce trespass rights at his home;

e. Loss of evidence regarding his children's welfare due to uninvestigated falsification of records;

f. Loss of evidence due to failures to preserve evidence according to Florida State GS2 schedules;

g. Emotional distress from the knowledge that those who harm his children face no consequences;

h. Damage to his credibility in family court proceedings from NCSO's "unfounded" determinations;

i. Continued vulnerability to harassment and interference due to NCSO's announced non-enforcement policies.

These harms are ongoing and irreparable—Ms. Schreiber continues to act with impunity, knowing NCSO will not enforce criminal laws against her; the not preserved or produced body-worn camera footage can never be recovered,

and the uninvestigated school records continue to contain falsifications, leaving Plaintiff's children unprotected from those who have harmed them. Plaintiff seeks compensatory damages for the harms already suffered, punitive damages against the individual Defendants for their deliberate indifference, and declaratory and injunctive relief (including policy reforms and training) to prevent future constitutional violations. Plaintiff seeks compensatory damages for the harms already suffered, punitive damages for the deliberate indifference shown to his constitutional rights, and declaratory and injunctive relief to prevent future constitutional violations.

## CLAIMS FOR RELIEF

### COUNT I: 42 U.S.C. § 1983 – Substantive Due Process Violation Under the Fourteenth Amendment
### (Against Defendants Anstett, Paolillo, and Pinkston in Their Individual Capacities, and Sheriff Leeper in His Official Capacity)

69. As alleged in Paras 1-68, Defendants Anstett, Paolillo, and Pinkston, acting under color of state law, deprived Plaintiff of his substantive due process rights under the Fourteenth Amendment by engaging in arbitrary and conscience-shocking conduct that interfered with his liberty interests, including his fundamental right to family integrity and security in the care, custody, and control of his children (*Troxel v. Granville, 530 U.S. 57, 65 (2000)*).

70. Defendants' deliberate indifference—manifested in the voiding of the trespass warning without basis (B19-21; E65a), refusal to investigate school records falsification (C33; E65b), and premature closure of the child abuse investigation without victim interviews or evidence preservation (D45-59; E65c)—shocks the conscience and was objectively unreasonable, as it arbitrarily obstructed criminal enforcement and exposed Plaintiff and his children to ongoing harm. These failures were not mere negligence but purposeful omissions that enabled Ms. Schreiber's impunity (E68d-i).

71. On information and belief, this conduct violated clearly established law requiring law enforcement to investigate credible reports without bias (*Hope v. Pelzer, 536 U.S. 730, 739 (2002)*), entitling Plaintiff to relief against the individual Defendants.

72. Sheriff Leeper, in his official capacity, is liable under Monell v. Dep't of Soc. Servs., *436 U.S. 658 (1978)*, as the unconstitutional custom of non-enforcement (E62-66) ratified these actions, serving as the moving force behind the due process deprivations (E67).

73. As a direct result, Plaintiff suffered harms including emotional distress, familial disruption, and loss of evidence critical to his children's wellbeing (E68).

COUNT II: 42 U.S.C. § 1983 – Equal Protection Violation Under the Fourteenth Amendment
(Against Defendants Anstett, Paolillo, and Pinkston in Their Individual Capacities, and Sheriff Leeper in His Official Capacity)

74. As alleged in Paras 1-68, Defendants Anstett, Paolillo, and Pinkston, acting under color of state law, deprived Plaintiff of equal protection under the Fourteenth Amendment by subjecting him to disparate treatment motivated by discriminatory animus toward reports implicating Ms. Schreiber and Nassau County School Board affiliates, while enforcing laws equally against similarly situated complainants (E62; E64).

75. This "class of one" discrimination (or treatment based on Ms. Schreiber's status as a favored class of school employee, E66) is evidenced by NCSO's departures from standard practices: Enforcing trespasses generally but voiding one for Ms. Schreiber (B19; E64a); investigating public records falsifications by potential perpetrators unaffiliated with the Nassau County School Board, but refusing here (C33; E64b); and conducting thorough abuse probes except where Raulerson's workplace favored expediency (D50; E64c). Such irrational favoritism lacks legitimate purpose and treated Plaintiff less favorably without rational basis (*Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)*).

76. On information and belief, Defendants knew or should have known this violated clearly established equal protection principles prohibiting selective

enforcement (*Yick Wo v. Hopkins, 118 U.S. 356 (1886)*), entitling Plaintiff to relief against the individuals.

77. Sheriff Leeper, in his official capacity, is liable under *Monell* as the custom of preferential treatment for school employees (E66) was the moving force, ratifying the disparate handling (E63; E67).

78. As a direct result, Plaintiff suffered harms including deprivation of equal law enforcement services and ongoing harassment (E68a, i).

COUNT III: 42 U.S.C. § 1983 – Monell Claim for Unconstitutional Custom and Policy (Against Defendant Sheriff Bill Leeper in His Official Capacity)

79. As alleged in Paras 1-68, Sheriff Leeper, sued in his official capacity as the policymaking head of NCSO, is liable under 42 U.S.C. § 1983 and (*Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)*), for maintaining and ratifying an unconstitutional custom or policy of selective non-enforcement of criminal laws favoring certain individuals, including Nassau County School Board employees like Ms. Schreiber and her associates (E62-66).

80. This custom—evidenced by ratification of the trespass policy (E63; Exhibit E), departures from investigative standards (E64-65), deference to school personnel (E66), and failures to investigate or preserve evidence (B/C/D)—is a

persistent practice attributable to Sheriff Leeper as final policymaker (Para 7A), causing the due process and equal protection violations in Counts I and II.

81. Defendants' deliberate indifference to constitutional training and supervision perpetuated this custom, despite Plaintiff's notifications (e.g., Exhibit D to Sheriff Leeper; C24 to Anstett), making it the moving force behind Plaintiff's injuries (E67; *City of Canton v. Harris, 489 U.S. 378, 388 (1989)*).

82. As a direct result, Plaintiff suffered the harms detailed in Para 68, including irreparable erosion of family security and evidence loss.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and provide the following relief:

83. Plaintiff demands judgment against Defendants Anstett, Paolillo, and Pinkston, jointly and severally, for compensatory damages in an amount exceeding $75,000, exclusive of interest and costs, for the emotional distress, familial disruption, and other harms suffered (E68).

84. Plaintiff demands punitive damages against the individual Defendants in an amount to be determined at trial, for their reckless and malicious indifference to Plaintiff's constitutional rights.

85. Plaintiff demands judgment against Defendant Sheriff Bill Leeper in his official capacity for compensatory damages exceeding $75,000, exclusive of interest and costs, as well as declaratory relief pursuant to 28 U.S.C. §§ 2201-02 declaring NCSO's custom of selective non-enforcement unconstitutional, and permanent injunctive relief (including policy reforms, enhanced training on equal enforcement, and preservation of evidence) to prevent future violations.

86. Plaintiff demands his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 (even if pro se, for future counsel), and such other relief as the Court deems just and proper.

DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

Respectfully submitted,

Dustin DuFault
Pro Se Plaintiff
815 Stanley Drive