OCT 22 2025 PM2:30 FILED - USDC - FLMD - JAX

In The United States District Court
For The Middle District Of Florida
Jacksonville Division

Dustin DuFault,

Plaintiff, CASE NO. 3:25-cv-683-MMH-MCR

V.

Sheriff Bill Leeper, In His Official Capacity
as Sheriff of Nassau County;
Director John Anstett, In His Individual Capacity;
Director Robert "Bobby" Lippelman, In His Individual Capacity;
Sergeant Kellam Paolillo, In His Individual Capacity; And
Detective Ivan Pinkston, In His Individual Capacity;

Defendants.

**First Amended Complaint For Violations Of 42 U.S.C. § 1983**

---

## INTRODUCTION

1. Plaintiff brings this § 1983 action against Sheriff Bill Leeper in his official capacity and against certain officials including supervisors and investigators in their individual capacities. The action challenges Defendants' unconstitutional policy or custom of affirmatively interfering with and obstructing the enforcement of Florida Statutes, when certain favored individuals are implicated. This custom has deprived Plaintiff of his rights under the Fourteenth Amendment to the United States Constitution, including

substantive due process through arbitrary and conscience-shocking actions, and equal protection through disparate treatment in the handling of his reports. Plaintiff seeks damages from the responsible officials and *Monell* relief against the Sheriff.

2. While each constitutional claim is pleaded in a separate count, they share a common feature: in each episode, Defendants took affirmative steps to exempt Ms. Erin Schreiber—and her associates—from ordinary enforcement of criminal laws.

3. Ms. Schreiber is a Nassau County School Board employee and the mother of Plaintiff's three minor children. However, these matters do not arise from custody disputes or family court proceedings; they challenge only state action by NCSO officials, and Ms. Schreiber's identity is relevant only to demonstrate the pattern of NCSO's selective enforcement; this action does not seek relief regarding custody matters or from Ms. Schreiber. For instance, Defendants refused to issue trespass warnings against Ms. Schreiber when requested by Plaintiff and rescinded a duly issued trespass warning issued to Ms. Schreiber which was requested by Plaintiff's apartment complex management. When Plaintiff reported evidence of falsified school records for his children, NCSO declined to investigate. Finally, NCSO closed a child-abuse investigation involving Ms. Schreiber and her paramour based on a threshold legal rationale

that foreclosed culpability, despite contrary evidence. These actions resulted in disparate treatment favoring Ms. Schreiber over similarly situated complainants.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and § 1343(a)(3) (civil rights actions), as the claims arise under the Constitution of the United States and 42 U.S.C. § 1983.

5. Venue is proper under 28 U.S.C. § 1391(b)(2), as all events giving rise to the claims occurred in Nassau County, within the Middle District of Florida.

## PARTIES

6. **Plaintiff.** Plaintiff Dustin DuFault is an adult resident of Nassau County, Florida. He is the father of three minor children and brings this action pro se to vindicate his constitutional rights arising from Defendants' interference with criminal law enforcement in matters involving his family and property. His children are identified in this pleading by initials consistent with Fed. R. Civ. P. 5.2.

**7. Defendants.**

A. Defendant Sheriff Bill Leeper is the elected Sheriff of Nassau County, Florida, sued in his official capacity as head of the Nassau County Sheriff's Office (NCSO). This suit, actionable under *Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)*, seeks compensatory damages, declaratory relief, and injunctive relief against the NCSO entity for its unconstitutional policies and customs. At all times relevant to this complaint, Sheriff Leeper was the final policymaker with respect to law enforcement policies, practices, and training.

B. Defendant John Anstett is Director of Law Enforcement Operations for the Nassau County Sheriff's Office. He is sued in his individual capacity for damages. At all times relevant to this complaint, he acted under color of state law and exercised supervisory authority over law enforcement operations.

C. Defendant Robert "Bobby" Lippelman is the General Counsel, Director of Legal Services, and supervisor of the Records Division for the Nassau County Sheriff's Office, as confirmed in his official bio posted on the NCSO website **(Exhibit O)**. He is sued in his individual capacity for damages. At all times relevant to this complaint, he acted under color of state law and exercised supervisory authority over public records compliance, legal

advice to NCSO personnel, and the Records Division. Through deliberate indifference or failure to supervise, he allowed or contributed to a pattern of non-production with regards to Plaintiff's public records requests, including non-responses to Plaintiff's inquiries and legal holds **(Exhibit E)**, selective treatment favoring Ms. Schreiber (e.g., providing assistance to her while ignoring Plaintiff), in violation of Plaintiff's due process and equal protection rights under the Fourteenth Amendment.

D. Defendant Kellam Paolillo was a Sergeant with the Nassau County Sheriff's Office. He is sued in his individual capacity for damages. At all times relevant to this complaint, he acted under color of state law as a supervising law enforcement officer.

E. Defendant Ivan Pinkston is a Detective with the Nassau County Sheriff's Office. He is sued in his individual capacity for damages. At all times relevant to this complaint, he acted under color of state law as an investigating officer.

8. **Non-Party Officers.** The following NCSO officers participated in events described herein but are not currently named as defendants, though Plaintiff reserves the right to amend:

A. Deputies Sellers and McClendon - Issued the lawful trespass warning later voided by defendants

B. Lieutenant Griffith - Failed to respond to Plaintiff's complaints about the voided trespass

C. Deputy Silva - Recorded then failed to preserve critical BWC footage

D. Deputies Hagan and Millan - Took evidence then failed to preserve BWC footage

E. Deputy Crews - Refused to investigate school records falsification

F. John/Jane Does 1-20 - Other NCSO personnel whose identities will be revealed through discovery and who may be added as defendants upon leave of Court.

## FACTUAL ALLEGATIONS

### A. Background and Family Framework

9. Plaintiff Dustin DuFault is an adult resident of Nassau County, Florida, along with his three minor children: L.C.D., born 2012; S.C.D., born 2014; and the

youngest S.M.D., born 2016, identified by initials per Fed. R. Civ. P. 5.2. Ms. Erin Schreiber, the children's mother and a Nassau County School Board employee, shares legal custody under a parenting plan from Nassau County Circuit Court. The plan sets specific timesharing and exchanges but grants no entry rights to either parent's residence outside designated periods **(Exhibit A: Relevant Excerpts from Parenting Plan)**.

10. Ms. Schreiber is employed by the Nassau County School Board. As documented below, she has repeatedly received preferential treatment from NCSO when criminal laws would otherwise apply to her conduct. These incidents occurred between 2023 and 2025 and caused ongoing harm to Plaintiff and his children.

**B. The Rescission of the Lawfully Issued Trespass Warning**

11. Throughout 2023 and through today, Plaintiff resided at Eastwood Oaks Apartments, a private apartment complex in Hilliard, Nassau County, FL. Plaintiff repeatedly informed Ms. Schreiber that she was not welcome to come to his home unless explicitly invited, or during their swapping of the children as described in the adopted parenting plan.

12. Despite this, Ms. Schreiber repeatedly entered or attempted entry to Plaintiff's home during Plaintiff's visitation periods. Her conduct involved screaming at

Plaintiff and his children, banging on and opening the door to their home, and often required police intervention to restore order and stop Plaintiff's family from being "confined in fear" in their home.

13. Each time Ms. Schreiber engaged in this conduct, Plaintiff contacted NCSO to restore peace and order at his home. In each case, Plaintiff would ask the responding officers to trespass Ms. Schreiber. Ms. Schreiber would then tell the responding officers that she could not be trespassed because she had a parenting plan that states she picks the children up from Plaintiff's home. Based on Ms. Schreiber's characterization of the parenting plan, and without reviewing its contents, the responding officers declined to issue trespass warnings to Ms. Schreiber.

14. Officers repeatedly accepted Ms. Schreiber's characterization of their inability to trespass her based on the adopted parenting plan, even though the parenting plan in question does not speak to that issue, and despite the fact that Trespass Law is a matter of statutory right codified in the Florida Statutes. Furthermore, NCSO Operations Manuals direct personnel to disambiguate between civil and criminal matters when handling contacts they perceive to be principally civil in nature **(See Exhibit T)**. Instead of doing so, officers responding to Plaintiff's requests construed criminal trespass law as a civil matter. Even if the civil agreement between Plaintiff and Ms. Schreiber

attempted to mitigate rights under criminal Florida Statutes, which it does not in reality, Florida Statutes would still control in matters of law enforcement.

15. On June 11th, 2024 Ms. Schreiber picked up Plaintiff's children for a "dinner visit" which encompassed several hours in the evening. When returning the children to Plaintiff's home, Ms. Schreiber informed Plaintiff that she would return in the morning to pick up L.C.D and take her to her therapy appointment, claiming that Plaintiff was unwilling to drive L.C.D. to her appointment. That was not true, and when Plaintiff attempted to explain to Ms. Schreiber that L.C.D.'s care providers had decided it was best for L.C.D. therapeutically to do a telehealth session the following day, Ms. Schreiber became enraged and insisted she would return in the morning to take L.C.D. to an in person appointment. This demand was unacceptable to Plaintiff and did not comport with the adopted parenting plan. As such, Plaintiff made it clear to Ms. Schreiber that this was not acceptable and not to return to his home the following day.

16. Despite Plaintiff's admonishment to Ms. Schreiber, she did return on the morning of June 12, 2024, and began banging on Plaintiff's door and screaming. These actions caused fear and distress to Plaintiff and his children, who ran and hid, and caused L.C.D. to miss her Therapy appointment. Plaintiff messaged Ms. Schreiber in *Our Family Wizard* asking her to leave so

that Plaintiff would not need to once again involve the police. This message is incorporated under **Exhibit P**. Ms. Schreiber did not leave and so Plaintiff contacted NCSO and deputies responded.

17. When the deputies arrived, Plaintiff once again asked them to trespass Ms. Schreiber. Ms. Schreiber again told the responding officers that she couldn't be trespassed due to the parenting plan. The responding officers again adopted Ms. Schreiber's interpretation and representation of the parenting plan as barring Plaintiff from having trespass rights under the law. Instead – the responding officers asked Ms. Schreiber to leave the property at that point in time, which she did. Shortly afterwards, the officers also left.

18. Within 5 minutes of the officers' departure, Ms. Schreiber again returned to Plaintiff's home and began engaging in substantially similar conduct, prompting Plaintiff to again contact NCSO. The same officers returned to Plaintiff's apartment complex. Without speaking to, or with direction from the Plaintiff, the officers spoke with the management of Eastwood Oaks Apartments, who independently said they'd had many complaints about Ms. Schreiber's conduct on the property and that *they* wanted to trespass her. The officers accepted the trespass request from apartment complex management, but by this time Ms. Schreiber had departed. They then came back to Plaintiff's apartment and informed him of these events, and that they were unable to cite

Ms. Schreiber at that time because she'd already left, but that Plaintiff should inform Ms. Schreiber that they had now received a valid trespass request, had recorded it in their system, and that she would be subject to criminal trespass if she returned to any portion of Eastwood Oaks Apartments property.

19. Plaintiff did inform Ms. Schreiber of these developments via *Our Family Wizard*. As this would require a modification of the swap location in the parties parenting plan, and Plaintiff suggested the Library as it is closer to Ms. Schreiber's home and a location the children enjoy going to anyway. Plaintiff also offered for Ms. Schreiber to propose other locations. Plaintiff made it clear in his communication to Ms. Schreiber, based on the deputies instructions, that returning to Eastwood Oaks Apartments was not an option, and that barring a response with an alternate suggestion, that Plaintiff would be at the Library at the next swap date of June 17th, 2024.

20. On the morning of June 17, 2024 Ms. Schreiber returned to Eastwood Oaks Apartments. A trespass warning was issued to Ms. Schreiber with by NCSO, and Plaintiff was given a copy. Ms. Schreiber was given clear warning by NCSO deputies Sellers and McClendon that she would be arrested if she returned to the Eastwood Oaks Apartments property. A copy of the Trespass Warning along with a letter from Eastwood Oaks Apartment management requesting the trespass is included as **Exhibit B.**

21. Later that morning, Ms. Schreiber contacted NCSO claiming, "She doesn't want to complain but just wants to understand what's going on." Sergeant Kellam Paolillo responded to Ms. Schreiber's call and "picked up and voided" Ms. Schreiber's copy of the trespass warning she was issued on behalf of Eastwood Oaks Apartments as documented in a call for service report he wrote. A composite of Call for Service Reports entered by Sergeant Paolillo are attached as **Exhibit C**.

22. An unknown deputy then came to Plaintiff's home to notify him of this development. The deputy requested that Plaintiff surrender his copy of the trespass warning and Plaintiff declined.

23. At 2:53pm Plaintiff contacted NCSO to discuss the decision to void the trespass warning with higher ranking officers in the chain of command and was referred to Deputy Sergeant Kellam Paolillo, who contacted Plaintiff via phone. Paolillo advised Plaintiff that the trespass warning would not be issued "due to the court order in place and after consulting with NCSO Legal Counsel." As memorialized in his Call For Service Detail Report. Plaintiff then asked officer Paolillo to have his supervising Lieutenant Griffith contact him to discuss the matter further. Both of Deputy Sergeant Kellam Paolillo's reports are incorporated as **Composite Exhibit C.**

24. At 5:12pm, Plaintiff emailed Sheriff Bill Leeper with his assessment of the legally precarious actions being taken by his officers. Mr. Leeper did not respond to Plaintiff's email, which is incorporated as **Exhibit D.**

25. At 5:42pm Plaintiff had not been contacted by Lieutenant Griffith and therefore called in to dispatch to inquire if he would be contacting him. Plaintiff was told another request was entered and that it appeared there was some kind of problem with the prior request. Plaintiff does not recall getting a call from Lieutenant Griffith and a record of the call was not produced in Plaintiff's public records requests to NCSO.

26. On June 13, 2025, Plaintiff contacted NCSO General Counsel Bobby Lippelman in a good faith attempt to resolve this matter extrajudicially **(Exhibit E: Emails)**. Plaintiff did not receive a response from Mr. Lippelman, but did receive a phone call from NCSO Director of Law Enforcement Operations John Anstett on behalf of Mr. Lippelman on June 16, 2025 at 4pm. Mr. Anstett reiterated NCSO's policy of not enforcing trespass laws when a party has a parenting plan, regardless of its provisions or independent property rights of third parties. When Plaintiff asked Mr. Anstett to state this policy in writing via email, Mr. Anstett declined to do so "unless something changes." This interaction demonstrates the chain-of-command's reliance on legal advice to support non-enforcement in such cases, contributing to the pattern favoring

Ms. Schreiber and causing ongoing harms to Plaintiff's family security. Plaintiff memorialized the details of this conversation in his own email to Mr. Lippelman on June 16, 2025, and never received a response disputing the accuracy of that memorialization. Plaintiff's emails to Mr. Lippelman are incorporated as **Exhibit E**.

27. On information and belief, Eastwood Oaks management did not request rescission of the trespass warning and continues to authorize NCSO to enforce trespass against Ms. Schreiber on the property.

## C. The School Records Report and Inaction

28. During the 2022-2023 school year, Ms. Schreiber was employed by the Nassau County School Board as a part-time teacher, and Plaintiff's children attended Nassau County schools. On multiple occasions during Plaintiff's timesharing, the children described being picked up from school by Ms. Schreiber shortly after Plaintiff dropped them off, taken to Ms. Schreiber's home to play board and/or card games, and returned to school shortly before Plaintiff arrived in the school pickup line. This was confusing, as Nassau County schools use an automated alert system for absences, and none had been sent to Plaintiff on these occasions. Upon information and belief based on the children's reports of this conduct continuing and Plaintiff's personal knowledge of his own

communications to Ms. Schreiber, Ms. Schreiber was unresponsive to Plaintiff's attempts to communicate that this conduct was unacceptable.

29. After exhausting his attempts to come to a reasonable agreement with Ms. Schreiber, Plaintiff sent an email to the principal of the school where this conduct had taken place (Hilliard Elementary School), to the principal of L.C.D.'s new school (Hilliard Middle-Senior High School, where Ms. Schreiber is also employed), and to the school superintendent, in an effort to raise this concern with authoritative parties, and inquire how it was possible that the children would be removed from school without a notification being generated. That email was sent on September 28, 2023. Plaintiff received a cursory response related to his records request, but which did not address the claims being made by the children. However, when Plaintiff went to collect the records from the school office, he was told by Principal Loudermilk, of Hilliard Elementary School, that after a certain time of day, the children counted as being present for funding purposes, and that that was the standard they used for marking children absent, which was the likely reason he was not being notified. On information and belief, as a school board employee, Ms. Schreiber knew about this flaw in the record keeping process and may have exploited it to conceal her activities.

30. On information and belief, the operational structure described to Plaintiff in paragraph 28 does not comport with Florida Statutes for tracking attendance nor with the stated policies of the Nassau County School Board as relayed to Plaintiff in communication with Mark Durham, the district's assistant superintendent.

31. Ms. Schreiber's conduct continued during the 2023-24 school year. She removed L.C.D. both from her classroom and from the school campus on multiple occasions without generating attendance reporting to Plaintiff. When questioned about her conduct, Ms. Schreiber messaged Plaintiff in *Our Family Wizard* containing an explanation that her actions were in accordance with multiple specific school officials and sanctioned as proper by those individuals. However, when Plaintiff reviewed this message with the school principal, the principal conferred with the named parties and confirmed to Plaintiff the purported conversations had not taken place. Ms. Schreiber also referred to a title that she herself held in referring to L.C.D.'s "Teacher of Record" as if that was a disinterested third party when, in fact, that title is held by Ms. Schreiber. On information and belief, the message sent by Ms. Schreiber was intended to conceal her interference with accurate attendance reporting of L.C.D.

32. Limited records and School Board oversight hindered redress, despite Florida Statutes requiring accurate attendance records (e.g., Fla. Stat. § 1003.23 via it's

invocation of the rules of the State Board of Education). This changed on May 7, 2025, when Ms. Schreiber filed a sworn, verified emergency motion in the family case (PETITIONER/FORMER WIFE'S VERIFIED EMERGENCY MOTION TO SUSPEND TIMESHARING AND/OR OTHER RELIEF, Docket #343; Case No. 2019-DR-974; Fourth Judicial Circuit Court of Florida in Nassau County), averring under penalty of perjury that on April 28, 2025, L.C.D. was "too distraught to attend her classes until 5th period" and suffered "an extreme panic attack" .

33. Ms. Schreiber also secured permission for L.C.D. (12 years old) to testify as a minor at the emergency hearing which resulted from Ms. Schreiber's emergency motion. L.C.D. testified under oath that she did not attend her classes on April 28, 2025 and the court stated that they found her to be a credible witness.

34. Instead of reflecting that L.C.D. did not attend classes on April 28, 2025, her academic record reflects that she was present in each of her classes for that day. On information and belief, that would have required all of L.C.D.'s teachers to either make false entries as to L.C.D.'s presence, or modification of the record after the fact.

35. On June 3, 2025 Plaintiff sent a public records request to the Nassau County School Board's point of contact for those requests – their assistant

superintendent Mark Durham. In Plaintiff's email, he described the situations he had experienced with apparent discrepancies in his children's attendance records that appeared to involve Ms. Schreiber. Plaintiff's email specifically probed about how it would be possible for his children to be removed from school without generating attendance record documentation. On June 19, 2025, Mr. Durham responded to Plaintiff's inquiry by stating that all students check-outs and check-ins from school should be recorded.

36. Plaintiff then assembled all of the documentation he had collected regarding the discrepancies in his children's attendance records and brought them to NCSO headquarters in Yulee, Florida, circa June 23, 2025, requesting to speak with a detective to discuss investigating potential criminal conduct involving violations under F.S. 839.13. Deputy Crews was dispatched to review the materials Plaintiff brought in. After reviewing, Deputy Crews stated that discrepancies appeared in the data provided but, instead of referring the matter to a detective, inquired what Plaintiff wanted done with the information. When Plaintiff reaffirmed his request for investigation—explaining he had dealt with these issues for years—the deputy pressed whether Plaintiff sincerely wanted to pursue criminality among the potentially involved parties (teachers, principals, etc.). Deputy Crews then recounted his upbringing in Hilliard, attending Hilliard Middle-Senior High School, and

recalling children wandering campus during school. Deputy Crews opined that accurate attendance records were not a reasonable standard under those circumstances. On information and belief based on Plaintiff's personal knowledge of the interaction, this view contradicted Florida Statutes and Assistant Superintendent Mark Durham's stated policy as shown to Deputy Crews included in the email communications Plaintiff had provided which stated that check-ins and check-outs must be recorded. Additionally, Plaintiff's reported discrepancies indicate manipulation to conceal conduct not incidental to regular schooling or otherwise beneficial to the children. Nevertheless, the deputy declined to refer the materials for further investigation. The composite document Plaintiff submitted to NCSO Deputy Crews is attached as **Exhibit F.**

37. On the evening of September 19, 2025, Plaintiff had a conversation with his son S.C.D. Earlier in the day, Plaintiff had received notification that S.C.D. was absent from school during his last period. When Plaintiff inquired with S.C.D. about why he was absent, he stated that he'd left school early with Ms. Schreiber to attend the homecoming parade. He also stated that during first period – when he is in Ms. Schreiber's Drama Class – he noticed that he had not changed his clothing from the previous school day, and so he left campus to go change and was also absent then. S.C.D.'s attendance record did *not* reflect that absence.

38. On the evening of September 21, 2025, Plaintiff again had a conversation with S.C.D. and Plaintiff wanted to clarify the circumstances of S.C.D.'s prior disclosed departure from campus. Plaintiff asked his son if he'd left school before classes began, or in the middle of 1st period, and S.C.D. stated he left in the middle of class, after school had begun.

39. These conversations with S.C.D. are video recorded and in Plaintiff's possession because of a prior court order secured by Ms. Schreiber compelling the recording of Plaintiff's conversations with his children.

40. Florida Statute § 1003.23 requires accurate attendance records for all students via its invocation of the rules set forth by the State Board of Education. Falsification of public records is a criminal offense under Florida Statute §839.13. Despite clear evidence of systematic attendance record falsification affecting Plaintiff's children, NCSO refused to investigate, demonstrating selective enforcement that favors Ms. Schreiber.

41. The failure to investigate these claims on the part of NCSO and the sentiment stated to Plaintiff about why Deputy Crews would not investigate due to the connection to school personnel demonstrates the inadequate law enforcement practices displayed throughout this action, and exemplifies the custom contributing to erosion of evidence of the wellbeing of Plaintiff's children when in Ms. Schreiber's care.

### D. The Child Abuse Report and NCSO Investigation

42. On April 11, 2024, Plaintiff picked his children up from school to begin his timesharing period. As is his custom with his children, they returned to Plaintiff's apartment and began preparing to go swimming in Plaintiff's apartment swimming pool. When preparing to go swimming, it became evident that S.C.D. had extensive bruising across his back and arms, including handprint bruises on both of his arms. S.C.D. and his siblings described him getting into an altercation with Ms. Schreiber and her paramour Richard "Noah" Raulerson, who is also a Nassau County School Board employee.

43. To ensure S.C.D.'s safety and wellbeing, Plaintiff took him to a local hospital for evaluation, where he was medically coded for child abuse, and the attending staff made referrals to the Department of Children and Families and Nassau County Sheriff's Office.

44. NCSO officers Hagan and Millan responded to the hospital, took evidentiary photos, and conducted interviews with Plaintiff, L.C.D. and an unspecified additional child as memorialized in officer Hagan's Case Supplement Report. The evidentiary photos taken by officer Hagan were placed into evidence in S.C.D.'s abuse investigation with NCSO on April 12, 2024 at 1:00 a.m. as documented in the Property Detail Report attached as **Exhibit G**.

45. Officers Hagan and Millan informed Plaintiff that they would be contacted the following day at Plaintiff's home to interview with Detective Ivan Pinkston.

46. The following morning, Plaintiff and his children remained in Plaintiff's apartment as they had been told to expect contact from both DCF investigators and NCSO Detective Pinkston.

47. At approximately 11:47am on April 12, 2024 Plaintiff answered a knock on the door at his apartment to discover an NCSO officer now known as Deputy Roberto Silva and DCF investigators CPI Jordan Cox and CPI Peters (first name unknown), and welcomed them inside. After introductions, CPI Cox and CPI Peters began their interview process, while Deputy Silva remained in Plaintiff's entryway. When questioned, it became apparent that while Plaintiff presumed that Deputy Silva was the assigned detective, that instead he had been dispatched as an escort as requested by the DCF investigators. However, he stated he would record the interviews being conducted on his body-worn camera, and Plaintiff observed him doing so. Deputy Silva also recorded the video recording Plaintiff had made the previous day of S.C.D.'s explanation for the bruises on his body which Plaintiff recorded at the moment he discovered S.C.D.'s bruises. Deputy Silva agreed to forward his body-worn camera footage to Detective Pinkston.

48. Detective Pinkston never did come to Plaintiff's residence and on information and belief, never interviewed Plaintiff's children, and on personal knowledge did not interview Plaintiff.

49. On the afternoon of April 12, 2024 Plaintiff was contacted again by DCF CPI Cox who requested Plaintiff and his children attend another interview conducted by Luis Ramirez with the First Coast Child Protection Team in Jacksonville, FL. Plaintiff and S.C.D. participated in that additional interview. In the narrative obtained by Plaintiff from DCF, the CPT team noted:

> *"The child S.C.D. and father Dustin Dufault attended CPT in Jacksonville, FL. They were interviewed by Luis Ramirez but CPI was unable to attend. The child confirmed the mother's paramour grabbed him and slammed him to the wall for fighting with his sister. Initial medical impressions are physical abuse against S.C.D. and failure to protect against the mother. Please see CPT summary for details."*

> I have modified this quote to redact S.C.D's identity. The DCF Chronological Notes Report is attached as **Exhibit H** with appropriate redactions.

50. Both child abuse and failure to protect a child from abuse are criminal acts as covered under Florida Statutes Chapter 827.

51. When Plaintiff was able to reach Detective Pinkston, he was told that he needed to wait to receive the report from DCF before he would be able to conduct his investigation and expressed difficulty getting the report due to a staff shortage at DCF.

52. According to Detective Pinkston's Investigation Summary, he received the DCF report on April 26, 2024. This is the day the DCF imposed "Safety Plan" expired and Plaintiff's children were permitted by DCF, barring law enforcement intervention, to again be in contact with Richard "Noah" Raulerson.

53. Detective Pinkston memorialized in his Investigation Summary that on April 29, 2024 he conducted an interview with Mr. Raulerson at Hilliard Middle-Senior High School. Plaintiff obtained a "redacted" copy of that recorded interview via Public records Request.

54. Plaintiff's copy of Raulerson's redacted interview audio is 9 minutes and 11 seconds long. In the interview, Mr. Raulerson's account of the events leading to S.C.D.'s bruising can be plainly heard. Mr. Raulerson's statements as captured in the recording do not comport with the statements given by Plaintiff's children in their recorded statements taken by Plaintiff when he first discovered bruising on S.C.D., the interviews with other NCSO officers as witnessed by Plaintiff, nor in their interviews with DCF as memorialized in the DCF Chronological Notes Report **(Exhibit H)**.

55. On information and belief, no recorded interview with Plaintiff or his children was retained by NCSO or placed into evidence in this investigation, and Detective Pinkston made no independent effort to interview S.C.D. or the other

children. Nor does it appear he attempted to resolve the substantial differences of Raulerson's account of events as compared to the multiple statements given to investigators by the DuFault children to both other NCSO officers and as documented in the DCF file that Detective Pinkston did have access to.

56. Detective Pinkston's Investigative Summary concludes, based on his interview with Mr. Raulerson:

> *"Based on these circumstances, I do not believe Richard Raulerson knowingly or willfully abused the reported victim. Furthermore, an excerpt from The Florida Standard Jury Instructions for Criminal Cases reads as follows: It is not a crime for [a parent] [a person who is acting in the place of a parent] of a child to impose reasonable physical discipline on a child for misbehavior under the circumstances even though physical injury resulted from the discipline. The circumstances (striking multiple people) warranted a physical response from Raulerson."*

Detective Pinkston's Investigative Report is attached as **Exhibit M.**

57. Detective Pinkston's stated rationale for his disposition of this investigation hinged in part on Mr. Raulerson invoking an affirmative defense of *in loco parentis*. The full text of the relevant Standard Florida Jury Instructions is attached as **Exhibit N**. As stated in the full instructions, this is a highly nuanced matter. As stated in Detective Pinkston's Investigative Summary, Raulerson does not live with Plaintiff's children. On information and belief, he doesn't provide financially toward their care. The DuFault children informed Plaintiff after these events that Mr. Raulerson and Ms. Schreiber engaged in an argument about Mr. Raulerson no longer engaging in discipline with Plaintiff's

children. These factors weigh heavily against Mr. Raulerson's ability to stand up an affirmative defense based on *in loco parentis*.

58. Furthermore, Detective Pinkston's statement that "I do not believe Richard Raulerson knowingly or willfully abused the reported victim" appears prematurely conclusive **(Exhibit N)**. The Florida Standard Jury Instructions define "willfully" as "intentionally and purposely." According to S.C.D.'s account in the DCF/CPT interview **(Exhibit H)**, Mr. Raulerson grabbed and slammed S.C.D. against a wall, causing the documented extensive bruising. Under the jury instructions, "child abuse" includes "the intentional infliction of physical injury upon a child." Whether such conduct exceeded reasonable discipline—particularly given the extensive bruising, handprint marks, medical coding for abuse, and DCF / CPT's findings of physical abuse and failure to protect **(Exhibit H)**—are questions of fact for a jury, especially in light of Mr. Raulerson's conflicting version of events. Detective Pinkston's role was to gather evidence and, where probable cause exists, refer the matter for prosecutorial review—not to unilaterally determine affirmative defenses would succeed at trial.

59. Officers Hagan, Milan, & Silva all conducted body worn camera interviews with Plaintiff and his children. They all wrote reports referencing child abuse against S.C.D. and failed to associate their body worn camera interviews with

the victim and other witnesses as evidence in the investigation being conducted under GS2 rules for Law Enforcement. Their reports are attached as **Composite Exhibit U**.

60. On information and belief, based on pre-suit inquiries into other instances of child abuse, Detective Pinkston's assertions do not represent the standards applied by NCSO in similarly situated circumstances not involving Ms. Schreiber, perpetuating the practice of not investigating evidence of criminality when she is implicated. This is evidenced by the cursory interview of Mr. Raulerson; the failure to properly enter, maintain, and retain evidence from multiple interviews provided to NCSO (e.g., body-worn camera footage under GS2 #200); the failure to secure independent interviews with S.C.D. and other witnesses; the failure to resolve the vastly different account Mr. Raulerson gave compared to the children's statements and the DCF report available to him **(Exhibit H)**; the failure to integrate the professional opinions of DCF/CPT and hospital workers; and the misapplication of an affirmative defense—all amounting to a complete systemic failure to investigate this matter and contributing to harms to Plaintiff's family, including reduced physical and emotional security and erosion of evidence regarding the children's wellbeing in Ms. Schreiber's care.

61. As a direct and proximate result of Detective Pinkston's premature case closure, Mr. Raulerson faced no consequences, the children received no protection, and Ms. Schreiber used the "unfounded" determination to undermine Plaintiff's credibility in family court proceedings, further eroding his parental rights. Without seeking to relitigate or challenge those state proceedings, Defendants' actions caused independent constitutional harms to Plaintiff, including interference with his fundamental liberty interest in the care, custody, and association with his children (*Troxel v. Granville, 530 U.S. 57, 65 (2000)*), emotional distress, and ongoing familial disruption.

## E. Systematic Denial of Public Records Access

### Abuse Records

62. On July 10, 2025 Plaintiff made the following public records request of NCSO:

> *"All of the investigation materials and entire case file related to case 2024-40149. These should be un-redacted, as I am the victims father and legal custodian. Please be sure to include body camera footage of all involved officers, and all reports gathered from other agencies."*

63. Initial response to Plaintiff's request was deficient in several respects. NCSO did not provide the Raulerson's interview recording, nor did they provide body-worn camera footage that Plaintiff still expected to exist then. This caused Plaintiff to send a deficiency notice to NCSO. The original request and deficiency notice are attached as **Exhibit I**.

64. Plaintiff specifically requested the unredacted audio interview with Raulerson, which was responsive to Plaintiff's earlier request but not provided, and audit logs for all items including the body-worn camera footage in the case of disposal.

65. Despite multiple inquiries, Plaintiff has not received audit logs showing the handling of the body-worn camera footage taken by Officers Millan, Hagan, Silva, or Pinkston. According to NCSO BWC policy and procedure, all of the interactions involved in this case were to be recorded by policy **(See Exhibit J)**, and Plaintiff has personal knowledge that recordings were made during his presence and interaction with officers Millan, Hagan, and Silva. Plaintiff has no way of knowing if the body-worn camera footage was ever properly classified and associated with the Abuse case in the continuing absence of production of body-worn camera audit logs from NCSO. Nor is it possible for Plaintiff to verify under what protocol they were apparently disposed, despite his attempts to clarify with NCSO through their public records process.

66. Responsive documents instead included an attachment entitled: *gs2-june-2023 - BWC retention.pdf* (attached as **Exhibit K.**) The file is a page pulled from the State of Florida *General Records Schedule GS2 for Criminal Justice Agencies and District Medical Examiners* (GS2) and the two generalized retention schedules for body-worn camera footage were highlighted under items #224 & #192.

Omitted in the provided document is the rest of the retention schedules on other pages.

67. The full GS2 document has a particularized retention schedule as it pertains to Child Abuse Investigations under item #200. I have highlighted that section and it is attached as **Exhibit L.** On information and belief, all of the body-worn camera interviews conducted of Plaintiff and his children should have been retained under this category and according to this retention schedule and entered as evidence in the child abuse investigation. That retention schedule extends for 7 years past the age of majority. S.C.D. was 10 years old.

68. NCSO's production of a page highlighted to show disposal of body-worn camera footage under generalized GS2 retention is not appropriately responsive under FS 119 public records law as it does not show the audit trail of the particular footage taken as part of the abuse investigation. Those records exist and should be provided as responsive to Plaintiff's public records inquiries under F.S. 119.

69. After Plaintiff sent NCSO his Notice of Deficiency, he was provided an audio recording of a segment of the interview between Detective Pinkston and Richard "Noah" Raulerson. The file Plaintiff was provided is titled: *240429_1041-redacted.m4a.* He was still not provided audit logs for the relevant body-worn camera footage.

70. When Plaintiff first reviewed the audio recording of the Raulerson interview, he presumed it was a full account of the interview between Detective Pinkston and Raulerson because the response from NCSO in the JustFOIA platform did not reference particularized statutory basis for making redactions as required under F.S. 119. However, Plaintiff later realized the file name provided indicated that the audio had been "redacted". This was confusing to Plaintiff because the audio he was provided contained no audible indications of redaction, causing Plaintiff to feel concerned that the audio was potentially clipped instead and therefore not an entire account of the investigation conducted by Detective Pinkston.

71. Plaintiff sent an additional public records request to NCSO to clarify whether the audio he was provided was "redacted" or "clipped", requested once again an unredacted version of the recording, or in lieu of an unredacted copy, a properly noticed, particularized, statutory basis for the redactions made that would comport with the standards set forth in F.S. 119.

72. In response to Plaintiff's renewed request, NCSO sent him the following statement:

> *The Nassau County Sheriff's Office does not have records that are responsive to your request. As a result, your request is considered closed - please contact our office with questions or submit a new request.*

*There was confidential and exempt information in the audio that was redacted. Please see the excerpt from the Florida State Statute 119.07 : (d) A person who has custody of a public record who asserts that an exemption applies to a part of such record shall redact that portion of the record to which an exemption has been asserted and validly applies, and such person shall produce the remainder of such record for inspection and copying.*

Request & Response Attached as **Exhibit Q**

73. This response is still deficient under F.S. 119.07 (d-f) which require a stated statutory basis for exemptions, not a blanket "confidential and exempt" cover with no particularity and which leaves Plaintiff unable to gauge neither the reasonableness of nor the amount of redaction taking place.

**Trespass Records**

74. The records and facts demonstrate that NCSO issued, and then rescinded a trespass warning to Ms. Schreiber as documented in Sergeant Kellam Paolillo's call for service reports **(Exhibit C)** and in the trespass warning issued by NCSO and the request letter provided by Eastwood Oaks Apartments **(Exhibit B)**.

75. NCSO's operations manual provided to Plaintiff as a result of a public records request, documents the system and process for issuing Trespass requests such as the one shown in Exhibit B. The relevant operations manual section provided to Plaintiff is attached as **Exhibit R**.

76. The operations manual states that Trespass Warnings are documented in the agencies *New World System*. A known RMS system utilized by law enforcement agencies for tracking records with robust auditing capabilities.

77. Plaintiff has made multiple inquiries in an attempt to obtain RMS audit logs for the creation, viewing, and ultimate recission of the trespass warning issued to Ms. Schreiber.

78. NCSO maintains that these records "Do not exist" and instead provides call for service reports, which themselves describe NCSO Sergeant Paolillo voiding out the trespass warning entry.

79. The creation and voiding sequence and documenting which NCSO staff may have potentially interacted with the trespass record is central to this litigation, and is a public record under F.S. 119. The claim that no record exists is inconsistent with standard record-keeping practices based on the established sequence of events and may be designed to obstruct this litigation.

80. Plaintiff is in possession of the Trespass warning which was issued and of which he was provided a copy.

81. Plaintiff is in possession of a recording made the day the trespass was issued, and then rescinded. The recording is an outbound call from an unknown NCSO party who can be heard to be on a first name basis with Ms. Schreiber.

During the recording, multiple NCSO deputies can be heard informing Ms. Schreiber that she has been trespassed from the Eastwood Oaks Apartments property. On personal knowledge, Plaintiff identifies the on-scene officers' voices in the recording as those of Deputies Sellers and McClendon.

82. NCSO's claim that "No Record Exists" is attached as **Exhibit S**.

**Communication Records**

83. On September 29, 2025 Plaintiff submitted a public records request for phone logs from NCSO's various telephony providers. These are defined as public records under F.S. 119.0701 and are commonly maintained for several years.

84. On September 30, 2025, NCSO employee Gary Gaskill uploaded a bitmap image to the JustFOIA portal. The bitmap image contained text which read "There are no matching records".

85. This confused Plaintiff as there are almost certainly telephone records covering the filtering criteria provided in his public records request, and the imparting of the statement in a bitmap image seemed intentionally engineered to make it more difficult to demonstrate non-compliance with F.S. 119

86. Plaintiff sent a further public records request inquiring about the role of Gary Gaskill as Plaintiff did not recall getting prior responses to his public records requests from that individual.

87. NCSO submitted a response that was another bitmap image – this time an image of Gary Gaskill's NCSO business card. The provided business card stated Mr. Gaskill role was *Information Technology Director*. However, the word director had been heavily redacted with an ink pen to nearly obscure the word director.

88. This caused Plaintiff to be concerned about the nature of why Mr. Gaskill's business card was so plainly defaced to misrepresent it's official form when responding to his public records request. Therefor Plaintiff sent a follow up message to NCSO's public records department flagging the response as problematic.

89. Following Plaintiff's email message to NCSO on this matter, the responsive record was deleted from the JustFOIA portal.

90. Public records requests are themselves, public records. The deletion of the responsive record from the JustFOIA portal is itself destruction of a public record, obfuscates the transparency required under Florida Statutes, and further impedes Plaintiff's civil rights and capacity to engage in the instant

litigation.

**Records Custodian Bobby Lippelman**

91. As enumerated in his bio (Attached as **Exhibit O**), Mr. Lippelman serves as a director level supervisor for NCSO and supervises the Legal Services, Government Affairs, and Records Divisions in addition to serving as General Counsel.

92. The existing production of records to Plaintiff demonstrate that NCSO personnel relied on Director Lippelman's policy statements when engaging in the conduct described within this complaint.

93. Director Lippelman has not responded to any of Plaintiff's inquiries into these matters or Plaintiff's attempts to resolve these issues extrajudicially. Instead Director Lippelman has remained silent himself and dispatched other personnel to relay the policy positions related to this litigation. Director Lippelman has refused to acknowledge Plaintiff's email requests for legal holds of his requested documents.

94. This pattern of non-response contrasts with evidence that Director Lippelman has communicated with Ms. Schreiber on multiple occasions via email and phone, including in the summer of 2024 around the time of the trespass

incident and in November 2024 when he assisted with her records requests. Records produced to Plaintiff indicate these interactions helped her obtain responsive materials promptly.

95. Director Lippelman's NCSO biography enumerates a resume well versed in all aspects of law enforcement. He graduated law school Magna Cum Laude in 2002, after which he served as an assistant state attorney for the *Fourth Judicial Circuit of Florida* serving Nassau, Duval, and Clay counties for nearly nine years. He served as senior trial attorney in multiple divisions. He had a career later in civil litigation. After joining NCSO as their general counsel, Director Lippelman attended Florida Gateway College Police Academy, and was then sworn in as a Deputy Sheriff. In 2024, in the midst of all of these matters taking place, Director Lippelman attended and completed supervisory and command instruction with FBI-LEEDA.

96. Director Lippelman is clearly well qualified to comprehend the implications of the legal policies he's communicated throughout the NCSO organization when advising on the matters within this complaint.

97. In his role overseeing the public records department – Director Lippelman is supportive of Ms. Schreiber's efforts, while stonewalling the efforts of Plaintiff – mirroring the preferred treatment Ms. Schreiber enjoyed during the original events.

98. Director Lippelman's records department's selective non-responsiveness of Plaintiff's public records requests may be an attempt to prevent examination of NCSO's broad spectrum preferential treatment towards Ms. Schreiber across a wide array of times and circumstances as described throughout this pleading, which further harms Plaintiff's constitutional rights including his right to pursue relief under this action.

## F. Ratification, Custom Evidence, and Harms

99. The incidents described in ¶¶11-61 allege a pattern and practice of NCSO affirmatively obstructing enforcement of Florida criminal laws when Ms. Schreiber or her associates are involved. This pattern, on information and belief, evidences an unconstitutional custom that implicates both equal protection (through disparate treatment), substantive due process (through arbitrary interference), and state action inflicted harms (through the destruction of evidence and creation of records based on sham investigations and application of law).

100. **Ratification by Final Policymakers.** Sheriff Leeper, as the final policymaker for NCSO, was directly notified of the unconstitutional trespass rescission on June 17, 2024 (**Exhibit D**; ¶¶24-26) but took no corrective action.

Director Anstett, acting with final policymaking authority or as Sheriff Leeper's authorized representative, explicitly confirmed NCSO's policy of non-enforcement of trespass laws in cases involving parenting plans on June 16, 2025, regardless of the plan's actual provisions or property rights involved, after consulting with Director Bobby Lippelman. The high-level approval by two director level NCSO officers, and Sheriff Leeper ratified subordinates' actions and endorsed the non-enforcement approach as official policy.

101. **Pattern of Disparate Treatment.** On information and belief, NCSO's handling of matters involving Ms. Schreiber departed from standard law enforcement practices in similarly situated cases not implicating her or other school board affiliates:

a. In trespass matters, NCSO typically enforces property owners' rights upon request (as seen with initially with Eastwood Oaks management, ¶20), but voided a valid trespass warning previously issued at management's request when Ms. Schreiber was the subject (¶¶11-27);

b. In school records investigations, NCSO typically investigates credible allegations of public records falsification, as demonstrated by the arrest of Sergeant Kellam Paolillo by NCSO on July 7, 2025. However, NCSO refused to examine documented evidence of record falsification when

school board employees were implicated and evidence was presented by Plaintiff (¶36);

c. In child abuse investigations, NCSO typically conducts thorough investigations including victim interviews and evidence preservation, but here conducted only a cursory interview with the alleged perpetrator at his school workplace, failed to preserve the body-worn camera footage of the victims statements under the appropriate and statutory retention schedule dictated in the GS2 **(Exhibit L)**, and closed the case despite medical coding for abuse and DCF findings (¶¶42-61).

102. **Deliberate Indifference Through Obvious Inadequacy.** On information and belief, the investigation practices employed in these matters were so deficient compared to standard protocols that they demonstrate deliberate indifference to Plaintiff's constitutional rights:

a. Accepting Ms. Schreiber's misrepresentation of the parenting plan without review, despite policy directives to disambiguate between civil and criminal matters (¶¶13-14);

b. Refusing to investigate repeated misrepresentations in school records based solely on the deputy's personal opinions about Hilliard school practices (¶¶28-41);

c. Closing a child abuse investigation without preserving evidence for review by the assigned Detective Pinkston, failing to re-interview the victim or reconcile the substantially conflicting accounts given by the alleged perpetrator and victim, oir the other witnesses (¶¶42-61).

103. **Evidence of Preexisting Custom.** On information and belief, NCSO's preferential treatment of Nassau County School Board employees represents a preexisting custom or practice, as evidenced by:

a. Multiple officers' immediate deference to Ms. Schreiber's assertions without verification (¶¶11-27);

b. The deputy's reflexive protection of school personnel when presented with evidence of criminal conduct (¶¶28-41);

c. Detective Pinkston's cursory investigation and disposition of the abuse case at Mr. Raulerson's school workplace (¶¶42-61);

d. The coordinated nature of the trespass rescission, involving multiple command levels within hours is indicative of a known network and method to absolve Ms. Schreiber of unlawful conduct – even when implicating a 3rd parties statutory property rights (¶¶11-27).

104. **Moving Force Behind Constitutional Violations.** NCSO's customs and policies were the moving force behind Plaintiff's constitutional injuries, as the non-enforcement approach directly enabled the voiding and non-enforcement of the trespass warning (¶¶11-27), the refusal to investigate records falsification (¶¶28-41), and the premature closure of the abuse investigation (¶¶42-61). But for this custom favoring Ms. Schreiber and her associates, Plaintiff would have received equal protection under the law, his property rights would have been enforced, criminal investigations would have proceeded according to standard protocols, and evidence of his children's welfare would have been preserved.

105. **Continuing and Cumulative Harms.** As a direct and proximate result of Defendants' unconstitutional customs, policies, and actions, Plaintiff has suffered and continues to suffer:

a. Deprivation of equal protection through disparate treatment in law enforcement services;

b. Violation of substantive due process through arbitrary and conscience-shocking interference with criminal law enforcement;

c. Interference with his fundamental liberty interest in the care, custody, and management of his children (Troxel v. Granville, 530 U.S. 57, 65 (2000)), including:

i. Lost parenting time as a result of sham investigations

ii. Diminished custody rights as a result of the "unfounded" determination

iii. Ongoing interference with parent-child relationships;

d. Severe emotional distress, including:

i. Anxiety and fear for his children's safety

ii. Helplessness from inability to protect his children

iii. Psychological trauma from witnessing his children's injuries without recourse

e. Reputational harm, including:

i. Being labeled as making false reports in family court

ii. Diminished credibility with court-appointed professionals

iii. Damage to his standing in custody proceedings;

f. Ongoing security concerns, including:

i. Continued vulnerability to harassment at his home

ii. Inability to protect his property

iii. Fear of continued trespass and confrontations;

g. Economic damages, including:

i. Legal costs in family court responding to "unfounded" findings

ii. Lost work time dealing with ongoing security issues

iii. Costs of alternative security measures;

h. Housing instability, including:

i. Risk of eviction due to ongoing disturbances at his apartment complex caused by Ms. Schreiber's continued trespassing;
ii. Strained relationship with property management due to NCSO's refusal to enforce the valid trespass warning;
iii. Inability to guarantee peaceful enjoyment of his home to apartment management;
iv. Risk to his tenancy from repeated police calls and disturbances in common areas.

i. Loss of evidence due to failures to preserve evidence according to Florida State GS2 schedules;

j. Loss of evidence regarding his children's welfare due to uninvestigated falsification of records;

k. Ongoing denial of proper investigation into credible allegations of child abuse, leaving his children unprotected.

These harms are ongoing and irreparable—Ms. Schreiber continues to act with impunity, knowing NCSO will not enforce criminal laws against her; the not preserved or produced body-worn camera footage can never be recovered; the child abuse investigation remains improperly closed despite unresolved evidence and uninterviewed witnesses; and the uninvestigated school records continue to contain falsifications, leaving Plaintiff's children unprotected from those who have harmed them.

## CLAIMS FOR RELIEF

### COUNT I: 42 U.S.C. § 1983 – SUBSTANTIVE DUE PROCESS VIOLATION UNDER THE FOURTEENTH AMENDMENT AGAINST DEFENDANT PAOLILLO

106. Plaintiff realleges and incorporates by reference ¶¶1-10 (parties and jurisdiction) and ¶¶11-27 (the trespass warning incident).

107. On June 17, 2024, Defendant Paolillo, acting under color of state law as a Nassau County Sheriff's Sergeant, violated Plaintiff's Fourteenth Amendment substantive due process rights by arbitrarily voiding a lawfully issued trespass warning against Ms. Schreiber without legal authority.

108. Defendant Paolillo's conduct was conscience-shocking and arbitrary in that he: (a) responded to Ms. Schreiber's residence and unilaterally "picked up and voided" a valid trespass warning; (b) acted without any legal basis for voiding the warning; (c) later confirmed to Plaintiff that the trespass was voided; and (d) acted with deliberate indifference to Plaintiff and Eastwood Oaks Apartment's property rights and safety.

109. As a direct and proximate result of Defendant Paolillo's violations, Plaintiff suffered the harms described in ¶105.

COUNT II: 42 U.S.C. § 1983 – EQUAL PROTECTION VIOLATION UNDER THE FOURTEENTH AMENDMENT AGAINST DEFENDANT PAOLILLO

110. Plaintiff realleges and incorporates by reference ¶¶1-10 (parties and jurisdiction) and ¶¶11-27 (the trespass warning incident).

111. Defendant Paolillo, acting under color of state law, violated Plaintiff's Fourteenth Amendment equal protection rights by intentionally treating him differently from similarly situated property owners without rational basis.

112. Upon information and belief, NCSO enforces trespass warnings for other property owners, but Defendant Paolillo selectively voided only Plaintiff's valid trespass warning against Ms. Schreiber.

113. This disparate treatment was intentional and based on impermissible favoritism toward Ms. Schreiber, as shown by Defendant Paolillo's decision to visit her residence, void the valid trespass warning at her request, and refuse to enforce it for Plaintiff and other similarly situated property owners.

114. As a direct and proximate result of Defendant Paolillo's violations, Plaintiff suffered the harms described in ¶105.

COUNT III: 42 U.S.C. § 1983 – SUBSTANTIVE DUE PROCESS VIOLATION UNDER THE FOURTEENTH AMENDMENT AGAINST DEFENDANT ANSTETT

115. Plaintiff realleges and incorporates by reference ¶¶1-10 (parties and jurisdiction) and ¶¶11-27 (the trespass warning incident).

116. Following the June 17, 2024 incident, Defendant Anstett, acting under color of state law as a director-level official at NCSO, violated Plaintiff's Fourteenth Amendment substantive due process rights by confirming and ratifying NCSO's refusal to issue trespass warnings against Ms. Schreiber.

117. Defendant Anstett's conduct was conscience-shocking in that he: (a) contacted Plaintiff at the direction of Bobby Lippelman; (b) confirmed that NCSO would not issue trespass warnings to Ms. Schreiber "due to the parenting plan" despite no legal prohibition in the parenting plan and the trespass in question originating from a 3rd party; (c) refused to provide this

rationale in writing when requested; and (d) acted with deliberate indifference to Plaintiff's civil rights and the property rights of all individuals when impacted by Ms. Schreiber's conduct.

118. As a direct and proximate result of Defendant Anstett's violations, Plaintiff suffered the harms described in ¶105.

COUNT IV: 42 U.S.C. § 1983 – EQUAL PROTECTION VIOLATION UNDER THE FOURTEENTH AMENDMENT AGAINST DEFENDANT ANSTETT

119. Plaintiff realleges and incorporates by reference ¶¶1-10 (parties and jurisdiction) and ¶¶11-27 (the trespass warning incident).

120. Defendant Anstett, acting under color of state law, violated Plaintiff's Fourteenth Amendment equal protection rights by confirming a discriminatory non-enforcement policy that treated Plaintiff differently from similarly situated individuals.

121. Upon information and belief, NCSO issues and enforces trespass warnings for other property owners, but Defendant Anstett confirmed NCSO would not do so for Plaintiff "due to the parenting plan" - a restriction not applied to other individuals.

122. This disparate treatment was intentional and lacked any rational basis, as the parenting plan contains no prohibition on trespass enforcement, and the

trespass request originated from a 3rd party with their own property rights and interests under Florida Statutes.

123. As a direct and proximate result of Defendant Anstett's violations, Plaintiff suffered the harms described in ¶105.

COUNT V: 42 U.S.C. § 1983 – SUBSTANTIVE DUE PROCESS VIOLATION UNDER THE FOURTEENTH AMENDMENT AGAINST DEFENDANT PINKSTON

124. Plaintiff realleges and incorporates by reference ¶¶1-10 (parties and jurisdiction) and ¶¶42-61 (the child abuse investigation).

125. Beginning in April 2024, Defendant Pinkston, acting under color of state law as a Nassau County Sheriff's Deputy, violated Plaintiff's Fourteenth Amendment substantive due process rights by conducting a sham investigation into credible allegations of child abuse.

126. Defendant Pinkston's conduct was conscience-shocking in that he: (a) failed to secure existing recorded contemporaneous interviews with S.C.D., the ten-year-old victim who made the outcry, or other witnesses; (b) failed to replace these interviews of the victim by conducting his own; (c) failed to review or incorporate the medical opinions of multiple professionals into his investigation; (d) closed the investigation as "unfounded" after conducting only perfunctory inquiries against the alleged perpetrator without

interviewing the victim; and (e) acted with deliberate indifference to the safety and welfare of Plaintiff's children.

127. As a direct and proximate result of Defendant Pinkston's violations, Plaintiff suffered the harms described in ¶105.

COUNT VI: 42 U.S.C. § 1983 – EQUAL PROTECTION VIOLATION UNDER THE FOURTEENTH AMENDMENT AGAINST DEFENDANT PINKSTON

128. Plaintiff realleges and incorporates by reference ¶¶1-10 (parties and jurisdiction) and ¶¶42-61 (the child abuse investigation).

129. Defendant Pinkston, acting under color of state law, violated Plaintiff's Fourteenth Amendment equal protection rights by conducting a sham investigation while properly investigating abuse allegations for other parents.

130. Upon information and belief, NCSO conducts thorough investigations including interviewing child victims when other parents report abuse, but Defendant Pinkston refused to interview S.C.D. or review evidence when Plaintiff reported abuse.

131. This disparate treatment was intentional and based on impermissible bias, denying Plaintiff the equal protection of law enforcement services.

132. As a direct and proximate result of Defendant Pinkston's violations, Plaintiff suffered the harms described in ¶105.

COUNT VII: 42 U.S.C. § 1983 – SUBSTANTIVE DUE PROCESS VIOLATION UNDER THE FOURTEENTH AMENDMENT AGAINST DEFENDANT LIPPELMAN

133. Plaintiff realleges and incorporates by reference ¶¶1-10 (parties and jurisdiction) and ¶¶11-27 (the trespass warning incident).

134. Defendant Lippelman, acting under color of state law as NCSO's General Counsel and Director, violated Plaintiff's Fourteenth Amendment substantive due process rights by providing legally baseless advice that led to the voiding of a lawfully issued trespass warning.

135. Defendant Lippelman's conduct was conscience-shocking in that he: (a) advised Sergeant Paolillo that a valid trespass warning should be voided "due to the parenting plan" when no such legal prohibition existed; (b) directed Director Anstett to communicate this unlawful policy to Plaintiff; (c) knew or should have known as an experienced attorney that his legal advice lacked any basis in law; and (d) acted with deliberate indifference to the property rights of third parties and Plaintiff's safety.

136. As a direct and proximate result of Defendant Lippelman's violations, Plaintiff suffered the harms described in ¶105.

COUNT VIII: 42 U.S.C. § 1983 – EQUAL PROTECTION VIOLATION UNDER THE FOURTEENTH AMENDMENT AGAINST DEFENDANT LIPPELMAN

137. Plaintiff realleges and incorporates by reference ¶¶1-10 (parties and jurisdiction), ¶¶11-27 (trespass incident) and ¶¶62-98 (public records access).

138. Defendant Lippelman, acting under color of state law, violated Plaintiff's Fourteenth Amendment equal protection rights by participating in discriminatory enforcement regarding the trespass warning and systematically denying him access to public records while facilitating access for Ms. Schreiber.

139. This disparate treatment was intentional, as evidenced by: (a) Lippelman's legally baseless advice that led to voiding a valid trespass warning; (b) Lippelman's failure to respond to any of Plaintiff's communications; (c) his assistance to Ms. Schreiber in obtaining records in November 2024; and (d) the Records Division's pattern of withholding public records requested by Plaintiff under his supervision.

140. As a direct and proximate result of Defendant Lippelman's violations, Plaintiff suffered the harms described in ¶105.

COUNT IX: 42 U.S.C. § 1983 – CONSPIRACY TO DEPRIVE SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT(AGAINST DEFENDANTS: LIPPELMAN, PAOLILLO, & ANSTETT)

141. Plaintiff realleges and incorporates by reference ¶¶1-10 (parties and jurisdiction) and ¶¶11-27 (the trespass warning incident).

142. Defendants Lippelman, Anstett, and Paolillo reached a mutual understanding and agreement to deprive Plaintiff of his substantive due process and equal protection rights under the Fourteenth Amendment by annulling the Eastwood Oaks trespass warning and formalizing a policy of non-enforcement benefiting Ms. Schreiber.

143. In furtherance of this agreement, Defendant Paolillo voided the warning, Defendant Anstett confirmed the blanket non-enforcement directive, and Defendant Lippelman provided or approved the pretextual legal justification for those actions.

144. Their concerted conduct caused the constitutional injuries to Plaintiff described in ¶105.

COUNT X: 42 U.S.C. § 1983 – MUNICIPAL LIABILITY / MONELL AGAINST DEFENDANT LEEPER, AS SHERIFF OF NASSAU COUNTY

145. Plaintiff realleges and incorporates by reference ¶¶1-105.

146. Through Director / General Counsel Lippelman, Director Anstett, and Sergeant Paolillo's actions throughout this complaint, and through the actions of other Deputies, the Nassau County Sheriff's Office maintained, ratified, and enforced an official custom of non-enforcement of trespass and abuse related laws benefiting Ms. Schreiber, and failed to train or supervise personnel regarding constitutional enforcement duties.

147. These customs and resulting supervisory failures were the moving force behind the violations alleged in Counts I–III, and the injuries to Plaintiff described in ¶105.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and provide the following relief:

148. Against Defendants Anstett, Paolillo, and Lippelman:

a. If the conspiracy alleged in Count IX is proven, jointly and severally, compensatory damages of at least $500,000;

b. In the alternative, against each defendant individually for compensatory damages for their respective violations as proven at trial;

for the severe emotional distress, ongoing security concerns, property rights violations, reputational harm, and interference with family relationships arising from the trespass incident and related constitutional violations as detailed in ¶104.

149. Against Defendant Pinkston, compensatory damages of at least $750,000 for the severe emotional distress, interference with fundamental parental rights, reputational damage from the "unfounded" determination used against Plaintiff in custody proceedings, and ongoing harm to parent-child relationships arising from the inadequate child abuse investigation as detailed in ¶105.

150. Against all individual Defendants, punitive damages of at least $1,000,000 each for their deliberate indifference to child safety, knowing violation of clearly established constitutional rights, and pattern of discriminatory conduct.

151. Against Defendant Sheriff Bill Leeper in his official capacity:

a. Declaratory relief pursuant to 28 U.S.C. §§ 2201-02 declaring NCSO's customs, policies, and practices of selective non-enforcement based on favoritism unconstitutional;

b. Permanent injunctive relief requiring:

   I. Reopening and proper investigation of case 2024-40149 in accordance with constitutional standards;

   II. Revision of enforcement and evidence-preservation policies to ensure equal protection;

   III. Mandatory training for all NCSO personnel on constitutional enforcement duties and the prohibition against selective enforcement;

   IV. Implementation of oversight mechanisms to prevent future discriminatory enforcement;

   V. Preservation of all evidence related to the incidents described herein;

c. Compensatory damages for the ongoing harms caused by NCSO's unconstitutional customs and policies.

152. Costs, including reasonable attorneys' fees under 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

Respectfully submitted,

Dustin DuFault
Pro Se Plaintiff
815 Stanley Drive
Fernandina Beach, FL 32034
410.982.9607
dustin@halcyonharbor.com
Date: September 26, 2025

---

**Exhibit Index**

Exhibit A: Relevant Excerpts from Parenting Plan (¶9)

Exhibit B: Copy of Trespass Warning (¶¶20; 74-75)

Exhibit C: Composite of Deputy Sergeant Kellam Paolillo's Reports (¶21)

Exhibit D: Email to Sheriff Bill Leeper (¶24)

Exhibit E: Emails to NCSO General Counsel Bobby Lippelman (¶26)

Exhibit F: Composite Document Submitted to NCSO on School Records (¶36)

Exhibit G: Property Detail Report (¶44)

Exhibit H: DCF Chronological Notes Report (Redacted) (¶¶49-59)

Exhibit I: Public Records Request and Deficiency Notice to NCSO (¶63)

Exhibit J: NCSO Body-Worn Camera Policy and Procedure (¶65)

Exhibit K: Partial GS2 Schedule (gs2-june-2023-BWC-retention.pdf) (¶66)

Exhibit L: GS2 Item #200 For Child Abuse; Highlighted (¶67)

Exhibit M: Detective Pinkston's Investigative Report (¶56)

Exhibit N: Florida Standard Jury Instructions (Relevant Excerpt) (¶¶57-58)

Exhibit O: Bobby Lippelman bio displayed on NCSO website (¶¶7C; 91)

Exhibit P: Our Family Wizard message to Ms. Schreiber on day of trespass (¶16)

Exhibit Q: Raulerson Interview Redaction Re-Inquiry and Response (¶72)

Exhibit R: NCSO Ops Manual, Trespass Warnings (¶75)

Exhibit S: Trespass RMS Request Stating No Record Exists (¶81)

Exhibit T: NCSO Ops Manual; Disambiguating Civil vs Criminal Matters (¶14)

Exhibit U: Composite: Hagan, Milan, and Silva's reports, child abuse (¶59)