Exhibit A

VIII. TRANSPORTATION AND EXCHANGE OF CHILDREN

1. Transportation:
The parent beginning their time-sharing shall provide transportation for the children.

2. Exchange:
Both parents shall have the children ready on time with sufficient clothing packed and ready at the agreed upon time of exchange. If a parent is more than 30 minutes late



DS
ENĐ

DS
DMD

Wife

Husband

without contacting the other parent to make other arrangements, the parent with the children may proceed with other plans and activities.

Exchanges shall be at school when in session and at the Father's residence when not in session, unless the parties mutually agree in writing otherwise.

Exhibit B

# Nassau County Sheriff's Office

## FIELD INVESTIGATION REPORT/TRESPASS WARNING

76001 BOBBY MOORE CIR
YULEE, FL 32097

**EVENT**

| CONTACT DATE/TIME | CONTACT TYPE | CONTACT REASON | CASE # |
|---|---|---|---|
| 06/17/2024 09:27 | *Trespass Warning | *Trespass Warning | 2024-00062676 |
| [illegible] | | [illegible] | INFORMATION SOURCE |
| | | | |
| LOCATION | | | |
| 37149 CODY CIR HILLIARD, FL | | | |

**CONTACT**

| CONTACT ROLE | | NAME (LAST, FIRST, MIDDLE, SUFFIX) | | | | |
|---|---|---|---|---|---|---|
| *Trespass Subject | | SCHREIBER, ERIN NICOLE | | | | |
| DOB | AGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | |
| 03/17/1985 | 39 | 37122 W 3RD ST HILLIARD, FL 32046 | | | | |
| RACE | SEX | | HEIGHT | WEIGHT | HAIR | EYE |
| White | Female | | 5'7" | 190 | BRO | BRO |
| DL NUMBER/STATE | | PRIMARY PHONE | | | | |
| S616214855971 / FL | | (904)400-1303 | | | | |

**CONTACT**

| CONTACT ROLE | | NAME (LAST, FIRST, MIDDLE, SUFFIX) | | | | |
|---|---|---|---|---|---|---|
| Business | | EASTWOOD OAKS APARTMENTS, | | | | |
| DOB | AGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | |
| | | 37149 CODY CIR HILLIARD, FL 32046 | | | | |
| RACE | SEX | | HEIGHT | WEIGHT | HAIR | EYE |
| | | | | | | |
| DL NUMBER/STATE | | PRIMARY PHONE | | | | |
| | | | | | | |

### FIELD INVESTIGATION NARRATIVE

This person has been trespassed for a time period of one year.

Per Eastwood Oaks Apartments management, all buildings and parking lot.

*ADDITIONAL CONTACTS AND VEHICLES MAY BE PRINTED ON FOLLOWING PAGES*

| INVESTIGATING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| 1531 SELLERS | 06/17/2024 | |

Exhibit B

**Nassau County Sheriff's Office**
FIELD INVESTIGATION REPORT
76001 BOBBY MOORE CIR
YULEE, FL 32097

2024-00062676

## ADDITIONAL CONTACTS

**CONTACT**

| CONTACT ROLE | NAME (LAST, FIRST, MIDDLE, SUFFIX) | | | | |
|---|---|---|---|---|---|
| Complainant | GEIGER, KENNEDY LORIN | | | | |
| DOB / AGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | |
| 09/28/2001 / 22 | 37149 CODY CIR HILLIARD, FL 32046 | | | | |
| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYE |
| White | Female | 5'5" | 130 | BLK | BRO |
| DL NUMBER/STATE | PRIMARY PHONE | | | | |
| G260512018481 / FL | | | | | |

**CONTACT**

| CONTACT ROLE | NAME (LAST, FIRST, MIDDLE, SUFFIX) | | | | |
|---|---|---|---|---|---|
| DOB / AGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | |
| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYE |
| DL NUMBER/STATE | PRIMARY PHONE | | | | |

**CONTACT**

| CONTACT ROLE | NAME (LAST, FIRST, MIDDLE, SUFFIX) | | | | |
|---|---|---|---|---|---|
| DOB / AGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | |
| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYE |
| DL NUMBER/STATE | PRIMARY PHONE | | | | |

**CONTACT**

| CONTACT ROLE | NAME (LAST, FIRST, MIDDLE, SUFFIX) | | | | |
|---|---|---|---|---|---|
| DOB / AGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | |
| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYE |
| DL NUMBER/STATE | PRIMARY PHONE | | | | |

**CONTACT**

| CONTACT ROLE | NAME (LAST, FIRST, MIDDLE, SUFFIX) | | | | |
|---|---|---|---|---|---|
| DOB / AGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | |
| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYE |
| DL NUMBER/STATE | PRIMARY PHONE | | | | |

| INVESTIGATING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| | | |

Exhibit B

# East Wood Oak

37149 Cody Cir
Hilliard Fl 32046

June 12, 2024

This is to certify that East Wood Oaks Apartments is wanting and willing to criminally trespass Erin Schreiber from the property. We have had multiple complaints regarding Ms. Schreiber on the property.

If you have any questions, you can reach the office at 904-8445-2922 or you can reach me directly at 470-283-0362.

Thank you

Amanda Hall
Community Manager
Eastwoodoaks.mgr@apg-inc.com

Exhibit B

Nassau County Sheriff's Office

## Call For Service Detail Report - CFS 877

| | | | | | |
|---|---|---|---|---|---|
| **Address** | 15821 CR 108, HILLIARD | | | | |
| **Common Name** | HILLIARD LIBRARY | | | | |
| **Custom Layer** | | **Census Tract** | | | |
| **Beat** | C1 | **Quadrant** | 40/90 | **District** | |
| **Caller Name** | DUFAUT, DUSTIN | **Caller Phone** | (410) 982-9607 | **Call Taker** | mi1424 |
| **Create Date** | 6/17/2024 9:08:29 AM | **Clear Date** | 6/17/2024 9:58:14 AM | **Nature Of Call** | |

**Call Details**

| Call Type | Status | Priority | Dispatcher | Created Date |
|---|---|---|---|---|
| S51 - Investigation | Follow-up In Progress | Low | mi1424 | 6/17/2024 9:08:29 AM |

**Call Narrative**

***** 6/17/2024 *****

| Time | Description | User | Unit # | Machine |
|---|---|---|---|---|
| 9:57:52 AM | THE SUB HAS BEEN S42 FROM EASTWOOD OAKS REFERNCE CCR#2024-00062676. | Mclendon,Kara | A901 | PATROL-313 |
| 9:13:23 AM | COMPL 1023 AT GOLD HEAVY DUTY DODGE TRUCK | Fencik,Michael | | DISPATCH-W10-5 |
| 9:13:04 AM | COMPL BELIEVES SHE WENT TO 37425 CODY CIRCLE APT C12 / EASTWOOD OAKS | Fencik,Michael | | DISPATCH-W10-5 |
| 9:12:20 AM | WAS TO DO S56 EXCHANGE NOW AT LIBRARY | Fencik,Michael | | DISPATCH-W10-5 |
| 9:11:34 AM | COMPL HAS LETTER FROM APT COMPLEX | Fencik,Michael | | DISPATCH-W10-5 |
| 9:11:25 AM | REQ LEO TO DO S42 PAPERWORK | Fencik,Michael | | DISPATCH-W10-5 |
| 9:11:11 AM | S51 REF 24-61391 / S43 HARASS "RUN INS" W/ EXWIFE | Fencik,Michael | | DISPATCH-W10-5 |

**EMD Narrative**

| Time | Description | User |
|---|---|---|

**Call Persons**

| Name | Date of Birth | Contact Phone | Machine |
|---|---|---|---|
| DUFAUT,DUSTIN | | (410) 982-9607 | DISPATCH-W10-5 |
| SCHREIBER,ERIN | [redacted]1985 | | PATROL-313 |

**Call Vehicles**

| Vehicle Type | Make | Model | Role | Year | License State | License Number |
|---|---|---|---|---|---|---|

**Call Dispositions**

| Name | Count |
|---|---|

Exhibit C

Nassau County Sheriff's Office

# Call For Service Detail Report - CFS 923

| | | | | | |
|---|---|---|---|---|---|
| **Address** | 37149 CODY CIR, HILLIARD | | | | |
| **Common Name** | EASTWOOD OAKS APARTMENTS | | | | |
| **Custom Layer** | | **Census Tract** | | | |
| **Beat** | C1 | **Quadrant** | 40/90 | **District** | |
| **Caller Name** | SCHREIBER, ERIN | **Caller Phone** | (904) 400-1303 | **Call Taker** | CH1540 |
| **Create Date** | 6/17/2024 10:56:24 AM | **Clear Date** | 6/17/2024 12:09:06 PM | **Nature Of Call** | |

**Call Details**

| Call Type | Status | Priority | Dispatcher | Created Date |
|---|---|---|---|---|
| PX - Call By Phone | Not In Progress | SPC | CH1540 | 6/17/2024 10:56:24 AM |

**Call Narrative**

*** 6/17/2024 ***

| Time | Description | User | Unit # | Machine |
|---|---|---|---|---|
| 12:09:05 PM | The s42 has been picked up and voided. | PAOLILLO,KELLAM | 7711 | PATROL-201 |
| 11:02:02 AM | COMPL ADVS SHE DOESN'T "WANT TO COMPLAIN" BUT JUST WANTS TO UNDERSTAND WHAT'S GOIN ON | Martin,Charles | | DISPATCH-W10-3 |
| 10:58:14 AM | COMPL REQ 1045 FROM S UNIT REF "HOW SHE WAS TALKED TO" EARLIER WHEN SHE WAS S42 FROM THIS 1020 | Martin,Charles | | DISPATCH-W10-3 |

**EMD Narrative**

| Time | Description | User |
|---|---|---|

**Call Persons**

| Name | Date of Birth | Contact Phone | Machine |
|---|---|---|---|
| SCHREIBER,ERIN | | (904) 400-1303 | DISPATCH-W10-3 |

**Call Vehicles**

| Vehicle Type | Make | Model | Role | Year | License State | License Number |
|---|---|---|---|---|---|---|

**Call Dispositions**

| Name | Count |
|---|---|

**Unit Dispositions**

| Name | Count | Unit Number | Disposition Date |
|---|---|---|---|
| H | 1 | 7711 | 6/17/2024 12:09:05 PM |

Exhibit C

Nassau County Sheriff's Office

## Call For Service Detail Report - CFS 18

| | | | | | |
|---|---|---|---|---|---|
| **Address** | 37425 CODY CIR, HILLIARD | | | | |
| **Common Name** | | | | | |
| **Custom Layer** | | **Census Tract** | | | |
| **Beat** | ZONE10 | **Quadrant** | 40/90 | **District** | |
| **Caller Name** | DUFAULT, DUSTIN | **Caller Phone** | (410) 982-9607 | **Call Taker** | mi1424 |
| **Create Date** | 6/17/2024 2:53:40 PM | **Clear Date** | 6/17/2024 3:46:57 PM | **Nature Of Call** | |

**Call Details**

| Call Type | Status | Priority | Dispatcher | Created Date |
|---|---|---|---|---|
| PX - Call By Phone | In Progress | SPC | mi1424 | 6/17/2024 2:53:40 PM |

**Call Narrative**

***** 6/17/2024 *****

| Time | Description | User | Unit # | Machine |
|---|---|---|---|---|
| 3:46:42 PM | Made 10-25 with the complainant via Px. He was advised a s42 will not be issued due to the Court Order in place and after consulting with the NCSO Legal Counsel. He requested the on duty Lt make contact with him. I made contact with Lt. Griffith and advised him of the scenario. | PAOLILLO,KELLAM | 7711 | PATROL-201 |
| 2:58:09 PM | REQ 1045 FROM S UNIT | Fencik,Michael | | DISPATCH-W10-5 |
| 2:57:52 PM | REF CCR 24-62676 | Fencik,Michael | | DISPATCH-W10-5 |
| 2:57:10 PM | S51 /COMPL ADV EXWIFE WAS S42 TODAY / SGT RECINDED THE S42 / NOW WORRIED | Fencik,Michael | | DISPATCH-W10-5 |

**EMD Narrative**

| Time | Description | User |
|---|---|---|

**Call Persons**

| Name | Date of Birth | Contact Phone | Machine |
|---|---|---|---|
| DUFAULT,DUSTIN | | (410) 982-9607 | DISPATCH-W10-5 |

**Call Vehicles**

| Vehicle Type | Make | Model | Role | Year | License State | License Number |
|---|---|---|---|---|---|---|

**Call Dispositions**

| Name | Count |
|---|---|

**Unit Dispositions**

Exhibit D



Gmail

Dustin DuFault <dustin@halcyonharbor.com>

mailto:Bleeper@nassauso.com

## Police sergeant's disposition of 24-62676

3 messages

**Dustin DuFault** <dustin@halcyonharbor.com> Mon, Jun 17, 2024 at 5:12 PM
To: Bleeper@nassauso.com

Sheriff Leeper,

I am writing regarding the case number above. I'm sorry to involve you but it would appear that senior level intervention will be required for a resolution on this matter that comports with my interpretation of Florida law. In short a sargent on your force overturned a trespass that was entered earlier in the day today for my ex wife.

I am currently occupying an apartment at Eastwood Oaks Apartments in Hilliard, FL which is the property from which she was trespassed. I also maintain a home in Fernandina Beach. My ex wife has repeatedly engaged in harassing behavior when I have my children for timesharing at my apartment. I have requested on multiple previous occasions to have her trespassed from the premises and she has always responded by telling the responding deputies that "because our parenting plan states that she should pick the children up from my apartment she should not be trespassed". They have therefore declined to issue the trespasses that I have requested historically.

However - on Wednesday 6/12/24, she once again was present at my home when I was supposed to be enjoying timesharing with my children and banging on our door and yelling. I had deputy McClendon come out and she did her whole "I have a parenting plan that says I can come here" routine - despite this not being a time during which we were to change timesharing of the children --- none of the times I've contacted your office have been. Deputy McClendon then told me, as expected based on prior interactions, that she would not be trespassing my ex wife, Ms. Schreiber. Instead she asked her to leave. Ms. Schreiber did leave, but after deputy McClendon left she was back banging on my door in less than five minutes, prompting me to call once again because my children and I were trapped in my apartment.

At that point Deputy McClendon, without input or prompting from me, engaged with the property manager and secured authorization *from them* to trespass Ms. Schreiber, however Ms. Schreiber had already left the premises by that point.

Fast forward to today and Ms. Schreiber was back on the property despite my warning her that she was no longer welcome on the Eastwood Oaks property. Officers Sellers and McClendon responded and proceeded to trespass her at the request of the apartment office. However, Ms. Schreiber contacted a Sargent and complained under the same legal theory she's stated all along --- that she "couldn't be trespassed because she has a parenting plan stating pickups should be conducted at my apartment". The sargent then agreed to delete the trespass warning which had already been issued to her.

Obviously I *do need to get the parenting plan updated.* I understand that. However for the moment I need some physical protection from a person who is increasingly unstable. It would also help ensure my request for a change in our parenting plan is granted if I can show that Ms. Schreibers conduct necessitated the issuance of a trespass by the apartment management and I do not agree that whatever civil agreements exist between Ms. Schreiber and myself impact or abridge the rights provided under florida statutes for trespass law. When I contacted the sargent that made the decision to delete her trespass warning, he stated that it was *because* the matter was a civil issue. I disagree with this assessment. What is a civil issue is the impact that any trespass would have on our private, civil agreement. That is not in fact a matter for the sheriffs office to adjudicate. The rights to trespass law exist under statute and the statutes do not state that they can be subjugated by private agreements. Moreover, the trespass request that was filed and then deleted today was not made by myself, but by a third party - the apartment complex themselves.

Therefore I believe the decision that was made by your sargent in this matter was made in error and is contrary to the rights established under Florida trespass law. Beyond that legal basis for the request I have substantial concerns about Ms. Schreibers unfettered access to come and harass me and my children. In an earlier incident she's actually, somehow, managed to open my locked door when showing up during my timesharing, and she's had many many prior incidents of engaging in concerning conduct at my residence. Beyond that - she's had more police interactions that had *nothing to do with me* within the past couple of months than any other adult I know of. Both with your officers and the Fernandina Beach Police. She has an open DCF investigation regarding abusing my son, and when I left town for just a handful of days a couple weeks ago she'd somehow managed to drive my eleven year old daughter to suicide and had her placed into a pediatric psych ward. My daughter has never had even a remote indication of any sort of psych problem when in my care. So all of that to say.... this is not some tit for tat marriage dispute. She's increasingly scary and unhinged in her conduct and that is the reason that I am pushing for my rights to be honored under Florida law. It would also help provide the basis

Exhibit D



for me to get the parenting plan changed to provide increased safety --- but as I told your sargeant, even with a modified pickup location for our parenting plan - that does nothing whatsoever to ensure the children's safety at my apartment when we aren't swapping which is when all of my ex wife's problematic conduct is occuring. I've never had to contact the sheriff's office during a time swap.

So that's my story. In short I don't believe the Sheriff's office should be denying relief that's provided by statute and I don't believe it's appropriate for officers to be truncating relief provided by statute because of a private agreement to which they are not a party and which is honestly unknowable to them in a verifiable way. That is a matter for the civil courts to handle. Upholding trespass law is a separate matter and our civil agreement which can only be read and interpreted by a court shouldn't color or abridge applying the trespass law as established by statute. With a trespass in place I can apply for relief from the family court from a stronger position than I presently can, and if they deem me to have broken the agreement then that can be dealt with at that time --- but that also won't happen because this trespass was requested by a third party --- the apartment complex at which I reside.

Thank you for your attention to this matter, I genuinely appreciate your time.

Dustin DuFault

---

[redacted] [redacted]

[redacted].

[Quoted text hidden]

---

**Dustin DuFault** <dustin@halcyonharbor.com> Mon, Jun 17, 2024 at 6:25 PM
To: Bleeper@nassauso.com

Sheriff Leeper,

I'm following up on my earlier email. I just wanted to send a copy of the trespass warning that I received this morning. As you can see the requesting party was the apartment complex - Eastwood Oaks Apartments. I am also attaching a copy of a letter I received from the apartment management regarding trespassing Ms. Schreiber. I did not instigate them seeking this relief - I found out about it after it had already been arranged between the management and Deputy McClendon last week. Although I maintain I also have a separate right to trespass Ms. Schreiber irrespective of our civil agreement under our parenting plan --- in this case the apartment was making the request. I submit this was a lawful request and should be enforced by NCSO and not rescinded.

With that in place that provides a good rational basis for me to then seek modification of our parenting plan.

Regards,

Dustin DuFault

[Quoted text hidden]

---

**2 attachments**

**2024_06_16_21_53_21.pdf**
138K

**2024_06_17_10_22_14.pdf**
675K

Exhibit E



Gmail Dustin DuFault <dustin@halcyonharbor.com>

**Formal Demand to Reinstate Trespass and Clarify NCSO Policy Regarding Civil Agreements**
1 message

**Dustin DuFault** <dustin@halcyonharbor.com> Fri, Jun 13, 2025 at 11:13 PM
To: blippelman@nassauso.com

Date: June 13, 2025

Mr. Bobby Lippelman

General Counsel

Nassau County Sheriff's Office

77151 Citizens Circle

Yulee, FL 32097

blippelman@nassauso.com

## Subject: Formal Demand to Reinstate Trespass and Clarify NCSO Policy Regarding Civil Agreements

Dear Mr. Lippelman,

I am writing to request immediate remedial action regarding a critical issue with how the Nassau County Sheriff's Office has handled enforcement of Florida's trespass laws in relation to my private residence and my rights as a lawful tenant.

As you are aware, Florida law (specifically § 810.09, Fla. Stat.) clearly grants a resident the right to exclude any individual from their property. On multiple occasions, I requested that deputies issue a trespass warning to Ms. Erin Schreiber due to her unauthorized and disruptive presence at my home — including during timesharing periods in which she is not scheduled to retrieve our children. Despite meeting the statutory criteria, deputies refused to issue the trespass, deferring instead to Ms. Schreiber's verbal assertions about the contents of our parenting plan.

It is my understanding — and my firm position — that:
- A civil parenting plan does not create an unconditional right for either party to enter the other's residence without permission.
- Law enforcement officers do not have the authority to interpret or override civil agreements in lieu of enforcing criminal trespass statutes.
- A lawful resident or property manager has the right to request a trespass warning, and that right cannot be abridged by third-party claims to civil access.

Most egregiously, on one occasion when NCSO deputies rightly recognized the dangerous and disruptive behavior of Ms. Schreiber and, based on complaints from other residents, worked with my apartment complex to issue a formal trespass warning — that warning was later rescinded by NCSO administration without my consent and over the objection of property management.

Exhibit E



To that end, I am formally requesting the following:

1. Immediate Reinstatement of the Rescinded Trespass Warning
Attached to this letter are:
- A copy of the original trespass warning issued to Ms. Schreiber.
- A letter from my apartment complex management confirming their interest in having Ms. Schreiber excluded from the property.

As a lawful tenant, and as a parent with a court-ordered parenting schedule, I assert my right to a safe and stable home environment. The original trespass was properly issued and should be reinstated without further delay.

2. Written Clarification of NCSO Policy
Please provide the following in writing:
- Confirmation that it is NCSO policy to honor trespass requests made by lawful residents, as required under Florida law.
- A legal explanation for why a trespass warning issued at the request of a property owner was rescinded — and whether such actions are routine, or discretionary.

3. Assurance Against Future Interference
I request assurance that NCSO will not allow parenting plan interpretations by either party to substitute for objective legal analysis when deciding whether to enforce criminal trespass statutes.

If this matter is not resolved promptly, I will have no choice but to explore my remaining legal remedies, including potential tort claims under Fla. Stat. § 768.28 for negligent failure to act, and civil rights violations under 42 U.S.C. § 1983 if this pattern of behavior continues.

I respectfully request a written response within ten (10) business days, including confirmation of the reinstated trespass and clarification of policy going forward.

Sincerely,

Dustin DuFault
37425 Cody Circle, Apt C12
Hilliard, FL 32046
410.982.9607

Attachments:

Trespass Warning & Apartment Management Letter

---

**Trespass Warning & Apartment Letter.pdf**
322K

**Exhibit E**

# Follow-Up on Denial of Trespass Request and Verbal Policy Clarification

Summarize this email

**Dustin DuFault** <dustin@halcyonharbor.com> Mon, Jun 16, 6:02PM
to blippelman

[Your Full Name]
[Your Street Address]
[City, State, ZIP Code]
[Phone Number]
[Email Address]

Date: [Insert Date]

Mr. Bobby Lippelman
General Counsel
Nassau County Sheriff's Office
77151 Citizens Circle
Yulee, FL 32097
blippelman@nassauso.com

Dear Mr. Lippelman,

I am writing to formally memorialize a phone call I received today at 4pm from an administrative representative of the Nassau County Sheriff's Office, who contacted me on your behalf due to your unavailability. I was informed the call was from the person's individual contact number which was 904.548.4081. During this call, I was informed that NCSO continues to refuse to issue a trespass warning to Ms. Erin Schreiber based on the assertion that our civil parenting plan grants her access to my residence.

I respectfully reiterated that a parenting plan is not a criminal defense to trespass, nor does it override a lawful resident's statutory right under Florida law (Fla. Stat. §810.09) to exclude an individual from their home. The representative declined to address the legal merits and maintained NCSO's position without providing written policy or legal justification. He also stated that your office would not respond in writing unless "something changes."

Given the seriousness of this matter and NCSO's stated refusal to respond in writing, I am proceeding with complaints to state oversight authorities and filing a federal civil rights action to seek appropriate relief.

Sincerely,

Dustin DuFault

Reply Forward

Exhibit F

To:
Nassau County Sheriff's Office
Criminal Investigations Division
June 23rd, 2025

## Subject: Formal Criminal Complaint – Alleged Tampering with Public School Attendance Records (F.S. §839.13)

Dear Investigations Division,

I am formally reporting suspected felony violations of F.S. §839.13 involving the falsification or suppression of public school attendance records in order to obscure unauthorized student removals by Ms. Erin Schreiber.

This conduct, if proven, constitutes criminal falsification of official public records, and may also implicate school board personnel in coordinated acts of tampering or dereliction of duty.

## Background and Allegations

### 1. Unauthorized Removals during My Timesharing

Multiple incidents occurred in which my children were removed from school without my knowledge or consent during my court-ordered timesharing period. These removals appear to have been deliberately hidden from official attendance logs:
- [redacted] DuFault (2022–23 school year): Removed from school during the day and taken to Ms. Schreiber's home to play Uno, then returned before the end of the school day.
- [redacted] DuFault (2022–23 school year): Removed from school to play Clue at Ms. Schreiber's home and returned before school dismissal.
- [redacted] DuFault (2023–24 school year): Repeatedly removed from school during her math class on days designated as my timesharing. [redacted] states she was taken home to change out of her Crocs because her mother's boyfriend did not approve of them—a matter entirely unrelated to school conduct or dress code violations.

These removals were not documented in the children's attendance records.

### 2. Extemporaneous Explanations

In response to the events above, I communicated with principals at Hilliard Elementary School and Hilliard Middle Senior High School, and copied Nassau County School Board Superintendent Kathy Burns. These communications are attached as **Attachment A.** I was told at the time that the missing records were a result of not counting absences after a certain time of day. Indeed, I was also informed that for the 2024-25 school year that at least in the case of Hilliard Elementary School, that parents were no longer permitted to remove children from the classroom after a certain time to prevent the circumstances that happened to me with missing attendance records.

Exhibit F

### 3. New, additional inconsistencies in attendance records vs. sworn statements

On May 07, 2025, Ms. Schreiber filed her

PETITIONER/FORMER WIFE'S VERIFIED EMERGENCY MOTION TO SUSPEND TIMESHARING AND/OR OTHER RELIEF.

In her motion, she states:

*"After the Former Husband dropped of [redacted] at school, the child was too distraught to attend her classes until 5th period, and then she had an extreme panic attack Monday night; she continues to experience pervasive anxiety."*

In the subsequent hearing, [redacted] DuFault testified under oath. The hearing was recorded by a court reporter. [redacted] testimony includes the following excerpt:

And then he dropped me off at school. I
couldn't find my mom. I think she was in a
meeting. So I went to my mom's boyfriend's
classroom, and he, like, put me in a classroom by
myself while I could wait for Mom to come. And so
she came. For about half the day, I just stayed in
her room. She picked up my classwork. I worked on
it there. And then I went back to my regular
things, like, for that school day.

Despite these statements, the official school attendance records reflect that [redacted] was marked present in all of her classes as if she had followed her full schedule. This documentation is provided in **Attachment B.**

This indicates a strong likelihood that the attendance records were deliberately misrepresented to obscure [redacted] true location and activities during the school day.

Therefore, I have reason to believe that attendance records have been falsely reported, showing the children present when they were not in school, repeatedly, over a period of years and despite my having put officials on notice that there have been issues in this regard.

Under Florida law and mandated incorporation of State Board of Education administrative rules, period-by-period attendance tracking is required for Middle School students, and students may only be counted present when physically in the respective classroom.

Exhibit F

4. Follow up conversation with assistant superintendent Mark Durham

Following the hearing referenced above, I was seeking non-related documents from the Nassau County School Board via FOIA request which put me in contact with assistant superintendent Mark Durham. I inquired with him about the purported time after which attendance was no longer logged at Nassau County Schools and was instead told that all check ins and outs of students are supposed to be logged. Which makes sense, as that comports with the state statutes.

However, this also confirms that what I'm being told at the local school level is the case does not comport with district policy. As far as I'm aware, for middle school attendance, each teacher is responsible to keep their attendance role independently.

Based on all of the above, it appears that one or more actors are consistently able to obfuscate attendance records with regards to my children, even after I have given notice about apparent issues to administration officials with the Nassau County School Board. I have attached our communications as **Attachment C.**

## Legal Basis

Under F.S. §839.13(1)(a), any public officer or employee who:
- Knowingly makes a false entry in a public record, or
- Causes another to do so, or
- Aids or abets in the commission of such acts, **commits a third-degree felony.**

Attendance records maintained by the school board are official public records. The standards for what must be kept as attendance records are defined in F.S. §1003.23 which mandates compliance with the rules of the State Board of Education. Simply put – the records must be accurate and certified, with middle school attendance requiring accurate attendance for each period. I have attached the statutes referenced as **Attachment D.**

If my children's attendance records were hidden or falsely reported, and those involved knowingly falsified or allowed the falsification of those records—understanding that the records did not truthfully reflect the student's presence or schedule—this constitutes criminal tampering with official records under Florida law. The falsification of a public record is itself the misconduct; no further knowledge of the falsifier's broader motive is required to establish a felony violation of F.S. §839.13.

## Request for Investigation

The ongoing concealment of Ms. Schreiber's conduct in this matter has greatly impacted the wellbeing and safety of my children, and it would appear that despite my having raised the issue to the attention of school board management historically that safe guards have not properly been put into place.

I respectfully request that your office open a formal criminal investigation into:

1. The accuracy of attendance records for the above incidents.
2. Whether any school personnel knowingly entered false information.
3. Whether Ms. Schreiber, or others, requested, encouraged, or conspired in the suppression or falsification of school records.

I am willing to provide testimony, timelines, and communications relevant to these events. I ask that this matter be assigned a case number and that I be informed of any investigative progress or referral to the State Attorney.

Exhibit F

Attachments A

Sincerely,



Dusti[illegible]ult Gmail

Dustin DuFault <dustin@halcyonharbor.com>

## Legal Hold Request

2 messages

Dustin DuFault <dustin@halcyonharbor.com> Thu, Sep 28, 2023 at 8:15 AM
To: Principal - Hilliard Middle Senior High School <crawfordjo@nassau.k12.fl.us>, Celena Loudermilk <loudermilkce@nassau.k12.fl.us>
Cc: Kathy Bums <kathy.bums@nassau.k12.fl.us>

Good Morning!

My children attend Nassau County schools. I have been very pleased with each of their teachers and education so I just want to start by thanking each of you! We do a lot of additional education at our home (we like to design and build things :D ) and it's just been amazing to see them growing and learning, and being able to apply what they are learning in both settings to further their education.

I have three children attending Nassau County schools.

During the 2022-2023 school year my children all attended Hilliard Elementary School:
[redacted] **DuFault**
[redacted] DuFault
[redacted] DuFault

For the present school year, [redacted] has transitioned to Hilliard Middle-Senior High School.

My former wife, Erin Schreiber, is a school board employee. She's currently a teacher at Hilliard Middle-Senior High School.

I am having an issue with her interfering in the children's schooling and my timesharing with the children. I have received many accounts from the children where during my timesharing I have dropped the children off for school in the morning, Ms. Schreiber has arrived and picked them up, later on dropped them back off at school, and then when I arrive to pick the children up from school I'm left completely oblivious that said activity has occurred unless it's recounted back to me by the children - which they have done many times.

The following are instances that I'm currently aware of:

During the 2022-23 school year, [redacted] was picked up from school during my timesharing, brought back to his mothers house where they played 'Uno', and then delivered back in time for me to pick him up.

During the 2022-23 school year, [redacted] was picked up from school during my timesharing, brought back to her mothers house where they played 'Clue', and then delivered back in time for me to pick her up.

During the 2023-24 school year, [redacted] has been picked up from school during my timesharing, and during *her math class*, and made to change her shoes (according to [redacted] because her boyfriend doesn't like 'Crocs' which has been her footwear of choice since forever and I understand are perfectly acceptable under the dress code).

During the 2021-23 school year all of the children told me there mother would stop by their school shortly before I would pick them up to "check and make sure their backpacks weren't too heavy" during which she would remove their school work and documents before my arrival.

I have attempted to work with Ms. Schreiber on these matters repeatedly. However she will, most often, completely fail to respond to me at all. Occasionally she will claim the children never even made the statement about her activities. Per our divorce agreement I'm relying on the children receiving an education through the school system that isn't being manipulated on an ongoing basis without my knowledge. I think removing a middle schooler from math class is *particularly* troubling because math is a discipline which is so entirely dependent on 'building blocks of learning' methodology that you cannot simply miss math class and expect to be at parity at your next instruction. Moreover [redacted] has a brilliant engineering mind and interest and if she's going to continue to want to develop those interests and skills this is a particularly important subject for her to continue to excel in.

**Exhibit F**

Celena Loudermilk Email

**Attachments A**



Gmail

Dustin DuFault <dustin@halcyonharbor.com>

## From Dustin DuFault (re: late drop offs)

1 message

**Dustin DuFault** <dustin@halcyonharbor.com> Fri, Feb 21, 2025 at 2:22 PM
To: Celena Loudermilk <loudermilkce@nassau.k12.fl.us>

Hi there Ms. Loudermilk,

I just wanted to clarify about today and why I was confused. In the prior instances I've mentioned of Ms. Schreiber dropping off the children at end of day, those involved her taking the kids out of school *during my timesharing*, and never disclosing those events to me, even when I asked her. So the problem was that I was supposedly putting my kids into school, where they should be (in my opinion anyway), and if anything came up like an emergency were to happen I would know where to collect them, but in reality she's removed them from class and taken then back to her home, only to put them back into class at the last minute.... and then refuses to acknowledge that.

Today was different because it was actually *my timesharing* which was why I was attending to the needs of [redacted] during that time and didn't quite catch what the issue was at first. But I get it - the catch all would be identifying a child being put back into class at the end of the day. I didn't realize that would be an issue since it wasn't before and I sincerely wasn't trying to rig anything.

Anyway - I get what you were getting at and appreciate the effort and will make sure if we have that situation occur again to have some documentation for you (although I doubt we will have an instance like that come up again).

Thanks for all you do!

Dustin DuFault

Exhibit F

Celena Loudermilk Email

Attachments A



Gmail

Dustin DuFault <dustin@halcyonharbor.com>

**Check out/in document attached**
4 messages

**John Crawford** <crawfordjo@nassau.k12.fl.us> Fri, Sep 29, 2023 at 4:02 PM
To: Dustin DuFault <dustin@halcyonharbor.com>

Mr. DuFault:

Attached is the information you requested detailing the dates and times your daughter has been checked out/in from HMSHS this school year . Our bookkeeper discovered a few more instances of checking out that neither she, nor you and I, were aware of during our conversation this morning. They came up when she ran a detailed report. I hope this helps. Have a good weekend!

John L. Crawford

Principal

Hilliard Middle-Senior High School

(904) 845-2171 ext. 4602

crawfordjo@nassau.k12.fl.us

**From:** smtpaccess@nassau.k12.fl.us <smtpaccess@nassau.k12.fl.us>
**Sent:** Friday, September 29, 2023 3:11 PM
**To:** John Crawford <crawfordjo@nassau.k12.fl.us>
**Subject:** Attached Image

NOTICE: Under Florida law, e-mail addresses are public records. If you do not want your e-mail address released in response to a public-records request, do not send electronic mail to this entity. Instead, contact this office by phone or in writing. This message (and any associated files) may contain information that is confidential. Any views or opinions presented in this email are solely those of the author and do not necessarily represent those of the Nassau County School District. Employees of the Nassau County School District are expressly required not to make defamatory statements and not to infringe or authorize any infringement of copyright or any other legal right by email communications. Any such communication is contrary to the School Board policy and outside the scope of the employment of the individual concerned. The Nassau County School District will not accept any liability in respect of such communication, and the employee responsible will be personally liable for any damages or other liability arising. The Nassau County School District does not discriminate on the basis of race, color, national origin, gender, age, disability or marital status in it's educational programs, services or activities, or in its hiring or employment practices.

**Dufault sign-out.pdf**
250K

**Dustin DuFault** <dustin@halcyonharbor.com> Tue, Oct 3, 2023 at 12:09 PM
To: Principal - Hilliard Middle Senior High School <crawfordjo@nassau.k12.fl.us>
Cc: Kathy Burns <kathy.burns@nassau.k12.fl.us>

## Attachments B




77

Exhibit F

**Exhibit F**

Celena Loudermilk Email **Attachments C**



Gmail Dustin DuFault <dustin@halcyonharbor.com>

## FOIA Request

10 messages

**Dustin DuFault** <dustin@halcyonharbor.com> Tue, May 27, 2025 at 12:14 PM
To: Mark Durham <durhamma@nassau.k12.fl.us>

Mr. Durham,

I hope you enjoyed the holiday weekend and are having a great start to your week!

I have three children attending Nassau County Schools. Their mother, Erin Schreiber (my ex wife), is a part time teacher for Nassau County.

Please regard this as my request under the Freedom of Information Act for the following materials:

1. All emails sent to or from Erin Schreiber (or her former name Erin DuFault) which reference any of my three children at some point during the thread. These should not be redacted as to matters pertaining to my children as I have custody and will provide my identification to prove I have access to their records. There are no date parameters for this request, it should cover all of her employment.

2. There was a situation involving Ms. Schreiber which was described to me by my daughter [redacted]. According to [redacted], Ms. Schreiber sponsors a club for High School students that has some nexus to history and / or government [redacted] is in middle school and is not a member of this club. However the club had an event that occurred on the campus of Florida State College of Jacksonville. Looking at the website for her school, Hilliard Middle Senior High School, I do not see a club listed on their website that matches the description given.

So: I need to know if she actually sponsors a club at the High School and regardless of that identify the event that took place that she and my daughter attended. If any clubs are identified I would like a calendar for the events held over the course of the past year by that club. If a club cannot be identified please search Ms. Schreiber's emails for references to Florida State College of Jacksonville (and FSCJ, F.S.C.J.) and provide those to me.

I would appreciate discretion in disclosing this request to Ms. Schreiber as well as ensuring measures to prevent her from destroying the records I am requesting.

My three children attending your schools are:

[redacted]

Thank you sincerely for your time,

Dustin DuFault

---

**Mark Durham** <durhamma@nassau.k12.fl.us> Wed, May 28, 2025 at 11:48 AM
To: Dustin DuFault <dustin@halcyonharbor.com>

Mr. DuFault,

We are in receipt of your public records request and will be in touch concerning fulfillment.

Mark Durham

Assistant Superintendent of Administration

**Exhibit F**

## Attachments C



Could you perhaps respond regarding the absences situation I inquired about? Are there situations in which children can leave school in the middle of the day and return without that getting recorded? Is that by policy? What would be the parameters for that to take place? It's happened several times so.... It's either systemically permitted or systemically overlooked.

Thank you,

Dustin DuFault
[Quoted text hidden]

---

**Mark Durham** <durhamma@nassau.k12.fl.us> Thu, Jun 19, 2025 at 2:29 PM
To: Dustin DuFault <dustin@halcyonharbor.com>

No. If a student is checked out, the time they checked out should be recoded. Same thing when they check back in.

[Quoted text hidden]

---

**Dustin DuFault** <dustin@halcyonharbor.com> Thu, Jun 19, 2025 at 2:33 PM
To: Mark Durham <durhamma@nassau.k12.fl.us>

Thank you. :)

Thats what my assumption was........

Okay. I appreciate that. Enjoy your vacation!
[Quoted text hidden]

Exhibit F

Attachments D



Select Year: 2024 Go

## The 2024 Florida Statutes (including 2025 Special Session C)

Title XLVI CRIMES | Chapter 839 OFFENSES BY PUBLIC OFFICERS AND EMPLOYEES | View Entire Chapter

**839.13 Falsifying records.—**

(1) Except as provided in subsection (2), if any judge, justice, mayor, alderman, clerk, sheriff, coroner, or other public officer, or employee or agent of or contractor with a public agency, or any person whatsoever, shall steal, embezzle, alter, corruptly withdraw, falsify or avoid any record, process, charter, gift, grant, conveyance, or contract, or any paper filed in any judicial proceeding in any court of this state, or shall knowingly and willfully take off, discharge or conceal any issue, forfeited recognizance, or other forfeiture, or other paper above mentioned, or shall forge, deface, or falsify any document or instrument recorded, or filed in any court, or any registry, acknowledgment, or certificate, or shall fraudulently alter, deface, or falsify any minutes, documents, books, or any proceedings whatever of or belonging to any public office within this state; or if any person shall cause or procure any of the offenses aforesaid to be committed, or be in anywise concerned therein, the person so offending shall be guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

(2)(a) Any person who knowingly falsifies, alters, destroys, defaces, overwrites, removes, or discards an official record relating to an individual in the care and custody of a state agency, which act has the potential to detrimentally affect the health, safety, or welfare of that individual, commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. For the purposes of this paragraph, the term "care and custody" includes, but is not limited to, a child abuse protective investigation, protective supervision, foster care and related services, or a protective investigation or protective supervision of a vulnerable adult, as defined in chapter 39, chapter 409, or chapter 415.

(b) Any person who commits a violation of paragraph (a) which contributes to great bodily harm to or the death of an individual in the care and custody of a state agency commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. For the purposes of this paragraph, the term "care and custody" includes, but is not limited to, a child abuse protective investigation, protective supervision, foster care and related services, or a protective investigation or protective supervision of a vulnerable adult, as defined in chapter 39, chapter 409, or chapter 415.

(c) Any person who knowingly falsifies, alters, destroys, defaces, overwrites, removes, or discards records of the Department of Children and Families or its contract provider with the intent to conceal a fact material to a child abuse protective investigation, protective supervision, foster care and related services, or a protective investigation or protective supervision of a vulnerable adult, as defined in chapter 39, chapter 409, or chapter 415, commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. Nothing in this paragraph prohibits prosecution for a violation of paragraph (a) or paragraph (b) involving records described in this paragraph.

(d) This section does not prohibit the disposing or archiving of records as otherwise provided by law. In addition, this section does not prohibit any person from correcting or updating records.

(3) In any prosecution under this section, it shall not be necessary to prove the ownership or value of any paper or instrument involved.

History.—s. 19, Feb. 10, 1832; RS 2571; GS 3483; RGS 5357; CGL 7492; s. 1023, ch. 71-136; s. 1, ch. 2002-386; s. 2, ch. 2007-174; s. 303, ch. 2014-19.

Copyright © 1995-2025 The Florida Legislature • Privacy Statement • Contact Us

Exhibit F

Attachments D



Select Year: 2024 Go

## The 2024 Florida Statutes (including 2025 Special Session C)

Title XLVIII EARLY LEARNING-20 EDUCATION CODE | Chapter 1003 PUBLIC K-12 EDUCATION | View Entire Chapter

**1003.23 Attendance records and reports.—**

(1) The attendance of all public K-12 school students shall be checked each school day in the manner prescribed by rules of the State Board of Education and recorded in the teacher's register or by some approved system of recording attendance. Students may be counted in attendance only if they are actually present at school or are away from school on a school day and are engaged in an educational activity which constitutes a part of the school-approved instructional program for the student.

(2) All officials, teachers, and other employees in public, parochial, religious, denominational, and private K-12 schools, including private tutors, shall keep all records and shall prepare and submit promptly all reports that may be required by law and by rules of the State Board of Education and district school boards. Such records shall include a register of enrollment and attendance and all persons described above shall make these reports therefrom as may be required by the State Board of Education. The enrollment register shall show the absence or attendance of each student enrolled for each school day of the year in a manner prescribed by the State Board of Education. The register shall be open for the inspection by the designated school representative or the district school superintendent of the district in which the school is located. Violation of the provisions of this section shall be a misdemeanor of the second degree, punishable as provided by law. This section shall not apply to home education programs provided in s. 1002.41.

History.—s. 118, ch. 2002-387.

Copyright © 1995-2025 The Florida Legislature • Privacy Statement • Contact Us

Exhibit G

# Property Detail Report

| | | | | | |
|---|---|---|---|---|---|
| **Print Date/Time:** | 08/12/2025 14:47 | **From Date:** | | Nassau County Sheriff's Office | |
| **Login ID:** | sutton924 | **Thru Date:** | | **ORI Number:** | FL0450000 |
| **Case Number:** | All | **Tag Number:** | 2024-00040149 | **Item Number:** | 1 |

## General Property Detail

| | | | | | |
|---|---|---|---|---|---|
| **Item Desc:** | S67 INV. DISK CONTAINING 14 PHOTOGRAPHS | **Unit of Measure:** | | **Reg. Date:** | |
| **Make:** | | | | **Reg. Number:** | |
| **Model:** | | **Year Manuf:** | | **Reg. Type:** | |
| **Style:** | | **Serial #:** | | **Reg. Year:** | |
| **Style Desc:** | | **OAN:** | | **Reg. State:** | |
| **Quantity:** | | **Color:** | | **Officer Remarks:** | CD/DVD |
| **Condition:** | | **Reg. Expire:** | | | |

## Property Detail

| | | | | | |
|---|---|---|---|---|---|
| **Case Number:** | 2024-00040149 | **Property Code:** | Evidence | **Received Date:** | 04/12/2024 |
| **Property Type:** | COMPUTER HARDWARE/SOFTWARE | **Property Class:** | | **Owner Name:** | |
| **UCR Value:** | | **Initial Value:** | | **Current Value:** | |
| **Notified via:** | | **Notified Date:** | | **Insurance Company:** | |
| **Policy #:** | | **Lien Holder:** | | **Recovery Location:** | |
| **Recovery Date:** | | **Recovery Code:** | | **Recovery Value:** | |
| **RFOJ?:** | No | | | **RFOJ Case Number:** | |
| **Location Stolen:** | | **Recovery ORI:** | | **Recovered Address:** | UF HEALTH NORTH ER |
| | | **NCIC Number:** | | | |

## Property Room

| | | | |
|---|---|---|---|
| **Facility:** | CD SHELF | **Targ Disp Date:** | |
| **Bin Location:** | CD 2024-02 | **Disposed Of:** | No |
| **Additional Bin Information:** | | **Disposed of Date:** | |
| **Tag #:** | 2024-00040149 | **Disposed of By:** | |
| **Tag Item #:** | 1 | | |

## Chain of Custody

| Date | Transaction | From | From Role | To | To Role |
|---|---|---|---|---|---|
| 04/12/2024 01:00 | **Type:** Intake<br>**Code:** Initial Intake | 495-PHILIP HAGAN | | 1494-BLAKE LONG | |

**Expected Return Date:**
**Remarks:**

Exhibit H

**Note Information**

| | |
|---|---|
| Contact Begin date:04/12/2024 04:00 PM | Contact End date: |
| Category:Child Investigation | Type:Field Visit |
| Worker Activity Code: | No Request For Action: N |
| Safety: N Safety Resolved:N | Safety date: Safety Resolution: |
| FSFN: N FSFN Resolved: N | FSFN date: FSFN Resolution: |
| Admin: N Admin Resolved: N | Admin date: Admin Resolution: |

**Contact Information**
Inv/Assessment Number: 2024-129387-01

**Subjects Contacted**

**Subjects Not Contacted**

**Non Face-to-Face Contacts**

**Other Subjects**
CPT Visit; CPT visti; CPT visit; 04/12/2024 04:00 PM

**Narrative**
The child [redacted] Dufault and father Dustin Dufault attended CPT in Jacksonville, FL. They were interviewed by Luis Ramirez but CPI was unable to attend. The child confirmed the mother's paramour grabbed him and slammed him to the wall for fighting with his sister. Initial medical impressions are physical abuse against [redacted] and failure to protect against the mother. Please see CPT summary for details.

## Request #PRR-2025-4027

*All of the investigation materials and entire case file related to case 2024-40149. These should be un-redacted, as I am the victims father and legal custodian. Please be sure to include body camera footage of all involved officers, and all reports gathered from other agencies.*

Details

**Submitted**
Thu, Jul 10, 2025

**Status**
Completed

**Requested Documents**

| File | Description | Size | Upload Date |
|---|---|---|---|
| gs1-sl-june-2023 911 recordings.pdf | | 207.26 KB | 08/12/2025 |
| 4050.00 BWC Body Worn Camera.docx | | 124.3 KB | 08/12/2025 |
| DSC_0011.JPG | | 8.62 MB | 08/05/2025 |
| DSC_0005.JPG | | 9.5 MB | 08/05/2025 |
| DSC_0014.JPG | | 9.28 MB | 08/05/2025 |

Rows per page: 5 1-5 of 25

DOWNLOAD ALL

Exhibit I

Exhibit I



Gmail

Dustin DuFault <dustin@halcyonharbor.com>

**Re: Re: Nassau County Sheriff's Office - Records Division - Record Request PRR-2025-4027 Completed**

1 message

**Caroline Gordon (Nassau County Sheriffs Office, FL)** <NassauSO@request.justfoia.com> Thu, Aug 28, 2025 at 11:41 AM

Reply-To: 260bd240-0451-4d60-b915-e2801f77a026.NassauSO@request.justfoia.com

To: dustin@halcyonharbor.com

Please see response below.

On Tue, Aug 12, 2025 at 10:58 am, Dustin DuFault wrote:

Note: I will attach a formatted version of this request to this email for your convenience!

August 12, 2025

Public Records Custodian

Nassau County Sheriff's Office — Records Unit

c/o Office of General Counsel

77151 Citizens Circle

Yulee, Florida 32097

Sent via email: publicrecords@nassauso.com; blippelman@nassauso.com

Re: Deficiency Notice and Supplemental Request — **PRR-2025-4027 (Case 2024-40149 — Child Abuse)**

Dear Custodian,

Thank you for your recent production regarding PRR-2025-4027, in which I requested the entire case file for Case No. 2024-40149 (including body-worn camera and in-car video, and "all reports gathered from other agencies"). I am the child-victim's father and legal custodian. Based on the documents produced, Det. Pinkston's "Investigative Summary" reflects that (a) he conducted a recorded interview of Mr. Raulerson and submitted the audio into evidence, and (b) the Child Protection Team (CPT) provided a Specialized Interview Report on April 26, 2024. Neither item was included in your production. This letter identifies deficiencies and requests specific follow-up items under Chapter 119. This notice supplements—but does not narrow or waive—my prior request.

*The CPT Specialized Interview Report is not public record. Please refer to Florida State Statute 39.202 :"All records and reports of the Child Protection Team of the Department of Health are confidential and exempt from the provisions of ss. 119.07(1) and 456.057, and*

Exhibit I



*shall not be disclosed, except, upon request, to the state attorney, law enforcement, the department, and necessary professionals, in furtherance of the treatment or additional evaluative needs of the child, by order of the court, or to health plan payors, limited to that information used for insurance reimbursement purposes."*

A. Specific records missing from Case 2024-40149

1) Raulerson recorded interview (audio/media) and any transcript: Please produce the recording referenced in the case file as having been "submitted into evidence," together with any transcript or notes. Provide the Property/Evidence item number(s), barcode(s), and chain-of-custody entries. If you contend any portion is exempt, cite the specific statutory exemption(s) for each withheld portion and produce all non-exempt material. See § 119.07(1)(e)–(f), Fla. Stat.

*Please see response documents in this request for attachment.*

2) CPT/DCF Specialized Interview Report: Det. Pinkston's summary states that CPT provided a Specialized Interview Report on April 26, 2024. Please produce the document or, if you contend it is confidential under Chapter 39 (e.g., §§ 39.202, 39.3035), state that basis specifically, confirm the record's existence within the case file/evidence, and produce any non-exempt portions. If NCSO does not maintain a copy, please so state and identify where and how the record is maintained (e.g., by CPT/DCF). As the parent/legal custodian I may pursue access from DCF/CPT under § 39.202(2)(d); however, NCSO's copy remains a "record made or received" in the case and should be accounted for.

*Please refer to Florida State Statute 39.202 : "All records and reports of the Child Protection Team of the Department of Health are confidential and exempt from the provisions of ss. 119.07(1) and 456.057, and shall not be disclosed, except, upon request, to the state attorney, law enforcement, the department, and necessary professionals, in furtherance of the treatment or additional evaluative needs of the child, by order of the court, or to health plan payors, limited to that information used for insurance reimbursement purposes."*

3) Evidence/Property ledger and chain-of-custody: Produce the Property/Evidence ledger/manifest and chain-of-custody for all media and documents associated with 2024-40149, including (without limitation) the 14 crime-scene photographs, the Raulerson recording, any body-worn/in-car video, and any external records received (e.g., CPT transmittals). Please include item numbers, descriptions, dates added/removed, and current disposition.

*Please see attachment in the responsive documents added into your request.*

B. Body-Worn Camera (BWC) / In-Car Video — audit and retention

4) Existence and audit logs: Your 8/5/2025 email states that BWC and in-car video are past the 90-day retention period. Please confirm whether any BWC or in-car recordings ever existed for this incident and produce the BWC system clip manifest and admin/audit/purge logs for all involved units, showing (at minimum) camera ID, uploader, upload date/time, event/case tags (including Case No. 2024-40149), retention category/hold status, any edits, and purge/delete events with user and timestamp. Also produce any export/share logs.

*No responsive document.*

Exhibit I



5) Policy & retention mapping: Produce the BWC program policy and retention matrix in effect on the incident date, including criteria to tag/retain recordings associated with criminal investigations, child-abuse cases, or matters referred to CID. If any BWC/ICV was purged, indicate whether the item was ever associated to the case file (RMS property entry or case tag) such that the General Records Schedule GS2 retention would have governed; and produce any records-disposition documentation for destroyed items (date, series, retention authority).

*Please see attachments in the responsive documents added into your request for our retention schedule Body-worn camera policy.*

C. RMS/CAD case audits and attachment manifest

6) RMS audit logs (enhanced fields; not a duplicate of 7/16/2025): I acknowledge the 7/16/2025 audit export you produced (showing change events but no user identifiers associated with the change log). Please produce an enhanced/native audit export for Case 2024-40149 that includes the following columns/fields (or their RMS equivalents): user_login/employee_id/name of the actor; date_time (to the second) and workstation/IP (if stored); module/object (case, supplement, attachments, property/evidence, approval/finalization); action (create/edit/view/approve/finalize/status-change); field_name; previous_value; new_value; object_id/record_id; and case_number. Provide in native CSV/XLSX (not PDF). If the RMS lacks any of these fields, please state so in a custodian statement under §119.07(1)(c) and identify the vendor/system and available audit fields. If you can re-map the request to the logical fields available, please do so and state the re-mapping you applied. If user IDs are stored only as internal keys, include the key?name mapping.

*Audit log was previously provided, it has been added again as attachment into the response documents into this request.*

6a) Approval/finalization workflow: Produce the approval/finalization logs for the "Unfounded" disposition (including Finalized-by user, approver chain, timestamps, and any comments/justifications).

*No responsive document.*

7) Attachment/links manifest: Provide the complete list (export) of attachments/linked items for Case 2024-40149 (file names, type, size, created/modified dates), including any references to BWC/ICV or external documents. If codes or abbreviations are used in the RMS/CAD fields or printouts, please include the legend/keys and any linkage key mapping CAD incident numbers to RMS case/evidence entries.

*No responsive document.*

D. 911/Communications audio

8) 911 audio retention/disposition: Please confirm whether any 911/communications audio exists for the originating call(s) and, if destroyed, produce the disposition entry (date/time and authority) and cite the retention schedule used. Please also provide the CAD incident numbers and any call detail records associated with the case.

*Please see attachment added into the responsive documents in this request for the retention schedule.*

E. Search description and exemption specificity

For any item you contend does not exist or is exempt, please provide a custodian statement describing the good-faith search (systems/locations, date ranges, keywords, and personnel) as required by § 119.07(1)(c), and identify with particularity the specific statutory exemption(s) relied upon, producing all non-exempt portions, as required by § 119.07(1)(e)–(f). If any responsive records have been destroyed, please provide the records-disposition documentation (date, record series, and retention authority) pursuant to Rule 1B-24.003, F.A.C.

*No responsive document.*

F. Retention schedule reference (GS2 — June 2023)

Please confirm the records-series and retention authorities applied to this case file and associated media. As you know, the General Records Schedule GS2 for Law Enforcement, Correctional Facilities & District Medical Examiners (June 2023) governs criminal case files and associated evidence/media. If short-term operational retention settings (e.g., 90-day BWC default) were applied, please explain how those settings interact with GS2 when recordings relate to a criminal case and whether any legal hold was set.

*No responsive document.*

Cure period; § 119.12 notice; preservation

This serves as written notice under § 119.12(1)(b), Fla. Stat. Please produce the above materials —or the specific statutory basis for any withholding/nonexistence—within five (5) business days of receipt. Please preserve all potentially responsive records, including BWC system logs, RMS/CAD audits, evidence ledgers, emails, and digital media, pending resolution of this request.

Sincerely,

Dustin DuFault

815 Stanley Dr

Fernandina Beach, FL 32034

Tel: 410.982.9607

On Mon, Aug 11, 2025 at 2:11?PM JustFOIA Notification <NassauSO@request.justfoia.com> wrote:

> Dear Requestor,
>
> The **Request Number: PRR-2025-4027** has been completed. Please click on the request link to download the response documentation.
>
> Thank you,

| 4050.00 NASSAU COUNTY SHERIFF'S OFFICE | | Reference: |
|---|---|---|
| BWC – Body Worn Camera | | |
| Effective date: 3/15/21 | Last revision: 6/28/22; 6/21/23 | |

**4050.10 PURPOSE:**

This policy provides guidelines for the use, maintenance, storage, and management of body worn video recorders by members of the Nassau County Sheriff's Office.

**4050.20 DISCUSSION:**

Mobile body worn video recorders provide Department members with the ready ability to capture their encounters with the public by recording audio and video onto a device worn by the member. Such recordings can provide valuable evidentiary information for situations including arrest, use of force, or the investigation of complaints against a member. The Department recognizes the importance of using body worn video recorders to enhance trust and openness with the public, while also safeguarding the privacy of individuals.

Due to their placement and the technology used, body worn video recorders may capture images and audio that are not observed by the member, or may not fully capture what the member sees and hears. The Department recognizes that body worn video recorders document a single viewpoint, and should be used to supplement investigations rather than relied upon as a definitive proof of what occurred.

**4050.30 POLICIES AND PROCEDURES**

**A. Definitions**

1. Activation - Pressing the start/stop button activates the BWC to begin recording audio and video.

2. Audio Recording - The electronic recording of conversation, spoken words, or other sounds.

3. Body Worn Camera (BWC) - The camera system that captures audio and video signals, capable of being worn on a deputy's person that includes at minimum a camera, microphone, and storage component.

4. BWC Uploading- The act of transferring recorded data from the BWC to the

storage server.

5. BWC Downloading – The act of transferring recorded data to any medium after BWC uploading to the storage server.

6. BWC Recording - The electronic recording of visual images, with or without audio, with the inclusion of 30 seconds (video only) prior to and after the activation of the recording.

7. Classification Tags - The method to mark and identify BWC recordings for a specific purpose and for which a predetermined retention period has been set.

8. Critical Incidents - Examples include deputy-involved shootings, in-custody deaths, Response to Resistance (RTR) incidents (resulting in death, serious injury, or alleged serious injury), deputy involved traffic crashes/pursuits with fatalities or serious injuries, serious injury or death of a deputy in the line of duty.

9. Deactivation - Pressing the start/stop button stops an active recording and returns the BWC to standby mode.

10. Docking the BWC - The process by which a deputy places the BWC into a NCSO network- attached data transfer device, causing videos previously recorded onto the BWC to be uploaded to the storage server.

11. Metadata - Information that is used to identify the deputy to whom the BWC is issued, the date and time each video was recorded, and deputy interaction/offense categorization of BWC recordings.

12. Mute Function - When this function is engaged the BWC will continue to record video only; no audio is recorded when this feature is turned on.

13. Deputy - Used in this directive to include full time deputy's, deputies in the Field Training Program, sergeants, and any other personnel who wear, use, maintain, store, or release audio or video data recorded by body cameras.

14. Police Activity - Engagement with an individual(s) within the community and/or in instances when a deputy reasonably believes contact with such an individual exists while working within an official capacity as a law enforcement deputy and carrying out the duties and responsibilities associated of such under Florida State Law and NCSO policy. Examples include, but are not limited to:

    (i) All engagements with a suspect, including advising of Miranda warning and transportation;

(ii) All investigative and enforcement actions;

(iii)Calls for service;

(iv)Self-initiated field activity; and

(v) Supervisory direction.

15. Standby Mode - While the BWC is powered on, the BWC has not been activated to commencing active recording.

**B. General**

1. Failure to adhere to this policy could subject a deputy to disciplinary action up to and including dismissal.

2. All BWC equipment and recordings are the property of NCSO.

3. Deputies are prohibited from using non-departmental BWCs in an official NCSO capacity while on or off-duty.

4. Only Personnel authorized to Download BWC recordings are permitted to do so and only then for official business authorized purposes. Any release of a BWC Download must be coordinated and logged through the Records Division pursuant to Chapter 119, Florida Statutes and all other State of Florida applicable public records video and audio recording laws.

5. Deputy's shall be in a uniform or have their badge prominently displayed when using a BWC.

6. BWCs shall only be worn on the uniform for which it is intended and may not be moved to obstruct or change the intended view.

    a. BWC will be worn on the Class "A" uniform when wearing it to/from court, while working shift, or any off duty detail requiring a Class "A" uniform.

    b. The BWC will not be worn with the Class "A" uniform during special events, such as the NCSO Police Memorial, or any other time when a Watch Commander or higher deems it not to be worn on the Class "A" uniform.

7. BWCs shall be powered on at the beginning of a deputy's shift.
8. BWC recordings are not replacements for any NCSO written reports or investigatory statements.

9. If a deputy is lawfully present (e.g., invitation, arrest warrant, search warrant, etc.) at a location where a person has a reasonable expectation of privacy (e.g., residence, restroom, dressing room, locker room, hospital, or mental health facility, etc.), there is no requirement for the deputy to announce to any person whether the BWC is recording. Additionally, there is no requirement that the deputy discontinue use of the BWC if requested when the deputy's presence is due to police activity or an extended invitation remains.

10. If a deputy is asked whether their BWC is recording, the deputy shall answer truthfully.

C. **Activation**

1. Deputies who are assigned BWCs shall activate their BWCs upon arriving at the scene of a police activity. Every reasonable attempt shall be made to activate the BWC prior to engaging in police activity (e.g., before exiting the patrol vehicle upon arriving at a call for service, while at a safe distance prior to engaging with a suspicious person, preceding the initiation of a traffic stop, upon engaging in any pursuit, etc.);

2. Deputies responsible for completing associated reports shall indicate therein whether any BWC was activated during the course of the incident (including, but not limited to, an Offense Report, Arrest & Booking Report, Uniform Traffic Citation, RTR Report, etc.). This shall apply whether the recording was activated by the primary or back up deputy(s).

D. **Deactivation/Muting of BWC**

1. A deputy may deactivate his/her BWC when his/her involvement in a police activity has concluded.

    a. At times deputies will perform law enforcement functions which do not directly involve engagement with an individual(s) within the community. While performing these functions, BWC recording may be ceased. Examples may include:

        (1) Directing traffic at the scene of a crash;

        (2) Holding a perimeter position on a stable crime scene;

        (3) Securing/transporting evidence;

        (4) When commanding deputies/supervisors deem recording unnecessary; or

Exhibit J

(5) When writing reports.

b. Deactivation of the BWC is appropriate when a deputy's involvement in a police activity concludes or while performing these police functions. However, activation is required should police activity begin again.

c. A deputy may also deactivate his BWC when he/she has a person in the vehicle being transported, as long as the in-car camera system is recording and operational. For example, an inmate, a citizen being transported for assistance, a Baker Act, an arrestee, etc.

(1) However, if the person becomes uncompliant, resistant, etc. causing the Deputy to stop and interact with the subject, the deputy must reactivate his/her BWC prior to doing so.

(2) Nothing herein should preclude the deputy from running his/her BWC if he/she feels as though it would be necessary.

2. Prior to muting the BWC, **deputy's shall make a recorded statement as to the reason the device is being muted** (e.g., supervisory direction, conference with legal counsel, unrelated phone conversation, strategic or tactical NCSO operation planning)

   ***a. Deputies will not mute their BWC simply for "Officer Conversations" or anything of the like.***

   ***b. Deputies are authorized to mute their BWC when interviewing possible sexual assault victims.***

3. After a deputy mutes his/her BWC, it is their responsibility to ensure he unmutes his BWC prior to re-engagement with police activity.

4. In certain instances (e.g., neighborhood canvasses, extended searches, high profile cases, etc.) a person willing to provide information may be reluctant to do so while a BWC is activated. Deputy's shall use discretion in these instances and weigh the need to obtain possibly critical information with the continued use of a BWC and loss of information. Deputies shall record a statement for the reason of the deactivation.

   The NCSO preference is to record such statements; however, it is recognized that such persons may be hesitant to provide information while being recorded due to a fear of retaliation, privacy concerns, or a feeling that the information is sensitive. In these situations, deputies may decide that

obtaining the information is more important than recording the conversation. The deputy shall then record a statement of the deactivation (e.g., "Community member desires to make an unrecorded statement."). After obtaining the statement, the deputy shall immediately activate their BWC to resume the police activity when safe to do so.

5. When a prohibited use of the BWC as outlined below is discovered, deputies shall deactivate their BWCs when it is safe to do so. If portions of the prohibited use are suspected to have been captured by the BWC, the deputy shall comply with the provisions of this order listed below requiring action or reporting.

6. Unless a police activity is occurring, BWCs shall be deactivated when entering places where persons have a reasonable expectation of privacy such as hospitals, private offices/work places, governmental facilities, etc. Other deactivation examples include:

    a. During deputy break periods;

    b. Engaging in administrative responsibilities;

    c. Law enforcement strategic or tactical discussions;

    d. Rolls calls;

    e. Static post assignments;

    f. Training;

    g. When at the Firing Range;

    h. When at the NCSO Training Academy;

    i. When instructed by a supervisor to end the recording; or

    j. When in the presence of undercover deputies and/or confidential informants (CI) who have not yet concealed their identity.

7. Deputy's shall not record when conferring with any public (government) or private attorney; nor when appearing or providing testimony for a deposition, court appearance, administrative hearing, or any other administrative duty in a government office. Deputies shall power off their BWC while performing these duties but must ensure the device is powered back on when concluded.

**E. Prohibitions**

1. Deputies shall not use their BWCs for any purpose other than their official NCSO law enforcement duties.

2. BWCs shall not be used to record a particular person based solely on the person's race, color, religion, national origin, gender, age, marital status, personal appearance, sexual orientation, identity or expression, family responsibility, homelessness status, physical disability status, or political affiliation.

3. BWCs shall not be used to knowingly capture legally privileged communications as defined in Chapter 90, Florida State Statutes (F.S.S.), including, but not limited to, sexual assault counselor/victim privilege, domestic violence advocate/victim privilege, attorney/client, doctor/patient, etc.

4. BWCs shall not be used to knowingly record undercover deputies and CIs. However, merely responding to assist undercover units is not reason alone to deactivate BWCs. Undercover deputies shall take care to conceal their identities and their informants identities prior to the arrival of deputies equipped with BWCs. Also, deputies shall document in the notes section of the video the presence of undercover deputies or CIs.

5. BWCs shall not be used as a means to conduct a field show up of a suspect.

6. BWCs shall not be used to record any personal conversation or a conversation between another deputy/individual.

7. BWCs shall not be activated when discussing strategic or tactical NCSO operations.

8. Deputies shall not make copies of any recording or disseminate any recording to the public, any media outlet, social media, or any other employee. The posting of BWC recordings to any social media site, without prior written approval of the Sheriff or designee, is strictly prohibited.

9. Deputies shall not capture a screen shot of BWC recordings for their personal use and are prohibited from otherwise recording any BWC recording for personal use.

10. Deputies shall not use any other electronic devices or other means in order to intentionally interfere with thecapability of BWCs.

11. Deputies shall not allow anyone the public to view their BWC recording(s) without written/ emailed authorization from Sheriff or his designee.

    A. Immediate Supervisors and/or Field Training Officers assigned to recruits,

are allowed to view their direct subordinates or recruits BWC via the in-car playback tool in Arbitrator 360, at any time deemed necessary for education, training, complaints, or any other official business of the NCSO.

12. Each BWC is configured for single use so deputies shall not use a BWC not assigned to them.

13. Deputies shall not erase, alter, reuse, modify, or tamper with any BWC recording.

14. BWCs shall not be used within 1000 feet of a bomb threat or located device scene due to possible radio frequency interference with any detonation device.

15. BWCs shall be removed prior to entering inside the Pretrial Detention Facility (PDF) or the Internal Affairs Unit.

16. Any use of a BWC recording not expressly provided herein without the expressed written consent of the Sheriff or his designee.

**F. Privacy Considerations/Citizens Advisement**

1. When a deputy is asked whether a BWC is being utilized, the deputy shall truthfully advise if the BWC is recording regardless of location.

2. Deputies may advise the victim, or others present at the scene, of a personal residence, medical, mental, or social service facility, places where there is a reasonable expectation of privacy, or related to an incident involving domestic violence, stalking, or sexual assault that the recording shall be withheld from release to the public as prescribed by law. To prevent misinterpretation of public records laws, deputies shall simply state that all recordings will be redacted and released as prescribed by law and any questions shall be directed to the Public Records Division.

3. All BWC recordings shall be redacted and released as prescribed by law. Any and all recordings or BWC Downloads to be released must be coordinated and logged through the Records Division pursuant to Chapter 119, Florida Statutes and all other State of Florida applicable public records, video and audio recording laws.

**G. Accidental Recordings**

1. Deputies shall indicate the accidental recording within the BWC software platform by placing the phrase "Accidental Recording" in the note section.

**H. Secondary Employment**

1. During secondary employment, deputies issued a BWC shall adhere to all guidelines and procedures herein regarding the BWC policy.

2. Any BWC recording captured must be uploaded at the end of their shift under normal circumstances, unless otherwise directed by a supervisor.

3. All actual or subsequent investigations of critical incidents, as defined herein, captured by the BWC must be uploaded upon the conclusion of the police activity.

**I. Off-Duty**

1. It is recognized that off-duty deputies not in uniform may have to engage in police activity while off-duty, which may result in incidents not being recorded.

2. However, if issued a BWC, off-duty deputies, in uniform which engage in police activity are required to adhere to the rules and regulations outlined in this policy as if they were on-duty.

3. Any BWC recording captured must be uploaded no later than when the deputy returns to their regular assignment under normal circumstances. Unless there is police activity that results in an arrest, RTR, or any other activity that requires written documentation.

**J. Deputy Responsibilities: Equipment, Inspection, Maintenance, and Repair**

1. Deputies are responsible for the proper care of the BWC used by and/or issued to them.

2. Prior to each shift, the deputy shall perform the following steps:

   a. Ensure the equipment is fully charged and working properly. deputies shall test the BWC's operation in accordance with manufacturer specifications, policies, and training;

   b. deputies are to attach the BWC directly to the deputy's uniform or person as trained by NCSO which allows the optimum recording of video and audio;

   c. If the BWC is malfunctioning, deputies shall immediately notify their supervisor. As soon as possible, the deputy shall have the malfunctioning BWC replaced by their Supervisor.

3. Prior to end of shift, deputies shall dock the BWC in the docking station in their patrol vehicle.

4. Malfunctions, damage, loss, or theft must be reported to the deputy's immediate supervisor as soon as practical. An Offense Report or Damaged Property Report, whichever is appropriate, must be completed when a BWC is damaged, lost or stolen.

5. Deputies shall notify their immediate supervisor of any BWC recording believed to have captured any employee of NCSO involved in misconduct or criminal activity.

6. Deputies are responsible for properly applying classification tags to all recordings with the appropriate category to ensure proper retention periods apply to each recording in accordance with NCSO policy and state law.

7. Deputies shall use the highest level classification tag as determined by the police activity in accordance with training.

**K. Data Access and Responsibility/ Review**

1. Access

All deputies who are required to wear, use, maintain, or store BWCs shall be trained in the BWC policy and procedures prior to obtaining access to BWC data storage. Additionally, all deputies who use, maintain, store, or release BWC recordings shall be trained in the BWC policy and procedures prior to obtaining access to BWC data storage. Authorized deputies shall only access BWC recordings under the following conditions in accordance with their assigned duties:

a. Deputies shall be allowed to review only their own BWC recordings when not otherwise prohibited, upon his/her own initiative or request, before writing a report or providing a statement regarding any event arising within the scope of their official duties pursuant to Section 943.1718(d), Florida Statutes. Such reports or statements may not provide for a review of BWC recordings due to an deputy's inherent duty to immediately disclose information including, but not limited to, the necessity to secure an active crime scene, to identify pertinent individuals, or other legal obligations.

b. By a deputy to make sure the BWC is working properly.

c. Deputies shall not view any BWC recording captured by another deputy or supervisor. Once recordings are uploaded, request for access to view may be requested by such deputies through their supervisor to the Records Custodian or designee, via cameraevidence@nassauso.com

2. When access to a BWC recording needs to be restricted, deputies are to notify supervisors who shall notify the Records Supervisor in an email to cameraevidence@nassauso.com regarding the BWC recording upon uploading the recording. Such restricted recordings include, but are not limited to:

   a. Undercover deputy/ CI is captured in video;

   b. Victim communications with advocates, attorneys, or therapists;

   c. Strategic or tactical NCSO operation plans;

   d. Sexual assault victims; or

   e. Alleged serious misconduct or criminal act by a member.

3. Watch Commander

   a. To ensure this program maintains its integrity, it is imperative that commanding deputies ensure that deputies equipped with BWCs utilize them in accordance with policy and procedures defined herein.
   b. Commanding deputies may review all BWC recordings regarding their subordinates when deemed necessary, but shall not consider such review to substitute for field supervision of subordinates. Watch Commander shall conduct a minimum of five random BWC videos to be documented on Green Form in conjunction with other monthly inspections.
   c. When a supervisor is notified of a malfunctioning camera, the supervisor shall ensure the deputy promptly obtains a BWC replacement.

   d. When a deputy who has successfully completed their probation claims to have failed to activate/de-activate their BWC as required, and the failure is not otherwise associated with other violations, the commanding deputy shall first confer with the Internal Affairs Unit to ensure the failure is not otherwise being administratively investigated and, if not, conduct a fact finding inquiry to determine if the failure

was reasonably excusable.

(1) If after this fact finding, the commanding deputy concludes the failure to activate/de-activate was reasonably excusable, the commanding deputy shall document these findings on a Green Form without any further action.

e. All NCSO action to address BWC activation failings of probationary deputies shall be handled in a manner consistent with the discretion of management, up to and including separation. Deputies shall be provided a 90 calendar day grace period upon being initially issued the BWC.

L. **Critical Incidents**

1. During the course of a shift, deputies equipped with BWC may encounter situations where critical incidents are recorded, as defined herein. BWC recordings related to a criminal or administrative investigation shall be treated as any other digital evidence.

2. Immediately after any critical incident, the following actions shall be taken:

   a. Supervisor shall take the BWC and place it in deputy's docking station to be uploaded.

   b. Under no circumstances shall a deputy record a conversation with legal representation.

   c. Supervisors shall ensure a replacement BWC is provided to a deputy when their BWC has been taken and cannot be returned prior to returning to their regular duties.

M. **Watch Commander Responsibilities to Alleged Misconduct**

1. When a commanding deputy or supervisor is made aware of alleged misconduct actually or potentially captured on a BWC, the following shall be followed:
   a. In instance of any alleged misconduct, a supervisor shall ensure the BWC device(s) are docked for timely upload of recordings.

N. **Docking/Storage and Security Procedures**

1. At the end of a deputy's regular shift, deputies shall securely upload the

BWC recording(s) contained on their BWC utilizing the approved procedures (i.e., wireless, docking station, etc.) and in accordance with training. BWC recordings, shall be stored utilizing a secure storage server and backed up for redundancy purposes. All BWC recordings shall be stored utilizing the NCSO approved security methods in compliance with Criminal Justice Information Standards (CJIS).

2. Files shall be securely stored in accordance with state records retention laws and no longer than useful for purposes of training or for use in an investigation or prosecution.

3. Each BWC recording shall have a chain of custody audit trail which documents all events associated with a file.

P. **Training**

All deputies who have access to BWC data storage must complete a NCSO approved training program to include:

1. Camera operation (i.e., activation, deactivation, and other features);

2. Proper placement of the camera on the uniform;

3. NCSO policy and relevant state/federal laws on camera usage;

4. Review of procedures for recordings to be used as evidence;

5. Basic maintenance;

6. Procedures for documenting and reporting malfunctioning to their issued BWC;

7. Procedures for uploading and classifying recorded data;

8. Procedures for accessing and reviewing recorded data; and

9. BWC refresher training as needed for system or equipment updates, or progressive discipline.

Q. **Evidentiary Requests**

1. Authorized personnel requiring BWC recordings for investigations shall make requests directly to Records Custodian or designee via an email to cameraevidence@nassauso.com Requests shall contain as much of the

following information to ensure any and all related recordings are received by the investigating deputy, but shall not be granted without compliance with subsection d. below:

a. CCR number;
b. Date/time of recording;
c. Names and ID number of the deputy assigned to the generation BWC; and
d. Brief summary of the nature and reason of the request for accountability and system integrity (e.g., verification after NCSO reminder of deputy's deactivation statements.)

2. Recordings shall be "shared" within the vendor's evidence management system as "view only." BWC recordings shall not be shared with a "download to disk" option. Retention of recordings may be extended at the request of the assigned detective.

   a. The SAO and OGC (Office of General Counsel) are exempt from this "share" restriction.

   b. SAO or OGC requests of BWC recordings for filing decisions, court purposes, etc., shall be directed to the Records Division by the filing deputy or detective, an email to cameraevidence@nassauso.com

3. Immediately upon receipt of a subpoena duces tecum for BWC recordings, the deputy will contact the Records Division to request the recording(s) be copied to a disc for submission to the Department of Highway Safety and Motor Vehicles (DHSMV) Hearing Office. Ensure a copy of the subpoena is attached to the email. Deputies shall be notified via email when their evidence is ready to be picked up. Additionally, deputies may call the Records Division to check on the status of a request. Members should send an email to cameraevidence@nassauso.com

   a. Should an instance of insufficient time prevent the deputy from obtaining a copy of the recording prior to the hearing date, deputies shall contact the DHSMV Hearing Office directly to request a continuance. Specifically, deputies shall advise the hearing office "NCSO is working diligently to provide evidence related to this case as instructed by the subpoena. I request a continuance to allow more time."

   b. Deputies shall take due care of any and all hard copies of digital evidence. All copies shall be left with the DHSMV Hearing

Office.

4. Deputies subject to investigations shall be provided all applicable BWC recordings pursuant to current practices and associated orders (e.g., Written Directive 3350 Discipline and Disciplinary Actions).

**R. Records Requests**

1. The authority governing the release of BWC recordings or associated reports containing criminal investigative information and criminal history information is found in various F.S.S. and Federal Statutes, local ordinances, and Administrative rules and directives including, but not limited to:

    a. Chapters 39, 119, 257, and 943 F.S.S.; and

    b. Chapters1B-24, 26, and 27, Florida Administrative Code.

2. Public records requests for BWC recordings shall be accepted and processed, in accordance with the provision of federal law, state law (including Chapter 119, F.S.S.), local statutes, and policies. The request shall be forwarded to Records Division for logging, tracking, and processing. The Records Department or designee shall make every reasonable effort to notify the deputy who created the produced BWC recording via email prior to its production (without divulging the requester).

**S. Retention and Disposal of Body-Worn Camera Video Recordings**

1. The retention of BWC recordings shall be in accordance with General Records Schedule as published by the Secretary of State for Law Enforcement Agencies and all applicable Florida State Statutes. GS2 is the publication consulted for guidelines when planning records request disposal. BWC shall not be deleted or purged without the approval of the Records Custodian or designee, pursuant to all logging and tracking of deleted or purged records.

2. BWC recordings are managed for retention by software applications. Recordings are retained in accordance with this directive and statutory requirements addressing the storage of evidence. The software is programmed to perform automated purges to delete recordings set to expire as provided in this policy.

    a. The Retention software will automatically purge video at 90 days, unless it is told to hold the video longer. If the video is needed for evidence, if the deputy believes the video needs to be held longer, etc. the deputy must

Exhibit J

notify the Records Custodian via an email to cameraevidence@nassauso.com to retain the said video and explain why, as this may affect the length of retention per FSS.

b. Please provide as much specific information in regards to the video to help in making sure the correct video is saved. (I.E. the CCR, Deputy's name and ID #, the video Classification Tag, Date, Time, any specific details about the video, etc)

3. BWC recordings must be retained according to the mandates or retention periods established by local, state, or federal law, and if applicable, NCSO. Such recordings that do not qualify for retention beyond the associated retention periods may be deleted by the BWC administrator.

4. It is the responsibility of the Records Custodian or designee to tag the BWC video if it is determined the recording should be archived for future court proceedings, administrative access, or otherwise may serve to support criminal and civil statute of limitations (e.g., capital or life felonies, evidence preservation requests, DNA evidence, etc.), and, if applicable, that copies are stored on DVD.

5. Only the Records Division may satisfy requests for public copies. BWC recordings contained on NCSO systems shall not be released to the public without prior approval from the Records Division. Request for copies of recordings that extend outside NCSO or the SAO shall be subject to the applicable provisions of law.

**ISSUING AUTHORITY**

Bill Leeper

**Bill Leeper, Sheriff**

Exhibit K

# State of Florida

## *GENERAL RECORDS SCHEDULE GS2 FOR CRIMINAL JUSTICE AGENCIES AND DISTRICT MEDICAL EXAMINERS*

**EFFECTIVE: June 2023**
Rule 1B-24.003(1)(b), *Florida Administrative Code*

Florida Department of State
Division of Library and Information Services
Tallahassee, Florida

850.245.6750

recmgt@dos.myflorida.com

info.florida.gov/records-management

Exhibit K



**VEHICLE PROCESSING LOGS** **Item #112**
This record series documents the processing of vehicles for evidence such as fingerprints and palm prints. The log may contain such information as vehicle processed; date and time of processing; and the name of the individual processing the vehicle. This information may also be found in the applicable CRIMINAL INVESTIGATIVE RECORDS item. See also "EVIDENCE PROCESSING RECORDS."
**RETENTION:** Retain until obsolete, superseded, or administrative value is lost.

**VEHICLE PURSUIT RECORDS** **Item #212**
This record series documents law enforcement vehicle pursuit of suspects or violators. Information may include, but is not limited to, date of pursuit; officers involved in pursuit; location where pursuit began; location where pursuit ended; weather and traffic conditions; reason for pursuit; tactics used; and how and why pursuit was terminated. A pursuit record may become part of an applicable CRIMINAL INVESTIGATIVE RECORDS item.
**RETENTION:** 4 anniversary years.

**VEHICLE RECORDS: INSPECTION CHECKLIST** **Item #111**
This record series consists of checklists used by law enforcement agencies to record the condition of vehicles and equipment. Inspections may be conducted at the beginning of each work shift or at other intervals determined by the agency.
**RETENTION:** Retain until obsolete, superseded, or administrative value is lost.

**VEHICLE RECORDS: IMPOUNDED** **Item #52**
This record series documents the impoundment of vehicles, including ground, air, and water vehicles, by a law enforcement agency. Records include information relating to the vehicle such as name and address of owner; year, make, and model; color; vehicle identification number (VIN); tag number; condition; damage (if any); and an inventory of the contents. The records may also provide date, time, and location of impoundment; reason for impoundment (e.g., accident, abandoned, recovered stolen, or used in commission of a crime); name of wrecker service; and release information such as fees or charges incurred, name and address of individual to whom the vehicle was released, and release authorizations and conditions (if any) imposed. See also "NOTICES: REMOVAL OF ABANDONED OR JUNKED VEHICLE," "PROPERTY RECORDS: SEIZED/ABANDONED/FORFEITED," and "EVIDENCE PROCESSING RECORDS."
**RETENTION:** 5 fiscal years after disposition of vehicle.

**VEHICLE RECORDS: TACHOMETER READING** **Item #113**
This record series consists of tachometer readings recorded to monitor the speed of law enforcement vehicles over a period of time. The records may also document use of lights and sirens.
**RETENTION:** 1 anniversary year.

**VICTIM ASSISTANCE CASE FILES** **Item #191**
This record series documents the agency's efforts to provide assistance to crime victims pursuant to Chapter 960, *Florida Statutes*, Victim Assistance. These records may include copies of police reports, court documents, correspondence, social service support referrals, crime compensation applications, victim impact statements, restitution statements, and other supporting documentation.
**RETENTION:** 5 fiscal years after final action.

**VIDEO/AUDIO RECORDINGS: BODY CAMERA** **Item #224**
This record series consists of recordings taken by a body camera as defined in Section 119.071(2)(l)1.a, *Florida Statutes*: "a portable electronic recording device that is worn on a law enforcement officer's body and that records audio and video data in the course of the officer performing his or her official duties and responsibilities." Since these recordings may play an integral part in prosecution or disciplinary actions, the agency is responsible for ensuring that internal management policies are in place establishing criteria for which images should be retained beyond the minimum. These records may become part of a criminal investigative record. Retention is pursuant to Section 119.071(2)(l)5, *Florida Statutes*, General exemptions from inspection or copying of public records. Agency Investigations. See also "VIDEO/AUDIO RECORDINGS: PATROL UNITS."
**RETENTION:** 90 days.

**VIDEO/AUDIO RECORDINGS: PATROL UNITS** **Item #192**
This record series consists of video recordings taken from a patrol vehicle (dash-cam videos) to document law enforcement activities of officers while on patrol. Since these recordings may play an integral part in prosecution or disciplinary actions, agencies are responsible for ensuring that internal management policies are in place establishing criteria for which images should be retained beyond the minimum. These records may become part of a criminal investigative record. See also "VIDEO/AUDIO RECORDINGS: BODY CAMERA."
**RETENTION:** 30 days.

Exhibit L



INVESTIGATIVE RECORDS" items, "FACIAL RECOGNITION RECORDS," "VIDEO/AUDIO RECORDINGS: BODY CAMERA" and "VIDEO/AUDIO RECORDINGS: PATROL UNITS."
**RETENTION:** Retain until obsolete, superseded, or administrative value is lost.

**CRIMINAL INVESTIGATIVE RECORDS: CAPITAL/LIFE FELONY** **Item #31**
This record series consists of information compiled by a criminal justice agency in the course of conducting a criminal investigation of a specific act or omission constituting a capital or life felony, including information derived by laboratory tests, reports of investigators or informants, or any type of surveillance (Section 119.011(3)(b), *Florida Statutes*, Public Records; Definitions). The series may also contain, but is not limited to, fingerprints and/or palm prints and print classification of the person arrested; FBI history number; state identification number; original and supplemental arrest reports and records; arrest affidavit; booking records; jail commitment records; first appearance records; copies of warrants; photographs; narrative describing case or offense; correspondence; the disposition of the case; bond and fine information for the person to be released from jail; commitment orders; court orders; record of offender's incarceration; Miranda rights form; family history; releasing orders; date of release; reason for release; court dispositions; and medical information. Retention is pursuant to Section 775.15, *Florida Statutes*, Time limitations; general time limitations; exceptions. See also "CRIMINAL INTELLIGENCE INFORMATION RECORDS" and other "CRIMINAL INVESTIGATIVE RECORDS" items.
**RETENTION:** 100 anniversary years after crime committed.

**CRIMINAL INVESTIGATIVE RECORDS: CHILD ABUSE OR NEGLECT** **Item #200**
This record series consists of information compiled by a criminal justice agency in the course of conducting a criminal investigation of a specific act or omission constituting child abuse, neglect, abandonment, and endangerment, including information derived by laboratory tests, reports of investigators or informants, or any type of surveillance (Section 119.011(3)(b), *Florida Statutes*, Public Records; Definitions). The series may also contain, but is not limited to, fingerprints and/or palm prints and print classification of the person arrested; FBI history number; state identification number; original and supplemental arrest reports and records; arrest affidavit; booking records; jail commitment records; first appearance records; copies of warrants; photographs; narrative describing case or offense; correspondence; the disposition of the case; bond and fine information for the person to be released from jail; commitment orders; court orders; record of offender's incarceration; Miranda rights form; family history; releasing orders; date of release; reason for release; court dispositions; and medical information. Retention is pursuant to Statute of Limitations, Section 95.11(7), *Florida Statutes*, For Intentional Torts Based on Abuse. See also "CRIMINAL INTELLIGENCE INFORMATION RECORDS" and other "CRIMINAL INVESTIGATIVE RECORDS" items.
**RETENTION:** 7 anniversary years after the age of majority, or 4 anniversary years after the injured person leaves the dependency of the abuser, or 4 anniversary years from the time of discovery by the injured party of both the injury and the causal relationship between the injury and the abuse, whichever occurs later. **Retention may need to be extended under conditions established by Section 775.15(12)(b) – Section 775.15(16), *Florida Statutes*.**

**CRIMINAL INVESTIGATIVE RECORDS: DEGREE OF CRIME UNKNOWN/NO CHARGES FILED** **Item #129**
This record series consists of information compiled by a criminal justice agency in the course of conducting a criminal investigation of a specific act or omission where the degree of crime is unknown or there were no charges ultimately filed, including information derived by laboratory tests, reports of investigators or informants, or any type of surveillance (Section 119.011(3)(b), *Florida Statutes*, Public Records; Definitions). The series may also contain, but is not limited to, fingerprints and/or palm prints and print classification of the person arrested; FBI history number; state identification number; original and supplemental arrest reports and records; arrest affidavit; booking records; jail commitment records; first appearance records; copies of warrants; photographs; narrative describing case or offense; correspondence; the disposition of the case; bond and fine information for the person to be released from jail; commitment orders; court orders; record of offender's incarceration; Miranda rights form; family history; releasing orders; date of release; reason for release; court dispositions; and medical information. Retention is pursuant to Section 775.15, *Florida Statutes*, Time limitations; general time limitations; exceptions. See also "CRIMINAL INTELLIGENCE INFORMATION RECORDS" and other "CRIMINAL INVESTIGATIVE RECORDS" items.
**RETENTION:** 4 anniversary years after offense committed.

**CRIMINAL INVESTIGATIVE RECORDS: ELDERS/DISABLED ADULTS ABUSE, NEGLECT, OR EXPLOITATION** **Item #124**
This record series consists of information compiled by a criminal justice agency in the course of conducting a criminal investigation of a specific act or omission constituting abuse, neglect, or exploitation of elders or disabled adults, including information derived by laboratory tests, reports of investigators or informants, or any type of surveillance (Section 119.011(3)(b), *Florida Statutes*, Public Records; Definitions). The series may also contain, but is not limited to, fingerprints and/or palm prints and print classification of the person arrested; FBI history number; state identification number; original and supplemental arrest reports and records; arrest affidavit; booking records; jail commitment records; first appearance records; copies of warrants; photographs; narrative describing case or offense; correspondence; the disposition of the case; bond and fine information for the person to be released from jail; commitment orders; court orders; record of offender's incarceration; Miranda rights form; family history; releasing orders; date of release; reason for release; court dispositions; and medical information. Retention is pursuant to Section 775.15, *Florida Statutes*, Time limitations; general time limitations; exceptions. See also "CRIMINAL INTELLIGENCE INFORMATION RECORDS" and other "CRIMINAL INVESTIGATIVE RECORDS" items.

Exhibit M

***Nassau County Sheriff's Office***

***CRIMINAL INVESTIGATIONS DIVISION***

***INVESTIGATIVE SUMMARY***

**Case Number: 2024-40149** **Type of Investigation: Child Abuse**

**Narrative:**

On April 11, 2024, Nassau County Sheriff's Office (NCSO) personnel responded to the UF Health North campus in response to the report of possible child abuse.

Upon Deputy Milan's arrival, he contacted the charging nurse, Jen, who made the initial call to NCSO's Communications Center. She said a nine-year-old male, S[redacted] Dufault (reported victim) was being physically examined for bruising on his arms and back. She reported the victim claimed he was grabbed by his mother's boyfriend, "Richard Noah Rawlings." She also notified the Department of Children and Families (DCF) about the incident.

Deputy Milan unsuccessfully attempted to locate Richard Noah Rawlings in several informational databases. Per the victim's father, Dustin Dufault, Rawlings lives with the victim's mother, Erin Schreiber, at her listed address 37122 W Third Street.

Deputy Milan gathered additional information from Mr. Dufault. Mr. Dufault said he shares custody with his ex-wife/mother of his children, Erin Schreiber. After he picked up his kids from their mother he took them swimming and when the victim removed his shirt he observed bruising on his arms and back. After the victim said Rawlings grabbed him, Mr. Dufault brought him to the hospital for treatment.

Deputy Milan spoke to the victim's older sister, [redacted]y Dufault, who was in the house at the time the incident occurred. She said the incident occurred either Monday, April 8, 2024 or Tuesday, April 9, 2024. She said her mother and the victim were involved in a verbal altercation regarding the victim playing a video game. When the victim refused the stop playing the video game, his mother picked him up and carried him to his room. As she did, the victim began to "kick and scream" as his mother was carrying him. When the victim was "kicking and screaming" he struck his mother numerous times "all over." The witness said she could not see what happened once they went into the bedroom, but "Noah" went into the room and she could hear banging from what she believed to be a physical altercation.

NCSO Crime Scene Unit (CSU) Detective Hagan responded to the hospital and photographed the injuries.

Patrol personnel advised me of the incident and the next day I contacted Investigator Cox with DCF. Cox ordered a forensic interview of the victim be conducted at the First Coast Child Protection Team.

I contacted the Case Coordinator Luiz Ramirez with First Coast Child Protection Team and requested any information related to this incident.

I also discovered the correct name for the subject is "Richard Noah Raulerson" not Rawlings. He does not live with the parties mentioned-above.

On April 26, 2024 Ramirez provided the Specialized Interview Report (SI).

On April 29, 2024, I conducted a recorded interview with Richard Raulerson at Hilliard Middle-Senior High School. Post-Miranda, Raulerson told me the victim and another juvenile were having a "crying meltdown." During this, the victim struck his sister in the abdominal region in a "fit of rage." The strike was hard enough for her to audibly cry in pain. Raulerson responded by grabbing the victim's arm and escorting him to his bedroom.

Afterwards, Schreiber entered the victim's room and Raulerson could hear "physical chaos" from the bedroom for approximately ten minutes. Raulerson becoming concerned for Schreiber's safety, entered the room and watched Schreiber and the victim physically struggle. Both Schreiber and the victim fell to the ground and the victim kicked Schreiber in her abdomen. Raulerson said he grabbed the victim's arms and restrained him to prevent further violence. Raulerson denied striking the victim. For a verbatim account of Raulerson's statements please refer to audio recording submitted into evidence.

Based on these circumstances, I do not believe Richard Raulerson knowingly or willfully abused the reported victim. Furthermore, an excerpt from The Florida Standard Jury Instructions for Criminal Cases reads as follows: *It is not a crime for [a parent] [a person who is acting in the place of a parent] of a child to impose reasonable physical discipline on a child for misbehavior under the circumstances even though physical injury resulted from the discipline.* The circumstances (striking multiple people) warranted a physical response from Raulerson.

***This case is deemed unfounded.***

***Detective I. Pinkston #1312***

Exhibit N

## 16.1 AGGRAVATED CHILD ABUSE
§ 827.03(2)(a), Fla. Stat.

**To prove the crime of Aggravated Child Abuse, the State must prove the following two elements beyond a reasonable doubt:**

**1.** (Defendant)

*Give 1a–1e as applicable.*

- **a.** **committed Aggravated Battery upon** (victim).
- **b.** **willfully tortured** (victim).
- **c.** **maliciously punished** (victim).
- **d.** **willfully and unlawfully caged** (victim).
- **e.** **knowingly or willfully committed Child Abuse upon** (victim) **and in so doing caused great bodily harm, permanent disability, or permanent disfigurement to** (victim).

**2.** (Victim) **was under the age of 18 years.**

*Give if element 1a is alleged.*

**In order to prove that an Aggravated Battery was committed, the State must prove the following two elements. The first element is a definition of Battery.**

**1.** (Defendant) **actually and intentionally**

*Give 1a or 1b or both as applicable.*

- **a.** **touched or struck** (victim) **against the will of** (victim).
- **b.** **caused bodily harm to** (victim).

*Give 2a or 2b or both as applicable.*

**2.** **a.** **In so doing,** (defendant) **[intentionally or knowingly caused [great bodily harm] [permanent disability] [permanent disfigurement]] [or] [used a deadly weapon].**

**b.** **At the time,** (victim) **was pregnant and** (defendant) **knew or should have known** (victim) **was pregnant.**

*Give if applicable.*

**A "deadly weapon" is any object that will likely cause death or great bodily harm if used or threatened to be used in the ordinary and usual manner contemplated by its design and construction.**

*Give if applicable.*

**An object not designed to inflict bodily harm may nonetheless be a "deadly weapon" if it was used or threatened to be used in a manner likely to cause death or great bodily harm.**

*Give if applicable.*

**"Great bodily harm" means great as distinguished from slight, trivial, minor, or moderate harm, and as such does not include mere bruises.**

*Give only if applicable. Fey v. State, 125 So. 3d 828 (Fla. 4th DCA 2013).*

**An intentional touching or striking includes situations where a defendant knows that a touch or strike is substantially certain to result from his or her act.**

*Give only if applicable. Clark v. State, 783 So. 2d 967 (Fla. 2001).*

**A Battery may be found as a result of the intentional touching or intentional striking of something other than the actual body of the person. However, the object that is touched or struck must have such an intimate connection with the person that it is to be regarded as a part or as an extension of the person. [For example, in cases where a person intentionally drove into another occupied vehicle, it is for you to determine whether the vehicle that was struck should be considered as a part or as an extension of the person inside that vehicle. This determination may include consideration about whether the person was "touched" through the force of impact by being jostled or otherwise impacted through the transfer of energy from the collision.]**

*Give if element 1b, 1d, or 1e is alleged.*

**"Willfully" means intentionally and purposely.**

*Give if element 1c is alleged. § 827.03(c), Fla. Stat.*

**"Maliciously" means wrongfully, intentionally, and without legal justification or excuse. Maliciousness may be established by circumstances from which one could conclude that a reasonable parent would not have engaged in the damaging acts toward the child for any valid reason and that the primary purpose of the acts was to cause the victim unjustifiable pain or injury.**

*Give if element 1e is alleged. § 827.03(1)(b), Fla. Stat.*

**"Child Abuse" means [the intentional infliction of physical or mental injury upon a child] [an intentional act that could reasonably be expected to result in physical or mental injury to a child] [active encouragement of any person to commit an act that results or could reasonably be expected to result in physical or mental injury to a child].**

*Give if applicable. § 827.03(1)(d), Fla. Stat.*

**"Mental injury" means injury to the intellectual or psychological capacity of a child as evidenced by a discernible and substantial impairment in the ability of the child to function within the normal range of performance and behavior as supported by expert testimony.**

Exhibit N

*Parental affirmative defense. Give if applicable. See Raford v. State, 828 So. 2d 1012 (Fla. 2002). See § 39.01(49), Florida Statutes, if the defendant's status as a parent is at issue.*

*§ 827.03, Fla. Stat., and case law are silent as to (1) which party bears the burden of persuasion of the affirmative defense and (2) the standard for the burden of persuasion. Under the common law, defendants had both the burden of production and the burden of persuasion on affirmative defenses by a preponderance of the evidence. The Florida Supreme Court has often decided, however, that once a defendant meets the burden of production on an affirmative defense, the burden of persuasion is on the State to disprove the affirmative defense beyond a reasonable doubt (e.g., self-defense and consent to enter in a burglary prosecution). In the absence of case law, trial judges must resolve the issue via a special instruction. See the opinions in Dixon v. United States, 548 U.S. 1 (2006), for further guidance.*

**It is not a crime for [a parent] [a person who is acting in place of a parent] of a child to impose reasonable physical discipline on a child for misbehavior under the circumstances even though physical injury resulted from the discipline.**

*If burden of persuasion is on the defendant:*

**If you find that the defendant proved** *(insert appropriate burden of persuasion)* **that [he] [she] was [a parent] [a person acting in place of a parent] of** (victim) **and that [he] [she] imposed reasonable physical discipline on** (victim) **for misbehavior under the circumstances, you should find [him] [her] not guilty.**

**If the defendant did not prove** *(insert appropriate burden of persuasion)* **that [he] [she] was [a parent] [a person acting in place of a parent] of** (victim) **or if the defendant did not prove that [he] [she] imposed reasonable physical discipline on** (victim) **for misbehavior under the circumstances, you should find [him] [her] guilty, if all the elements of the charge have been proven beyond a reasonable doubt.**

*If burden of persuasion is on the State:*

**If you find that the State proved** *(insert appropriate burden of persuasion)* **that the defendant was not [a parent] [a person acting in place of a parent] of** (victim) **or if you find that the State proved** *(insert appropriate burden of persuasion)* **that the defendant's physical discipline on** (victim) **was not reasonable for misbehavior under the circumstances, you should find [him] [her] guilty, if all of the elements of the charge have been proven beyond a reasonable doubt.**

**Lesser Included Offenses**

**AGGRAVATED CHILD ABUSE — 827.03(2)(a)**

| CATEGORY ONE | CATEGORY TWO | FLA. STAT. | INS. NO. |
|---|---|---|---|
| Aggravated Battery; if element 1a is charged | | 784.045 | 8.4, 8.4(a) |
| Felony Battery; if element 1a is charged | | 784.041 | 8.5 |

Exhibit N

| CATEGORY ONE | CATEGORY TWO | FLA. STAT. | INS. NO. |
|---|---|---|---|
| Battery; if element 1a is charged and only under certain circumstances. See *Kama v. State*, 507 So. 2d 154 (Fla. 2d DCA 1987) | | 784.03 | 8.3 |
| Child Abuse; if element 1e is charged | | 827.03(2)(c) | 16.3 |
| | Attempt | 777.04(1) | 5.1 |

**Comments**

Florida law on alternative conduct statutes is unsettled. For example, in a DUI case, it is permissible for some jurors to conclude the State proved only driving while impaired, and other jurors to conclude the State proved only driving with an unlawful breath alcohol level. *Euceda v. State*, 711 So. 2d 122 (Fla. 3d DCA 1998). However, according to the Second District, in Aggravated Battery cases, it is improper for some jurors to conclude the State proved only that the defendant intentionally caused great bodily harm and other jurors to conclude the State proved only that the defendant used a deadly weapon. *Miller v. State*, 123 So. 3d 595 (Fla. 2d DCA 2013). Unless the case law changes, in Aggravated Child Abuse cases based on a theory of Aggravated Battery where the State has charged both alternatives, trial judges must give a special instruction that informs jurors they must be unanimous on each alternative theory. For other Aggravated Child Abuse cases, as of September 2019, it is undetermined whether jurors must be unanimous for each alternative within element #1.

Num-chucks, which were originally designed as a farm tool, can be a deadly weapon. *R.V. v. State*, 497 So. 2d 912 (Fla. 5th DCA 1986). Jurors could find that a 7-inch straight-edged razor might be a dangerous weapon. *R.R. v. State*, 826 So. 2d 465 (Fla. 5th DCA 2002). In trials involving these types of objects, the judge should consider a special instruction informing jurors that an object can be a deadly weapon if its sole modern use is to cause great bodily harm or death. A special instruction may also be necessary in cases where the deadly weapon was an animal or a substance or something that is not commonly referred to as an "object."

This instruction was adopted in 1981 and amended in 2002 [824 So. 2d 881], 2005 [911 So. 2d 766], 2013 [122 So. 3d 263], 2014 [152 So. 3d 475], 2016 [190 So. 3d 614], and on April 3, 2020.

Exhibit O



# DIRECTOR OF GOVERNMENT AFFAIRS/ GENERAL COUNSEL

## BOBBY LIPPELMAN

×

Bobby Lippelman joined Sheriff Leeper's administration as General Counsel in February, 2013. He is a graduate of the University of Florida (B.S., 1998) and Vermont Law School (J.D., 2002; M.S.E.L., *Magna Cum Laude*, 2002).

Before joining Sheriff Leeper's administration, Bobby was appointed and served as an Assistant State Attorney for the Fourth Judicial Circuit of Florida (Nassau, Duval, and Clay counties) for nearly nine years. He served as a senior trial attorney in several divisions, including the Repeat Offender Court and the Special Prosecution divisions. He was also a member of the State Attorney's Office Homicide Unit for two years and later supervised all wiretap and long-term, major drug trafficking and gang racketeering prosecutions in State Court for the Fourth Judicial Circuit.

In 2007, Bobby received an award from the State Attorney's Office for completing the highest number of jury trials in the Fourth Judicial Circuit.

After his tenure as an Assistant State Attorney, Bobby focused on civil litigation—first as an associate attorney at a Jacksonville law firm, and later as the managing member and founder of a law firm serving clients in Nassau, Duval, and Clay counties.

While serving as General Counsel for NCSO, Bobby attended and graduated from the Florida Gateway College Police Academy in 2016, where he was named Class Valedictorian and Class Commander, and was sworn in as a Deputy Sheriff.

In May 2021, Bobby was promoted to the rank of Director and now supervises the Legal Services, Government Affairs, and Records Division. He continues to serve as the General Counsel for the Nassau County Sheriff's Office. Bobby attended and completed the FBI-LEEDA Supervisor, Command, and Executive Leadership Institutes and earned the trilogy award in 2024.

As restricted by law and the rules regulating The Florida Bar, the NCSO General Counsel is not authorized to provide legal advice to private citizens.

Exhibit P

Re: Lucy appts Sent

DD

Dustin DuFault
Sent Jun 12, 2024, 9:53 AM

To: Erin Schreiber (Viewed Jun 12, 2024, 9:53 AM)

You have been present at my home for several minutes knocking repeatedly. It is making us all feel really uncomfortable. Please leave or I will have to call the police -again- to protect our property, space, mental, and physical well-being.

It is far away my preference not to have to do this but this is not the first instance of you coming here and harassing us. It has already caused problems with the children in that they are always scared any time someone knocks on my door.

Exhibit Q

## Request #PRR-2025-6057

**Description**
Regarding: 2024-10149 Please review the attached audio recording which you previously produced to me. The file title is: 240429_1041-redacted.m4a I've listened to the audio. I did not hear audible redactions in what I was given. Does this mean this recording has been clipped? I was not given a rationale for why it would be redacted and I don't believe there should be one considering I am the father and custodian of the victim. Can you please produce an un-redacted copy of this recording -or- a statement about the redactions made and the statutory rationale for making the redaction? Thank you.

**Status**
**Completed** ✓

**Submitted On**
9/26/2025

**Completed On**
10/3/2025

VIEW REQUEST

Exhibit Q



Gmail

Dustin DuFault <dustin@halcyonharbor.com>

## Nassau County Sheriff's Office - Records Division - Records Request PRR-2025-6057 Closed

1 message

**Caroline Gordon (Nassau County Sheriffs Office, FL)** <NassauSO@request.justfoia.com> Fri, Oct 3, 2025 at 10:53 AM

Reply-To: 28c63719-7e4d-404a-863d-c24b9203f75c.NassauSO@request.justfoia.com
To: records@halcyonharbor.com

**RE: Records Request PRR-2025-6057 - Submitted On: 09/26/2025**

Dear Requestor,

The Nassau County Sheriff's Office does not have records that are responsive to your request. As a result, your request is considered closed - please contact our office with questions or submit a new request.

There was confidential and exempt information in the audio that was redacted. Please see the excerpt from the Florida State Statute 119.07 : *(d) A person who has custody of a public record who asserts that an exemption applies to a part of such record shall redact that portion of the record to which an exemption has been asserted and validly applies, and such person shall produce the remainder of such record for inspection and copying.*

Thank you,

Nassau County Sheriff's Office - Records Division
77151 Citizens Circle
Yulee, Florida 32097
publicrecordsrequest@nassauso.com
(904) 548 - 4009

---

*Powered by*

justfoia
an MCCi brand

## 4047.40 TRESPASS WARNING FORM (NCSO FI TRESPASS)

**NOTE: IN THE NEW WORLD SYSTEM THIS FORM IS FOUND UNDER NCSO FI TRESPASS. YOU SELECT WHICH FORM YOU ARE UTILIZING BY A CHECK BOX.**

A. A Trespass Report completed utilizing New World Systems software is used to document a warning given by one person to another person:

1. Not to remain in, or re-enter any establishment. The proprietor or someone in an authoritative position with the establishment must give the warning.
2. Not to remain on, or re-enter any private property or dwelling.

B. A deputy does not have to witness the alleged trespass to issue a trespass warning.

C. The Trespass Report Form should be filled out as completely as possible.

D. The deputy completing the Trespass Report shall:

1. Inform the person being warned that a Trespass Warning has been generated and the possible consequences if he or she violates the warning. The consequences include the possibility of an arrest.



2. Have the property owner or designee sign the NCSO signature form to acknowledge the trespass warning.

3. Turn the signature page into the records department for scanning.

119

Exhibit S

## Request #PRR-2025-4489

*Dear Custodian: This follows my prior audit log request for case 2024 00062676. Your latest reply ("these are all the documents we have") re sent the CAD incident print and a code legend but did not produce the requested RMS/Trespass audit/change logs or any rescission/void documentation. The CAD narrative for Incident 2024 00062676 shows a trespass was issued at 09:57:46 ("Per Eastwood Oaks Apartments management, all buildings and parking lot") and cancelled at 12:10:33 ("10 66 S 42 per 7711"). Under your code legend, 10 66 = Cancel and S 42 = Trespass. This establishes that a trespass existed and was rescinded on 06/17/2024. Additionally, as stated previously, I am in possession of the trespass which was issued and given to me by the responding officers. Please produce: 1. The RMS/Trespass record corresponding to this event (including the scanned trespass form) and any rescission/void/cancel entry (with user, timestamp, and approver), plus the RMS audit/change log for that record. 2. The CAD Administrative History/Audit export for Incident 2024 00062676 (showing which login/username created each narrative/status entry and when). 3. Identity mapping (names): Identify by full name and rank/title the person denoted by "7711" in the 12:10:33 entry ("10 66 S 42 per 7711"), and identify by name the CAD login/username that entered that line. If "7711" is a desk/unit/dispatcher code, identify the individual(s) on duty using that code at 12:10:33. Include any badge/employee number needed to uniquely identify the person(s). 4. If no RMS/Trespass record or audit exists, provide a written custodian statement describing the good faith search under § 119.07(1)(c) (systems/modules searched across CAD and RMS, search parameters/identifiers, dates of search, and personnel who conducted it), and produce any records disposition documentation showing when/how such records were disposed (with retention authority under Rule 1B 24.003, F.A.C./GS2). This notice does not narrow or waive my prior request; it is a final effort to cure the deficiency. If I do not receive the above, or a specific statutory basis for any withholding, within five (5) business days of your receipt of the notice delivered via my earlier request for this same information, I will file under § 119.11 (accelerated hearing) and seek fees under § 119.12. For convenience, I am re attaching the CAD incident page, the code legend, and the trespass warning issued 06/17/2024. Respectfully, Dustin DuFault*

### Details

**Submitted**
Wed, Jul 30, 2025

**Status**
Completed

**Requested Documents**

| File | Description | Size | Upload Date |
|---|---|---|---|
| Call Detail 2024062676_Redacted.pdf | | 196.96 KB | 07/30/2025 |
| Patrol Roster 03-31-25-Redacted.pdf | | 424.84 KB | 07/30/2025 |

Rows per page: 5 1-2 of 2

DOWNLOAD ALL

**Exhibit S**



Gmail **Dustin DuFault <dustin@halcyonharbor.com>**

---

## Nassau County Sheriff's Office - Records Division - Record Request PRR-2025-4489 Completed

1 message

---

**JustFOIA Notification** <NassauSO@request.justfoia.com> Wed, Jul 30, 2025 at 1:05 PM
Reply-To: 9bfff56b-7807-4a04-97a7-c42be7a056e3.NassauSO@request.justfoia.com
To: dustin@halcyonharbor.com

Dear Requestor,

The **Request Number: PRR-2025-4489** has been completed. Please click on the request link to download the response documentation.

1. The RMS/Trespass record corresponding to this event (including the scanned trespass form) and any rescission/void/cancel entry (with user, timestamp, and approver), plus the RMS audit/change log for that record. - No document responsive to your request.

2. The CAD Administrative History/Audit export for Incident 2024 00062676 (showing which login/username created each narrative/status entry and when). - See attached.

3. Identity mapping (names): Identify by full name and rank/title the person denoted by "7711" in the 12:10:33 entry ("10 66 S 42 per 7711"), and identify by name the CAD login/username that entered that line. If "7711" is a desk/unit/dispatcher code, identify the individual(s) on duty using that code at 12:10:33. Include any badge/employee number needed to uniquely identify the person(s). - See Attached.

4. If no RMS/Trespass record or audit exists, provide a written custodian statement describing the good faith search under §?119.07(1)(c) (systems/modules searched across CAD and RMS, search parameters/identifiers, dates of search, and personnel who conducted it), and produce any records disposition documentation showing when/how such records were disposed (with retention authority under Rule 1B 24.003, F.A.C./GS2). - No document responsive to your request.

Thank you,

Nassau County Sheriff's Office - Records Division
77151 Citizens Circle
Yulee, FL 32097
publicrecordsrequest@nassauso.com
(904) 548 - 4009

---

*Powered by*

justfoia
an MCCi brand

Exhibit T

| 4086.00 NASSAU COUNTY SHERIFF'S OFFICE | | Reference: CFA: 17.03, 18.12 |
|---|---|---|
| CIVIL COMPLAINTS | | |
| Effective date: 7/21/06 | Last revision: 7/3/14 | |

## 4086.00 CIVIL COMPLAINTS

**A.** It is the policy of the Nassau County Sheriff's Office to respond to civil complaints and disturbances, and under certain circumstances if necessary, to keep the peace.

**B.** This policy is to establish the guidelines to follow for deputies responding to civil complaints.

## 4086.10 RESPONDING TO CIVIL COMPLAINTS

**A.** A deputy may be dispatched to a citizen complaint that appears to be a civil matter:

1. To conduct a standby service for court orders.
2. To assist citizens with determining whether or not a specific complaint is strictly civil in nature.

## 4086.20 GUIDELINES FOR CIVIL COMPLAINTS

**A.** When a deputy is dispatched to a civil complaint, the deputy shall:

1. Be cognizant that absent any criminal conduct, he or she has no authority in civil matters.
2. Assist the complainant in determining if his or her complaint is a civil matter, or if the complaint or any specific part of the complaint constitutes a criminal act, or falls under the authority law enforcement.
    - **a.** If the deputy determines the call is not strictly civil, the deputy will take the appropriate action allowed by statute and agency policy to assist the complainant with any portions of the complaint that are not civil.
    - **b.** If the deputy determines the complaint is a civil matter, the deputy shall advise the complainant of that fact.
        - **1)** The deputy may also advise the complainant that he or she may contact an attorney or another such entity to assist them with the specific

complaint. However, the deputy shall not recommend a specific attorney or entity.

a. If the deputy determines the complaint is a civil matter, he or she **shall not:**

1) Mediate, negotiate, or in any way influence the outcome of any civil matter.

2) Use, or allow to be used, his or her position or presence as a Deputy Sheriff to intimidate a person or influence the outcome of any civil matter.

**B.** Nothing in this directive forbids a deputy from listening to a complainant about their specific complaint, regardless of the nature of the complaint.

**ISSUING AUTHORITY**

______________________________

**Bill Leeper, Sheriff**

-END-

Exhibit U

## Nassau County Sheriff's Office

CASE REPORT
77151 CITIZENS CIRCLE
YULEE, FL 32097

CASE# 2024-00040149

**EVENT**

| REPORTED DATE/TIME | OCCURRED INCIDENT TYPE | LOCATION OF OCCURRENCE |
|---|---|---|
| 4/11/2024 21:55 | Child Abuse | |

| OCCURRED FROM DATE/TIME | OCCURRED THRU DATE/TIME | LOCATION OF OCCURRENCE |
|---|---|---|
| 04/08/2024 12:00 | 04/09/2024 23:59 | 37122 W THIRD ST HILLIARD, FL |

**OFFENSES**

| | STATUTE/DESCRIPTION | COUNTS | ATTEMPT/COMMIT |
|---|---|---|---|
| 01 | 827.03(1) CHILD ABUSE | 1 | Commit |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**SUBJECT**

| JACKET/SUBJECT TYPE | | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | | | |
|---|---|---|---|---|---|---|---|
| Juvenile | Victim | DUFAULT, S[redacted]C[redacted] | | | | | |
| DOB | AGE or AGE RANGE | ADDRESS (STREET, CITY, STATE ZIP) | | | | | |
| [redacted]/2014 | | 815 STANLEY DR FERNANDINA BEACH, FL 32034 | | | | | |
| RACE | | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | EYE | |
| White | | Male | [redacted] | | | | |
| DL NUMBER/STATE | | PRIMARY PHONE | PHONE #2 | | PHONE #3 | | |
| [redacted] | | | | | | | |

**SUBJECT**

| JACKET/SUBJECT TYPE | | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | | | |
|---|---|---|---|---|---|---|---|
| Adult | Complainant | DUFAULT, DUSTIN MATTHEW | | | | | |
| DOB | AGE or AGE RANGE | ADDRESS (STREET, CITY, STATE ZIP) | | | | | |
| [redacted] | | 815 STANLEY DR FERNANDINA BEACH, FL 32034 | | | | | |
| RACE | | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | EYE | |
| White | | Male | 5'6" | 220 230 | BLK | BRO | |
| DL NUMBER/STATE | | PRIMARY PHONE | PHONE #2 | | PHONE #3 | | |
| [redacted] | | [redacted] | | | | | |

**SUBJECT**

| JACKET/SUBJECT TYPE | | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | | | |
|---|---|---|---|---|---|---|---|
| Juvenile | Witness | DUFAULT, L[redacted]C[redacted] | | | | | |
| DOB | AGE or AGE RANGE | ADDRESS (STREET, CITY, STATE ZIP) | | | | | |
| [redacted]2012 | | 815 STANLEY DR FERNANDINA BEACH, FL 32034 | | | | | |
| RACE | | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | EYE | |
| White | | Female | 4' 5' | 100 110 | BRO | BLU | |
| DL NUMBER/STATE | | PRIMARY PHONE | PHONE #2 | | PHONE #3 | | |
| [redacted] | | | | | | | |

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| 1452 MILLAN | 4/11/2024 | TURMAN, BRANDY N 04/25/2024 |

Exhibit U

**Nassau County Sheriff's Office**
CASE REPORT
77151 CITIZENS CIRCLE
YULEE, FL 32097

CASE# 2024-00040149

## ADDITIONAL SUBJECTS

**SUBJECT**

| JACKET/SUBJECT TYPE | | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | | |
|---|---|---|---|---|---|---|
| Adult | Person-Other | SCHREIBER, ERIN NICOLE | | | | |
| DOB | AGE or AGE RANGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | |
| [redacted] | | 37122 THIRD ST HILLIARD, FL 32046 | | | | |
| RACE | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | EYE | |
| White | Female | 5'7" | 150 | BRO | BLU | |
| DL NUMBER/STATE | PRIMARY PHONE | PHONE #2 | PHONE #3 | | | |
| Privacy Information | [redacted] | | | | | |

**SUBJECT**

| JACKET/SUBJECT TYPE | | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | |
|---|---|---|---|---|---|
| DOB | AGE or AGE RANGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | |
| RACE | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | EYE |
| DL NUMBER/STATE | PRIMARY PHONE | PHONE #2 | PHONE #3 | | |

**SUBJECT**

| JACKET/SUBJECT TYPE | | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | |
|---|---|---|---|---|---|
| DOB | AGE or AGE RANGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | |
| RACE | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | EYE |
| DL NUMBER/STATE | PRIMARY PHONE | PHONE #2 | PHONE #3 | | |

**SUBJECT**

| JACKET/SUBJECT TYPE | | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | |
|---|---|---|---|---|---|
| DOB | AGE or AGE RANGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | |
| RACE | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | EYE |
| DL NUMBER/STATE | PRIMARY PHONE | PHONE #2 | PHONE #3 | | |

**SUBJECT**

| JACKET/SUBJECT TYPE | | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | |
|---|---|---|---|---|---|
| DOB | AGE or AGE RANGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | |
| RACE | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | EYE |
| DL NUMBER/STATE | PRIMARY PHONE | PHONE #2 | PHONE #3 | | |

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| 1452 MILLAN | 4/11/2024 | TURMAN, BRANDY N 04/25/2024 |

**Exhibit U**

**Nassau County Sheriff's Office**
CASE REPORT
77151 CITIZENS CIRCLE
YULEE, FL 32097
CASE# 2024-00040149

**NARRATIVE**

On 4-11-2024 at 2200 hours, I was dispatched UF Health North in response to a child abuse.

Upon my arrival, I contacted the charging nurse, Jen, who made the initial call to NCSO Dispatch. She stated she had a patient in room 28 that was a nine-year-old male, [redacted] (victim). The victim had bruising on his arms, and back. She stated the victim advised he was grabbed by his mother's boyfriend, "Richard Noah Rawlings". The charging nurse also advise that she notified DCF of the incident and spoke with operator Christen #305.

I attempted, but was unable to locate the subject Richard Noah Rawlings in several information data bases. Rawlings is supposed to live with the victim's mother, Erin Schreiber, at her listed address.

The charging nurse then introduced me to the victim's father, Dustin Dufault (complainant). The complainant states he has shared custody with his ex-wife of their children. He had picked up his kids from their mother, and was taking them swimming, when he noticed the bruises on the victim. When the victim told the complainant that Rawlings grabbed him, the complainant brought him to the hospital for treatment.

I spoke to the victim's older sister, [redacted] (witness), who was in the house at the time the incident occurred. She stated the incident occurred either Monday 4/08/2024 or Tue 4/09/2024. She stated her mother, Erin Schreiber, and the victim got into an argument in the living room about the victim putting the video game he was playing down, and going to his room. When the victim refused, his mother picked him up, and carried him to his room. As she did, the witness stated the victim began to "kick and scream" as his mother was carrying him. When he vicimt was "kicking and screaming", he struck his mother several times "all over". The witness said she could not see what happened once they went into the bedroom, but "Noah" went into the room at that time, and she could hear the banging from what she believes to be a physical altercation.

Det. P. Hagan of CSU responded to the hospital, and photographed the injuries.

Det. Pinkston of CID was notified of the incident. He did not respond, but advised a follow up investigation will be conducted at a later date.

The victim was not interviewed at this time.

Case forwarded to CID.

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| 1452 MILLAN | 4/11/2024 | TURMAN, BRANDY N 04/25/2024 |

Exhibit U

# Nassau County Sheriff's Office

**CASE SUPPLEMENT REPORT**

CASE# **2024-00040149**

77151 CITIZENS CIRCLE
YULEE, FL 32097

| EVENT | | | |
|---|---|---|---|
| REPORTED DATE/TIME: 4/11/2024 21:55 | OCCURRED INCIDENT TYPE | | |
| OCCURRED FROM DATE/TIME | OCCURRED THRU DATE/TIME | LOCATION OF OCCURRENCE: 37122 W THIRD ST HILLIARD, FL | |

| OFFENSES | STATUTE/DESCRIPTION | COUNTS | ATTEMPT/COMMIT |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| SUBJECT | | | | | |
|---|---|---|---|---|---|
| JACKET/SUBJECT TYPE | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | | |
| DOB / AGE or AGE RANGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | |
| RACE | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | EYE |
| DL NUMBER/STATE | PRIMARY PHONE | PHONE #2 | PHONE #3 | | |

| SUBJECT | | | | | |
|---|---|---|---|---|---|
| JACKET/SUBJECT TYPE | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | | |
| DOB / AGE or AGE RANGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | |
| RACE | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | EYE |
| DL NUMBER/STATE | PRIMARY PHONE | PHONE #2 | PHONE #3 | | |

| SUBJECT | | | | | |
|---|---|---|---|---|---|
| JACKET/SUBJECT TYPE | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | | |
| DOB / AGE or AGE RANGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | |
| RACE | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | EYE |
| DL NUMBER/STATE | PRIMARY PHONE | PHONE #2 | PHONE #3 | | |

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| 495 HAGAN | 4/11/2024 | TURMAN, BRANDY N 04/30/2024 |

Exhibit U

**Nassau County Sheriff's Office**
**CASE SUPPLEMENT REPORT** CASE# **2024-00040149**
77151 CITIZENS CIRCLE
YULEE, FL 32097

**NARRATIVE**

On 04/11/2024 I responded to UF Health North ER room # 28 in reference to a child abuse investigation.

Upon arrival myself and Deputy S.C. Millan # 1452 made contact with the ER Charge Nurse that had called into report the alleged child abuse. The charge nurse advised myself and Deputy Millan the child was in ER room # 28 with his Father. The Charge Nurse Jen stated there was some significant bruising on the back of both of the child's upper arms and in the center of his back.

Myself and Deputy Millan asked the ER staff to get the Father out of the room and move him to a quiet area to begin obtaining information from the Father. Deputy Millan interviewed the father and another minor child sibling that was at the hospital with the Father. The determination was made to contact CID. Detective I. Pinkston # 1312 made contact with myself via Cell Phone. The determination was made that CID would interview the child and the father tomorrow. A General Offense Incident Report was generated by Deputy Millan. UF Health North ER had already contacted DCF and provided the Name of the Operator and ID number to Deputy Millan.

I documented the injuries to the child with my agency issued camera. I took 14 photographs of the child and his injuries with the child's Father in ER room # 28 during the photographs.

The photographs were downloaded onto disk and placed into Evidence at the NCSO Secure Evidence Facility.

I had no further investigative involvement in this case at this time.

Case pending.

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| 495 HAGAN | 4/11/2024 | TURMAN, BRANDY N 04/30/2024 |

Exhibit U

# Incident Report

**Print Date/Time:** 10/03/2025 10:35
**Login ID:** ca1664

Nassau County Sheriff's Office
**ORI Number:** FL0450000

**Incident:** **2024-00040310**

| | | | |
|---|---|---|---|
| **Incident Date/Time:** | 4/12/2024 11:25:04 AM | **Incident Type:** | S67 - Child/Adult/Abuse/Neglect |
| **Location:** | Privacy Information | **Venue:** | HILLIARD |
| **Phone Number:** | | **Source:** | 911 |
| **Report Required:** | No | **Priority:** | High |
| **Prior Hazards:** | No | **Status:** | In Progress |
| **LE Case Number:** | | **Nature of Call:** | |

Unit/Personnel

| Unit | Personnel |
|---|---|
| A901 | 1507-SILVA |

Person(s)

| No. | Role | Name | Address | Phone | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| 1 | Caller | Privacy Information | | | | | |

Vehicle(s)

| Role | Type | Year | Make | Model | Color | License | State |
|---|---|---|---|---|---|---|---|

Disposition(s)

| Disposition | Count | Date/Time |
|---|---|---|

**Unit: A901**

| Disposition | Count | Date/Time |
|---|---|---|
| K | 1 | 04/12/2024 12:52 |

Property

| Date | Code | Type | Make | Model | Description | Tag No. | Item No. |
|---|---|---|---|---|---|---|---|

**CAD Narrative**

**04/12/2024 : 11:48:15 williams577 Narrative: 1012 DCF**
**04/12/2024 : 11:27:08 williams577 Narrative: REQUESTING LEO**
**04/12/2024 : 11:27:01 williams577 Narrative: DFS S67**
**04/12/2024 : 11:26:40 williams577 Narrative: 1052 12 MIN**
**04/12/2024 : 11:26:19 williams577 Narrative: [redacted] HAD MARKS ON HIS BODY**
**04/12/2024 : 11:26:00 williams577 Narrative: BLUE DODGE AVENGER**