In The United States District Court
For The Middle District Of Florida
Jacksonville Division

Dustin DuFault,

Plaintiff, CASE NO. 3:25-cv-683-MMH-MCR

V.

Sheriff Bill Leeper, In His Official Capacity
as Sheriff of Nassau County;
Director John Anstett, In His Individual Capacity;
Director Robert "Bobby" Lippelman, In His Individual Capacity;
Sergeant Kellam Paolillo, In His Individual Capacity; And
Detective Ivan Pinkston, In His Individual Capacity;

Defendants.

# THIRD AMENDED COMPLAINT FOR VIOLATIONS OF 42 U.S.C. § 1983 [PROPOSED – ATTACHED TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND]

## INTRODUCTION

1. Plaintiff brings this action under 42 U.S.C. § 1983 against Sheriff Bill Leeper in his official capacity and against four officials of the Nassau County Sheriff's Office ("NCSO") in their individual capacities. Plaintiff claims no constitutional entitlement to compel an arrest, a prosecution, a trespass warning, or any particular investigation. He alleges that NCSO officials intentionally

administered their enforcement authority differently—without rational basis—whenever one favored individual, Ms. Erin Schreiber, was implicated, in violation of the Equal Protection Clause of the Fourteenth Amendment. See Village of Willowbrook v. Olech, 528 U.S. 562 (2000).

2. Ms. Schreiber is a Nassau County School Board employee and the mother of Plaintiff's three minor children. This action does not arise from, and seeks no relief concerning, custody or family-court matters; Ms. Schreiber's identity is relevant only because each episode pleaded below shares one feature: NCSO took affirmative steps to exempt her and her associates from the ordinary administration of law enforcement authority.

3. Plaintiff seeks damages, including nominal damages, from the individual Defendants, and declaratory and injunctive relief and damages against Sheriff Leeper in his official capacity under Monell v. Department of Social Services, 436 U.S. 658 (1978).

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3), as the claims arise under the Fourteenth Amendment and 42 U.S.C. § 1983.

5. Venue is proper under 28 U.S.C. § 1391(b)(2), as the events giving rise to the claims occurred in Nassau County, within the Middle District of Florida.

**PARTIES**

6. Plaintiff Dustin DuFault is an adult resident of Nassau County, Florida, and the father of three minor children, identified herein by initials pursuant to Fed. R. Civ. P. 5.2: L.C.D., S.C.D., and S.M.D.

7. Defendant Bill Leeper is the elected Sheriff of Nassau County, Florida, sued in his official capacity as the final policymaker for NCSO's law-enforcement policies, practices, and training.

8. Defendant John Anstett is NCSO's Director of Law Enforcement Operations, sued in his individual capacity. At all relevant times he acted under color of state law.

9. Defendant Robert "Bobby" Lippelman is NCSO's General Counsel and Director supervising the Legal Services, Government Affairs, and Records Divisions (Ex. O), sued in his individual capacity. At all relevant times he acted under color of state law.

10. Defendant Kellam Paolillo was at all relevant times a sergeant with NCSO, sued in his individual capacity. At all relevant times he acted under color of state law.

11. Defendant Ivan Pinkston is a detective assigned to NCSO's Criminal Investigations Division ("CID"), sued in his individual capacity. At all relevant times he acted under color of state law.

## FACTUAL ALLEGATIONS

### A. Background

12. Plaintiff and Ms. Schreiber share custody of the children under a parenting plan adopted in Nassau County Circuit Court. The plan designates exchange locations—"at school when in session and at the Father's residence when not in session"—but grants neither parent any right of entry to the other's residence outside designated exchanges. Ex. A.

13. Throughout the relevant period Plaintiff resided at Eastwood Oaks Apartments, a private apartment complex in Hilliard, Florida.

### B. The Trespass Warning: Issuance, Rescission, and Ratification

14. On multiple occasions in 2023 and 2024, outside designated exchange periods, Ms. Schreiber came to Plaintiff's apartment, banged on the door, screamed, and on at least one occasion—after being told through the door to leave—manipulated the knob of the closed door and opened it, frightening Plaintiff and the children and requiring police response.

15. On each such occasion Plaintiff asked responding deputies to issue a trespass warning. Each time, Ms. Schreiber told the deputies she "could not be trespassed" because the parenting plan designated pickups at Plaintiff's home. Without reviewing the plan, the deputies accepted her characterization and declined.

16. On June 11, 2024, following a dinner visit, Ms. Schreiber demanded to return the next morning—outside any designated exchange—to take L.C.D. to an appointment that L.C.D.'s providers had converted to telehealth. Plaintiff told her not to return.

17. On June 12, 2024, Ms. Schreiber returned anyway, banging on the door and screaming while the children hid. Plaintiff messaged her asking her to leave (Ex. P), then called NCSO. Deputies asked her to leave, and she did so; however, within five minutes of the deputies' departure she returned, prompting Plaintiff to call NCSO again for assistance.

18. On the second June 12 response, without any prompting by Plaintiff, the deputies spoke with Eastwood Oaks management, which reported multiple complaints about Ms. Schreiber and asked that she be trespassed from the property. Management supplied a signed letter confirming that "East Wood Oaks Apartments is wanting and willing to criminally trespass Erin Schreiber from the property." Ex. B.

19. Florida law authorizes exactly this: an owner or authorized person may warn a person off the property, and a law enforcement officer whose department has received the owner's written authorization is an "authorized person" who may communicate the warning. Fla. Stat. §§ 810.08(1), (3); 810.09(1), (3). NCSO's own procedure documents such warnings in its New World records system upon a warning given by "[t]he proprietor or someone in an authoritative position," acknowledged by the property owner or designee. Ex. R.

20. On the morning of June 17, 2024—when Ms. Schreiber again came to the complex—NCSO Deputies Sellers and McClendon issued a written trespass warning to Ms. Schreiber on behalf of Eastwood Oaks, covering "all buildings and parking lot . . . [p]er Eastwood Oaks Apartments management" for one year, and warned her she would be arrested if she returned. Ex. B. Plaintiff received a copy.

21. Within approximately ninety minutes, Ms. Schreiber telephoned NCSO, stating she did not "want to complain" but "just wants to understand what's

goin[g] on." Defendant Paolillo responded to her call. At 12:09 p.m., NCSO's contemporaneous record states: "The s42 [trespass warning] has been picked up and voided," entered by Paolillo. Ex. C.

22. On information and belief, Eastwood Oaks did not request rescission, never withdrew its written authorization, and continued to want Ms. Schreiber excluded from the property.

23. An NCSO deputy then came to Plaintiff's home and asked Plaintiff to surrender his copy of the warning. Plaintiff declined.

24. That afternoon, Paolillo told Plaintiff by phone that the warning "will not be issued due to the Court Order in place and after consulting with the NCSO Legal Counsel," as memorialized in Paolillo's own call-for-service record. Ex. C. Defendant Lippelman is NCSO's General Counsel. Ex. O.

25. NCSO's refusals abridged two distinct statutory positions. First, as the resident occupant Plaintiff himself repeatedly requested trespass warnings that Florida law authorizes; a private parenting plan is not a defense to criminal trespass and does not abridge statutory trespass authority, and NCSO policy required responding deputies to distinguish the criminal matter within their authority from any related civil dispute rather than treating the civil agreement as dispositive. Ex. T. Second, the June 17 warning rested on the independent written

authorization of a third-party property holder—authorization Ms. Schreiber's objection could not revoke.

26. The parenting plan is not an order granting Ms. Schreiber at-will access to Eastwood Oaks; it designates an exchange location. Ex. A. An exchange provision could at most justify a narrow accommodation—access at exchange times, or an alternate exchange location, which Plaintiff had already proposed in writing before the warning issued. It could not justify the categorically broader action taken: same-day nullification of a third party's written exclusion authorization at the request of the person warned; continued refusal to honor that authorization though Eastwood Oaks never withdrew it; and NCSO's later assertion that records of the warning "do not exist." Ex. S.

27. Plaintiff emailed Sheriff Leeper the same day describing the rescission and its lack of legal basis. Ex. D. Sheriff Leeper did not respond and took no corrective action.

28. On June 13, 2025, Plaintiff wrote to Defendant Lippelman demanding reinstatement of the warning and a written statement of NCSO policy. Ex. E. Lippelman did not respond. Instead, on June 16, 2025, Defendant Anstett called Plaintiff on Lippelman's behalf and confirmed that NCSO would not enforce trespass laws in Ms. Schreiber's circumstances because of the parenting plan—regardless of the plan's provisions or the independent property rights of third

parties—and declined to state that position in writing "unless something changes." Plaintiff memorialized the call in writing to Lippelman the same day and received no correction. Ex. E. Plaintiff's June 13, 2025 letter had expressly advised Lippelman that continued refusal to enforce would result in a federal civil-rights action; the refusal continued anyway.

29. NCSO policy directs deputies handling complaints with civil components to distinguish the criminal matters within law-enforcement authority from civil disputes, and forbids using the deputy's position to influence civil matters. Ex. T. Defendants instead treated a civil agreement between two parents as extinguishing a third-party property holder's statutory exclusion authority.

30. Plaintiff later requested the RMS trespass record and its audit trail through public records requests. NCSO responded that no responsive record exists. Ex. S. On information and belief, NCSO's ordinary practice is to maintain trespass warnings and their audit records in its New World system (Ex. R) and not to void a validly authorized warning at the request of the person warned absent withdrawal by the property holder.

31. On information and belief, NCSO issues and honors trespass warnings requested by property owners and managers in the ordinary course—the administration of such warnings turns on a single objective criterion, the property holder's authorization (Exs. B, R; Fla. Stat. § 810.09(3))—and NCSO's records of

comparable warnings and their treatment are in NCSO's exclusive possession. Plaintiff and Eastwood Oaks received the opposite treatment for one reason: the person warned was Ms. Schreiber.

**C. The Investigation of the Abuse of S.C.D.**

32. On April 11, 2024, when Plaintiff picked up the children and prepared to take them swimming, he discovered extensive bruising across S.C.D.'s back and both arms, including handprint-pattern bruising. The children described an altercation involving Ms. Schreiber and her paramour, Richard "Noah" Raulerson, also a Nassau County School Board employee. Plaintiff took S.C.D. to the hospital, where staff coded the presentation as child abuse and reported to the Department of Children and Families ("DCF") and NCSO.

33. NCSO Deputy Millan and CSU Detective Hagan responded to the hospital. Hagan took fourteen photographs of S.C.D.'s injuries, which were placed into evidence. Ex. G. Millan interviewed Plaintiff and L.C.D., who described Ms. Schreiber carrying S.C.D. to his room, "Noah" entering, and sounds of a physical altercation. Exs. M, U. Defendant Pinkston was notified that night; the deputies' reports record that CID "would interview the child and the father tomorrow." Ex. U.

34. Pinkston never conducted those interviews. He did not respond to the hospital, and at no time did he interview S.C.D., Plaintiff, L.C.D., or any other household witness.

35. On April 12, 2024, DCF investigators interviewed Plaintiff and the children at Plaintiff's home while NCSO Deputy Silva recorded body-worn camera interviews of the children—and recorded Plaintiff's contemporaneous cellphone video of S.C.D.'s outcry, made upon Plaintiff's discovery of the bruising—and stated he would forward the recordings to Pinkston as evidence for the investigation. The same day, S.C.D. was forensically interviewed at the First Coast Child Protection Team ("CPT"), where he "confirmed the mother's paramour grabbed him and slammed him to the wall for fighting with his sister," and the initial medical impressions were "physical abuse" against S.C.D. and "failure to protect" against Ms. Schreiber. Ex. H.

36. Pinkston received the CPT report on April 26, 2024—the day the DCF safety plan lapsed. On April 29, 2024, he conducted a single recorded interview of Raulerson, approximately nine minutes long, at Raulerson's school workplace. Raulerson denied striking S.C.D. and described restraining him. Ex. M.

37. Pinkston then closed the case as "unfounded." His investigative summary credits Raulerson's account, quotes the parental-discipline instruction from the Florida Standard Jury Instructions, and concludes that "[t]he

circumstances (striking multiple people) warranted a physical response from Raulerson." Ex. M. Raulerson is not the children's parent, did not reside with them, and on information and belief provided nothing toward their care—facts material to the in loco parentis predicate of the discipline defense that Pinkston's summary does not address. Exs. M, N.

38. Pinkston's summary reflects no effort to obtain or review NCSO's own body-worn camera recordings of the victim's and witnesses' statements, no interview of the victim or any household witness, and no reconciliation of Raulerson's account with the victim's CPT account, the sibling's statement, the handprint-pattern bruising, or the medical coding. Exs. H, M, U.

39. Under the State of Florida General Records Schedule GS2 for criminal justice agencies, records of a child-abuse investigation—including recordings that are part of the investigation—must be retained for years beyond the child's majority. Exs. J–L (GS2 Item #200). The body-worn camera recordings of the victim's and witnesses' statements were nevertheless not associated with the investigation or preserved, and NCSO has produced no audit trail for their disposition despite Plaintiff's requests. Exs. I, K, L.

**D. Comparator Investigations**

40. Detective Pinkston's handling of a materially indistinguishable report nine months later demonstrates his ordinary practice. In January 2025, Pinkston investigated a report of child abuse arising from bruising to a young child's buttocks where the caretaker claimed the child fell and then admitted spanking the child for defiance (NCSO CCR 2025-00002162; State v. Moore, No. 25-CF-38, Fourth Judicial Circuit, Nassau County; State Attorney No. 25AF002207). Ex. V (Pinkston's sworn arrest-warrant affidavit).

41. In the Moore investigation, by his own sworn account, Pinkston: (a) responded in person to the hospital the day after the report; (b) met with the CPT director and reviewed photographs of the injuries; (c) sat in on the CPT's recorded interview of a household witness; (d) followed up with the CPT and reviewed the CPT examiner's Initial Medical Impression finding "physical abuse"; (e) summoned the suspect to NCSO and conducted a recorded interview after Miranda warnings; and (f) sought an arrest warrant for child abuse, Fla. Stat. § 827.03, within approximately three days of the report. Ex. V.

42. In Moore, Pinkston rejected the same parental-discipline defense he credited for Raulerson, swearing that "[b]ased on the extent of the injuries suffered by the victim, the force used was greater than mere reasonable physical discipline for misbehavior based on these surrounding circumstances." Ex. V. In Moore the accused was the child's caretaker with a colorable in loco parentis role; Raulerson

was a non-parent who did not live with the children. In Moore the CPT was unable to interview the victim, yet Pinkston fully investigated; in S.C.D.'s case the CPT interviewed the victim, who described being grabbed and slammed into a wall, and Pinkston closed the case without ever speaking to him.

43. The two reports were prima facie identical in every respect material to an objectively reasonable investigator at intake: a hospital- or CPT-referred report of significant bruising to a young child; a CPT initial medical impression of physical abuse; an adult caretaker-figure invoking discipline or accident; and the same statute, agency, division, and investigator. The difference was in what followed: in Moore, an investigation; for S.C.D.—whose alleged abuser was Ms. Schreiber's paramour and fellow school-board employee—none of the steps Pinkston himself swears are his practice.

44. NCSO's ordinary practice in child-abuse investigations conducted by other personnel matches Pinkston's practice in Moore, not his treatment of S.C.D. In June 2023, CSU Detective P.W. Hagan—the same detective who photographed S.C.D.'s injuries—swore an arrest-warrant affidavit for child abuse based on significant welts and bruising to a child's buttocks from a belt spanking, in an explicit discipline context, after NCSO interviewed the complainant and child witnesses and documented the injuries (State v. Bell, No. 23-CF-572; NCSO CCR 2023-0053710). Ex. W.

45. In a February 2025 NCSO child-abuse investigation, the juvenile victim was interviewed three times—by DCF initially, by the CPT forensically, and by NCSO CID detectives—reflecting NCSO's ordinary practice of conducting its own victim interview notwithstanding DCF and CPT involvement (State v. Brown, No. 25-CF-531). Ex. X.

46. Records obtained from the Office of the State Attorney for the Fourth Judicial Circuit reflect dozens of NCSO child-abuse investigations from 2023 through 2026—identified by case number in Plaintiff's possession—in which NCSO personnel responded to the report, interviewed victims and witnesses, documented and preserved evidence, and referred charges. Those records necessarily reflect investigations referred for prosecution; records of NCSO investigations that were not referred remain in NCSO's exclusive possession despite Plaintiff's requests. Among the records available to Plaintiff, none reflects an investigation handled as S.C.D.'s was—no victim or witness interview, none of the agency's own recorded witness evidence obtained, and a contested discipline defense resolved on the accused's account alone.

**E. The School-Records Report**

47. The pattern extends beyond the abuse investigation. In 2023 through 2025, Plaintiff documented repeated discrepancies in his children's school

attendance records coinciding with Ms. Schreiber's removal of the children from school, including an occasion on which L.C.D.'s sworn court testimony that she did not attend classes was contradicted by an attendance record marking her present in every class. The school district's assistant superintendent confirmed in writing that all student check-outs and check-ins should be recorded. Ex. F.

48. In June 2025, Plaintiff brought his documentation to NCSO and requested investigation of potential records falsification under Fla. Stat. § 839.13. The reviewing deputy acknowledged the discrepancies but declined to refer the matter to a detective, remarking on his own schooling in Hilliard and questioning whether Plaintiff sincerely wished to pursue school personnel. Ex. F.

49. NCSO investigates records falsification when school-board personnel are not implicated: on July 7, 2025, NCSO arrested its own sergeant—Defendant Paolillo—on allegations involving falsification of records. The refusal to examine documented evidence of attendance-record falsification implicating school-board employees, against that practice, is part of the pattern of selective administration alleged here; Plaintiff does not assert an independent claim against the reviewing deputy.

**F. Records Treatment by Defendant Lippelman**

50. Defendant Lippelman supervises NCSO's Records Division and serves as its General Counsel. Ex. O. Plaintiff directed written communications to Lippelman personally: the June 13, 2025 demand concerning the trespass warning, a memorialization of the Anstett call, litigation-hold requests (Ex. E), and a February 2026 litigation-hold request concerning the body-worn camera footage of a then-pending records request, described below. Lippelman never responded to any of them.

51. During the same period, Lippelman personally communicated with Ms. Schreiber by email and telephone on multiple occasions, including in the summer of 2024 around the trespass rescission and in November 2024, when he personally assisted her with her public records requests, which were fulfilled promptly.

52. Plaintiff's own public records requests to the division Lippelman supervises—concerning the trespass record and audit trail, the body-worn camera recordings and their disposition logs, and the abuse-investigation file—were met with non-production, unexplained assertions that records "do not exist," and blanket redactions without the particularized statutory citations required by Fla. Stat. § 119.07. Exs. I, Q, S.

**G. The Common Direction of the Departures**

53. Intentional unequal administration may be shown by the sequence of events and departures from ordinary practice. Each episode pleaded above departed from NCSO's documented ordinary practice—issuance and maintenance of owner-authorized trespass warnings (Exs. B, R); child-abuse investigation of the kind Pinkston, Hagan, and CID otherwise conduct (Exs. V–X); investigation of records falsification (Paolillo's own arrest); and ordinary records production—and every departure ran in the same direction: in favor of Ms. Schreiber and her associates and against Plaintiff. The departures span NCSO's separate functions—patrol response, criminal investigation, records, legal counsel, and command—and no episode ran the other way.

54. The contemporaneous records tie the departures to identified actors: Paolillo voided the warning within hours of Ms. Schreiber's call (Ex. C); Paolillo attributed the decision to consultation with "NCSO Legal Counsel"—Lippelman (Exs. C, O); Anstett confirmed the non-enforcement position on Lippelman's behalf and refused to put it in writing (Ex. E); and Pinkston entered the "unfounded" disposition without investigation (Ex. M).

55. The pattern has continued since this action was filed. On February 5, 2026, when Plaintiff went to his children's school to pick them up for his timesharing under the parenting plan, the children were not made available to him. NCSO Deputy Ralph Revels was present, investigated the children's location,

and recorded at least part of the interaction on his body-worn camera (NCSO incident 26-11136). The next day, February 6, Plaintiff submitted a public records request for the incident report and the body-worn camera footage (PRR-2026-1044). On February 9, 2026, Plaintiff emailed Defendant Lippelman requesting a litigation hold on the footage; Lippelman did not respond. NCSO produced the incident report but not the footage, initially without any explanation.

56. NCSO later explained—in an internal February 18, 2026 email on which Defendant Lippelman was copied, produced to Plaintiff only after a follow-up request—that the camera's date had reset to a 2020 factory date and that, because videos automatically purge ninety days from the recorded date, the footage "would have been immediately deleted upon reaching the server" after the device "recalibrated on 2/7"—that is, on NCSO's own account, the footage was destroyed while Plaintiff's records request for it was pending. That explanation attributes the reset to a completely dead battery; the device audit log NCSO itself produced records the device powering off at 55% battery "by Power SW Off." NCSO's productions further show that Deputy Revels successfully uploaded footage from a different body-worn camera two days before the incident, and the wrong-date audit log pertains to a different device unit; the device-assignment logs Plaintiff requested to reconcile that discrepancy (PRR-2026-2443) have not been produced. On information and belief, this is at least the third instance in which NCSO

recorded evidence bearing on events involving Ms. Schreiber has become unavailable.

**H. Policy, Custom, and Ratification**

57. Sheriff Leeper is the final policymaker for NCSO. He was personally notified of the trespass rescission on June 17, 2024 (Ex. D) and took no corrective action; more than a year later, his director-level subordinates—Anstett and Lippelman—were still articulating and enforcing the same position (Ex. E). The persistence of one position, across NCSO's separate functions and across years, after direct notice to the Sheriff, supports the existence of a custom having the force of law. The treatment pleaded above was not the isolated act of a line deputy: it was implemented by a sergeant, ratified by the General Counsel and the Director of Law Enforcement Operations, communicated as agency policy, and left uncorrected by the Sheriff after direct notice.

58. NCSO's custom and policy of selectively administering enforcement authority in favor of Ms. Schreiber and her associates was the moving force behind each deprivation pleaded in Counts I through IV: but for that custom, the Eastwood Oaks warning would have been administered as NCSO administers other owner-authorized warnings, and the report of abuse of S.C.D. would have

been investigated as NCSO investigates other such reports, including by Pinkston himself. Exs. V–X.

59. The harms are ongoing. The rescinded warning and the policy confirmed by Anstett leave Ms. Schreiber free to return to Plaintiff's home; the "unfounded" disposition, entered without investigation, has been used against Plaintiff in other proceedings and leaves his children unprotected; and NCSO's own recorded witness evidence has been lost.

**I. Harms**

60. As a direct and proximate result of the conduct pleaded above, Plaintiff has suffered deprivation of equal protection of the laws; loss of the protection of a validly issued trespass warning and continued fear and disturbance at his home; the loss of NCSO's contemporaneous recorded evidence of his children's statements; reputational and practical harm from an "unfounded" disposition entered without investigation; emotional distress; and out-of-pocket losses, in amounts to be proven at trial. A violation of Plaintiff's constitutional rights entitles him to nominal damages even absent proof of compensable injury.

61. The individual Defendants' conduct was intentional and undertaken with reckless or callous indifference to Plaintiff's federally protected rights, supporting punitive damages.

## CLAIMS FOR RELIEF

### COUNT I – 42 U.S.C. § 1983: DENIAL OF EQUAL PROTECTION (CLASS OF ONE) – DEFENDANT PAOLILLO

62. Plaintiff realleges and incorporates ¶¶ 1–11 (jurisdiction and parties), 12–13 (background), 14–31 (the trespass episode), and 60–61 (harms).

63. Defendant Paolillo, acting under color of state law, intentionally treated Plaintiff and the Eastwood Oaks warning differently from similarly situated persons and warnings: NCSO administers owner-authorized trespass warnings according to the property holder's authorization in the ordinary course, and Paolillo voided this validly issued warning the same morning, at the request of the person warned, without withdrawal by the property holder.

64. No rational basis supported the difference in treatment. The parenting plan designates an exchange location; it is not an order granting access, could at most have justified a narrow exchange-time accommodation, and could not

rationally justify wholesale nullification of a third party's written authorization, continued non-enforcement, and the later assertion that no records exist.

65. Paolillo's treatment of Plaintiff was motivated by favoritism toward Ms. Schreiber—reasons personal in nature and unrelated to the duties of his position.

66. As a direct and proximate result, Plaintiff suffered the harms described in ¶¶ 60–61, and is entitled to compensatory, nominal, and punitive damages.

**COUNT II — 42 U.S.C. § 1983: DENIAL OF EQUAL PROTECTION (CLASS OF ONE) — DEFENDANT ANSTETT**

67. Plaintiff realleges and incorporates ¶¶ 1–11, 12–13, 14–31, and 60–61.

68. Defendant Anstett, acting under color of state law, confirmed, adopted, and enforced the differential treatment as NCSO policy: he told Plaintiff NCSO would not enforce trespass law in Ms. Schreiber's circumstances because of the parenting plan, regardless of the plan's provisions or the property rights of third parties, refused to reduce the position to writing, and thereby denied Plaintiff and the property holder the ordinary administration of trespass authority that NCSO affords others.

69. No rational basis supported the difference in treatment, for the reasons pleaded in paragraphs 25–30.

70. As a direct and proximate result, Plaintiff suffered the harms described in ¶¶ 60–61, and is entitled to compensatory, nominal, and punitive damages.

**COUNT III – 42 U.S.C. § 1983: DENIAL OF EQUAL PROTECTION (CLASS OF ONE) – DEFENDANT LIPPELMAN**

71. Plaintiff realleges and incorporates ¶¶ 1–11, 12–13, 14–31, 50–52 (records treatment), and 60–61.

72. Defendant Lippelman, acting under color of state law, personally participated in the differential treatment: as the "NCSO Legal Counsel" whose consultation Paolillo's contemporaneous record identifies as the basis for voiding the warning, he supplied or approved the rationale for nullifying the property holder's authorization; and in his personal handling of constituent communications he assisted Ms. Schreiber's records requests while ignoring Plaintiff's communications, demands, and litigation-hold requests directed to him personally.

73. No rational basis supported the difference in treatment, for the reasons pleaded in paragraphs 25–30, and no rational basis supported the disparity between his personal responsiveness to Ms. Schreiber and his personal non-responsiveness to Plaintiff on materially similar subject matter.

74. As a direct and proximate result, Plaintiff suffered the harms described in ¶¶ 60–61, and is entitled to compensatory, nominal, and punitive damages.

**COUNT IV — 42 U.S.C. § 1983: DENIAL OF EQUAL PROTECTION (CLASS OF ONE) — DEFENDANT PINKSTON**

75. Plaintiff realleges and incorporates ¶¶ 1–11, 32–39 (the abuse investigation), 40–46 (comparator investigations), and 60–61.

76. Defendant Pinkston, acting under color of state law, intentionally treated Plaintiff's report of the abuse of S.C.D. differently from prima facie identical reports, including a report Pinkston himself investigated (Ex. V) and reports investigated by the same division and personnel (Exs. W, X): he conducted none of the investigative steps reflected as his ordinary practice in his own sworn affidavit (Ex. V), obtained none of NCSO's own recorded witness evidence, never interviewed the victim or any witness, and resolved a contested discipline defense—whose in loco parentis predicate the accused lacked—in the accused's favor on the accused's account alone.

77. No rational basis supported the difference in treatment. Deference to DCF cannot explain it: NCSO's practice includes its own victim interviews notwithstanding DCF and CPT involvement (Ex. X), the CPT's impressions here

supported abuse (Ex. H), and Pinkston fully investigated the Moore report although the CPT there could not interview the victim (Ex. V). The discipline defense cannot explain it: Pinkston rejected that defense on lesser facts in Moore (Ex. V), and the accused here lacked the in loco parentis predicate for the defense Pinkston applied.

78. Pinkston's treatment of Plaintiff's report was motivated by favoritism toward Ms. Schreiber and her associates—reasons personal in nature and unrelated to the duties of his position.

79. As a direct and proximate result, Plaintiff suffered the harms described in ¶¶ 60–61, and is entitled to compensatory, nominal, and punitive damages.

**COUNT V — 42 U.S.C. § 1983: MONELL LIABILITY — DEFENDANT LEEPER, IN HIS OFFICIAL CAPACITY**

80. Plaintiff realleges and incorporates ¶¶ 1–61.

81. The deprivations pleaded in Counts I through IV were caused by NCSO custom and policy: a practice of selective non-enforcement and selective investigation favoring Ms. Schreiber and her associates, implemented by a sergeant, ratified and articulated as policy by NCSO's General Counsel and its Director of Law Enforcement Operations, and left uncorrected by Sheriff Leeper—

the final policymaker—after direct personal notice of the trespass rescission (Ex. D). The custom's existence is further evidenced by the common direction of the departures across NCSO's patrol, investigative, records, legal, and command functions, and by its continuation into 2026, as pleaded in ¶¶ 53–56.

82. That custom and policy was the moving force behind the constitutional violations pleaded in Counts I through IV, and continues to expose Plaintiff to the same treatment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

a. enter judgment against Defendants Paolillo, Anstett, Lippelman, and Pinkston for compensatory damages in amounts proven at trial, nominal damages, and punitive damages;

b. enter judgment against Defendant Leeper in his official capacity for compensatory damages, and declare that the customs, policies, and practices described above violate the Equal Protection Clause of the Fourteenth Amendment;

c. permanently enjoin Defendant Leeper, in his official capacity, to administer trespass-warning and child-abuse-investigation authority without

regard to the identity of the favored person; to restore or re-process the rescinded warning consistent with the property holder's authorization; to reopen investigation 2024-40149 for handling consistent with NCSO's ordinary practice; and to preserve all records related to the matters pleaded; and

d. award costs and such other and further relief as is just.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

Dustin DuFault
Pro Se Plaintiff
37425 Cody Circle, Apt C12
Hilliard, FL 32046
410.982.9607
dustin@halcyonharbor.com
Date: September 04, 2026

## EXHIBIT INDEX

Exhibits A–U: as filed with the Second Amended Complaint (Doc. 15-1), in Rule 5.2-compliant redacted form

Exhibit V: Affidavit for Arrest Warrant, Det. I. Pinkston, State v. Moore, No. 25-CF-38 (NCSO CCR 2025-00002162) (redacted)

Exhibit W: Affidavit for Arrest Warrant, Det. P.W. Hagan, State v. Bell, No. 23-CF-572 (NCSO CCR 2023-0053710) (redacted)

Exhibit X: Arrest Affidavit, State v. Brown, No. 25-CF-531 (redacted)